**In re SRC HOLDING CORPORATION, a/k/a Miller & Schroeder, Inc. and its subsidiaries, Debtor.**

**Bremer Business Finance Corporation and Brian F. Leonard, Trustee, Plaintiffs,**

**v.**

**Dorsey & Whitney LLP, a Minnesota Limited Liability Partnership, Defendant.**

**and**

**McIntosh County Bank, et al., Plaintiffs,**

**v.**

**Dorsey & Whitney LLP, a Minnesota Limited Liability Partnership, Defendant.**

**Bankruptcy Nos. 02–40284 to 02–40286. Adversary Nos. 05–4051, 03–4291.**

United States Bankruptcy Court, D. Minnesota.

Aug. 28, 2006.

Paul L. Ratelle, Fabyanske, Westra, Hart & Thomson, P.A., Minneapolis, MN, for Bremer and Leonard in the Bremer case.

Richard G. Mark, Mark G. Schroeder, Jason R. Asmus, Briggs and Morgan, P.A., Minneapolis, MN, for Dorsey & Whitney.

Edward W. Gale, Thomas C. Atmore, Leonard, O'Brien, Spencer, Gale & Sayre, Ltd., Minneapolis, MN, for Leonard in the Leonard v. Dorsey case.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT WITH RESPECT TO NON–CORE PROCEEDINGS AS TO WHICH THE PARTIES HAVE CONSENTED TO THE ENTRY OF JUDGMENT AND REPORT AND RECOMMENDATION WITH RESPECT TO NON–CORE PROCEEDINGS AS TO WHICH THE PARTIES HAVE NOT CONSENTED TO ENTRY OF JUDGMENT

NANCY C. DREHER, Bankruptcy Judge.

INTRODUCTION .................................................................114

FINDINGS OF FACT .............................................................115

 I. THE PARTIES.............................................................115
 A. Miller & Schroeder and Marshall ..................................115
 B. Dorsey & Whitney ..................................................116
 C. Bremer..............................................................117
 D. President R.C.-St. Regis Management Company .......................117
 E. The St. Regis Mohawk Tribe ........................................118

 II. THE STATE OF NEW YORK COMPACT ......................................118

 III. THE MANAGEMENT AGREEMENT .........................................118

 IV. THE ENGAGEMENT LETTER .............................................119

 V. THE NOTICE AND ACKNOWLEDGEMENT OF PLEDGE ........................120

 VI. THE REQUEST FOR NIGC APPROVAL ....................................122

 VII. THE AMENDMENT TO THE MANAGEMENT AGREEMENT AND THE TRIBAL
 RESOLUTION ..........................................................125

 VIII. NIGC DELAY .........................................................126

 IX. ST. REGIS II ..........................................................127

 X. THE RUN-UP TO CLOSING ...............................................128

 XI. MILLER & SCHROEDER'S MARKETING AND BREMER'S PURCHASE OF A
 PARTICIPATION INTEREST ..............................................133

 XII. THE PARTICIPATION AGREEMENT .......................................136

 XIII. POST-CLOSING EVENTS................................................140

 XIV. THE PRESIDENT LITIGATION ..........................................142

 XV. THE BREMER/MILLER & SCHROEDER LITIGATION.........................154

 XVI. THE EFFORTS TO COLLECT AGAINST THE TRIBE .........................161

CONCLUSIONS OF LAW .........................................................164

 I. JURISDICTION/CORE-NON CORE..........................................164
 A. Jurisdiction of Counts I, II and III in the Bremer Case: Core—
 Non–Core ..........................................................164
 B. Jurisdiction of Count IV in the Bremer Case and Count IV in the
 Miller & Schroeder Case; Core—Non–Core ..........................165

 II. BREMER'S MALPRACTICE CLAIMS IN THE BREMER CASE ...................166
 A. Res Judicata and Collateral Estoppel................................166
 B. Standing............................................................168
 1. Direct Attorney–Client Relationship ...........................168
 2. Third–Party Beneficiary .......................................170
 C. Negligence..........................................................173

D. Causation ................................................178
E. Damages ................................................180

III. THE TRUSTEE'S CLAIM IN CASE NUMBER 05–4015—INDEMNITY AND
 CONTRIBUTION............................................182

IV. THE TRUSTEE'S AND MARSHALL'S CLAIMS IN CASE NUMBER 03–4291 ..........182
 A. MRPC 1.7(a) ..........................................183
 B. MRPC 1.7(b) and 1.4 ..................................185
 C. Waiver ...............................................188
 D. Dorsey Breached its Fiduciary Duties of Loyalty and Full Disclosure ...................................................189
 E. Disgorgement .........................................189
 F. Marshall Investments' Claim—Breach of Fiduciary Duty .............191
 G. Judicial Estoppel ....................................191
 H. Prejudgment Interest .................................192

ORDER FOR JUDGMENT ...............................................193

The above-entitled matter came on for trial before the undersigned for seven days in February 2006, during which twenty witnesses (including seven experts) testified and hundreds of pages of documents were received in evidence. Appearances were as noted on the record.

## INTRODUCTION

In a nutshell, this is a story about what happens when a lawyer makes a mistake, learns he has done so, and then, without disclosing the problem to the client, tries to repair the problem on his own. It is also a story about how lawyers get into trouble when they fail to squarely address the issue of conflicted representation. In 1999, attorneys at the defendant law firm made a $12 million mistake in connection with documenting a major business transaction. The mistake first surfaced over a year later, at which time, instead of disclosing to the clients that there was a good possibility that the firm had committed malpractice, the firm urged that it be retained by the clients in major litigation arising out of that very business transaction. In the end, the law firm's attempted malpractice claims repair in that litigation only patched part of the problem and the clients were still out approximately $8 million.

This case is about one of the clients who wants approximately $1.5 million in damages for the money it invested in the transaction and has not yet retrieved, along with $400,000 that it incurred in another piece of litigation arising out of the transaction. Further, it is about the bankruptcy trustee who wants the law firm to disgorge the nearly $1 million in attorney's fees one of the clients (now the bankrupt debtor) paid to the law firm to pursue and defend litigation that, by reason of the law firm's failure to disclose its error, should never have happened.

The facts in this case are complex, but the lesson is simple. Know your client and if you make a mistake, and you know or should know that you have done so, be honest with that client. Otherwise you may find yourself in court in the embarrassing position of trying to explain to a judge why your clients were not really your clients and why you should be allowed to shed fiduciary duties attendant in all attorney-client relationships.

These are two consolidated adversary proceedings commenced in the chapter 7 bankruptcy case of SRC Holding Corpora-

tion, a/k/a Miller & Schroeder, Inc., and its subsidiaries ("Miller & Schroeder").

In Case No. 05–4051 ("the Bremer case"), Bremer Business Finance Corporation ("Bremer") has sued Dorsey & Whitney, LLP ("Dorsey") for damages incurred by Bremer when it purchased a participation interest in a loan ("St. Regis II"). The St. Regis II loan was made to President R.C.-St. Regis Management Company ("President"), a developer and manager of the St. Regis Mohawk Tribe's ("Tribe") Indian gaming facilities. Bremer alleges that Dorsey was retained as legal counsel to the lender to prepare the loan documentation and to close the transaction. Bremer alleges that Dorsey negligently prepared the loan documents and failed to secure proper regulatory approval before closing the loan as a consequence of which Bremer has a legal malpractice claim. Bremer seeks return of its investment in the loan participation and associated damages. Brian F. Leonard, the Chapter 7 trustee in Miller & Schroeder's bankruptcy case ("trustee"), also sues Dorsey for contribution and indemnity for any sums the estate has to pay on the claims Bremer has filed in the bankruptcy case.

In Case No. 03–4291 ("the Miller & Schroeder case"),[1] the trustee asserts that Dorsey is liable to it for breach of fiduciary duties of loyalty and full disclosure, which occurred when Dorsey undertook to represent Miller & Schroeder and the loan participants in a collection action against President ("the President litigation") and then accepted representation of Miller & Schroeder when Bremer sued Miller & Schroeder in a second piece of litigation ("the Bremer/Miller & Schroeder litigation"). The trustee, and the estate's successor Marshall Investments Corporation ("Marshall"), seek to have Dorsey disgorge all attorney's fees and costs they paid to Dorsey to pursue the President litigation and to defend the Bremer/Miller & Schroeder litigation.

## FINDINGS OF FACT

### I. THE PARTIES

#### A. Miller & Schroeder and Marshall

Miller & Schroeder was a Minneapolis-based investment banking firm. One of its key lines of business was arranging, as placement agent, financing for Native American Indian tribes engaging in the gaming business. During the 1990s, this became big business because many tribes began to develop their own casino and gaming businesses on their reservations and needed money to fund the construction and operations of their new businesses. However, because of the highly regulated nature of Indian gaming and the difficulties tribal sovereignty created with regard to the collection of debt, the tribe's sources

---

**1.** By an Order dated January 10, 2005, I dismissed for lack of subject matter jurisdiction, 28 of the 31 bank plaintiffs in Adv. No. 03–4291. Subsequently, by an Order dated May 11, 2005, I permissibly abstained pursuant to 28 U.S.C. § 1334(c)(1) from hearing the claims of the remaining 3 participating banks. This left only Count IV, the claims by the trustee and Marshall, for resolution. The 31 participating bank plaintiffs then commenced a state court action against Dorsey. The state district court granted Dorsey's motion for summary judgment, dismissing the banks' claims with prejudice. The state court found that there was no genuine material fact issue with respect to standing; whether an attorney-client relationship existed between the banks and Dorsey; whether the banks were the intended beneficiaries of Dorsey's representation of Miller & Schroeder; and whether Dorsey had not acted with malice, fraud or committed any other intentional tort. *See McIntosh County Bank v. Dorsey & Whitney*, No. 27CV05–3024, slip op. at 13–15 (Minn.Dist.Ct. Jan. 17, 2006). Bremer was not a plaintiff in Adv. No. 03–4291 and it was not a party in the state court action.

of capital were somewhat limited. As a consequence, tribes tended to pay above-market interest rates for funds. Miller & Schroeder developed a successful business serving as placement agent for the tribes to find them sources of capital to construct their casinos and run their other operations. *See* Exhibit MMM.[2]

Miller & Schroeder had a well-developed mode of business operation. As placement agent for the borrower-Tribe, it packaged the deal, serving nominally as lender in these transactions until such time as the loan was closed. Prior to closing, it sold 100% of the loans to loan participants, usually small local banks. Later, it became the servicing agent on the loans for the participating banks. Miller & Schroeder thus had two sources of revenue: its placement fee from the borrower-Tribe and, after closing, servicing fees paid by the loan participants to administer the loans. Miller & Schroeder was not the true lender in these transactions, and it never acted as such.

Miller & Schroeder had its own in-house counsel, Mary Jo Brenden, who provided the representation Miller & Schroeder needed to conduct this business. In-house counsel and internal staff for Miller & Schroeder prepared the offering memoranda, participation agreements, and sales literature used to sell the participation interests. It turned to outside counsel to document the transactions and provide regulatory guidance to the loan participants.

Miller & Schroeder fell on hard times, having to do to some degree with the problems generated by the St. Regis loans. In the summer of 2001, Marshall purchased the loan syndication assets of Miller & Schroeder. On August 31, 2001, as part of this transaction, Marshall entered into a subservicing agreement with Miller & Schroeder on the St. Regis loans pursuant to which Miller & Schroeder appointed Marshall as its agent to service the loans under its participation agreements. Miller & Schroeder then changed its name to SRC Holding Corporation and filed for Chapter 7 bankruptcy relief on January 22, 2002. Brian F. Leonard was appointed Chapter 7 trustee.

## B. Dorsey & Whitney

Dorsey is a law firm of over 600 lawyers, with offices in Minneapolis, Washington, D.C., Seattle and elsewhere. During the 1990s, Dorsey formed an Indian Law Department. Over several years prior to the transactions which are in question here, Miller & Schroeder, as nominal lender, had retained Dorsey to prepare the loan documents with respect to dozens of transactions substantially identical to the St. Regis loans. Based on this experience, Dorsey knew that Miller & Schroeder was not in the business of lending and that it would sell all interests in the loans prior to closing. In this transaction, as in earlier ones, Dorsey knew that it was being retained as counsel for the lender, Miller & Schroeder was a nominal lender, the participating banks were the lenders, and the beneficiaries of Dorsey's legal work were the participating banks. Dorsey also knew that the Miller & Schroeder sales force advertised to potential participants that Miller & Schroeder had hired Dorsey as counsel for the lender.

The pattern was so routine that Dorsey and Miller & Schroeder did not enter into retention agreements and Dorsey billed its fees on a transactional basis. The fees

**2.** Plaintiffs exhibits are designated first by tab number, then by exhibit number, then by Bates stamp where appropriate. Defendant's exhibits are designated first by exhibit number, then by tab number, and then by Bates stamp where appropriate.

Dorsey charged for its work on the St. Regis loans were significantly more than lodestar. The market was thus paying above-standard billing rates for Dorsey's expertise in Indian gaming regulatory matters.

Mark Jarboe, Paula Rindels, Christopher Karns, and Virginia Boylan were all attorneys at Dorsey who worked on the St. Regis loans. Jarboe was a partner at the firm and the head of the Indian Law Department. He had worked in Indian gaming law for over 10 years and was considered the in-house expert on the subject. Paula Rindels, a partner in the business group, had worked as the scrivener on many Miller & Schroeder tribal loans. She had no expertise in tribal regulatory issues and no knowledge of National Indian Gaming Commission ("NIGC") regulations. She billed approximately 90% of the time on this transaction. Virginia Boylan was a partner in Dorsey's Washington, D.C. office. She headed the Washington Indian Gaming Group, essentially serving as Jarboe's Washington, D.C. counterpart. She had been a congressional staffer involved in writing the Indian Gaming Regulatory Act of 1988 ("IGRA"). Because of this background, she was often called upon by other Dorsey attorneys for her expertise in matters having to do with the NIGC and IGRA. Christopher Karns began his legal career at the Bureau of Indian Affairs ("BIA") and then he became an associate in Dorsey's Washington, D.C. office. By the time of these transactions he had 5 or so years of experience in Indian gaming law. While these four lawyers had all done work on many prior loans in Indian country, this loan was different and was treated by all of them as a "sui generis" transaction because it was to be made to the management company and not directly to the Tribe. None of them had ever been involved in such a transaction before.

John Thomas was a partner in the workout and litigation groups at Dorsey. Brian Palmer was a partner, and William Dombos was an associate, in the litigation group. Thomas, Palmer and Dombos were the Dorsey attorneys who represented Miller & Schroeder and the loan participants in the President litigation and Miller & Schroeder in the Bremer/Miller & Schroeder litigation. William Wemz was Dorsey's in-house ethics counselor and Thomas Tinkham was Dorsey's loss management partner.

## C. Bremer

Bremer is a regional bank based in St. Paul, Minnesota. Ernest ("Bud") Jensen, the Chief Credit Officer, had 20 years of experience in commercial banking and was responsible for working up the underwriting decision in this case. Bremer had done business with Miller & Schroeder on 5 or 6 earlier transactions involving participated loans. Bremer does not have in-house counsel. In no prior transaction with Miller & Schroeder had Bremer retained its own counsel. Instead, it had relied on counsel retained by Miller & Schroeder on the loan participants' behalf to properly document the transaction and secure regulatory approval.

## D. President R.C.-St. Regis Management Company

President was a New York general partnership, consisting of two general partners, formed as a single purpose entity to enter into the Management Agreement with the St. Regis Mohawk Tribe. Ivan Kaufman was the sole shareholder of the two general partners. Kaufman had been very successful as a businessman but this was his first venture into building or managing Indian gaming facilities. It proved to be a mistake on his part. His integrity in these transactions was later called into

question, but, initially, he and his companies looked to be strong and reliable businesses and upstanding entities.

### E. The St. Regis Mohawk Tribe

The St. Regis Mohawk Tribe is a Native American tribe and a sovereign nation. It has a reservation in Hogansburg, New York located on the Canadian border fairly close to Montreal. In the late 1990s it set about to build a casino on its reservation. It hired President to construct the facilities, furnish the funding and then manage the casino operations. As a sovereign nation the Tribe has immunity from any suit in federal or state courts. Many of its activities are regulated by the NIGC, the BIA, and state regulatory authorities. Doing business with tribal entities has special risks, which include the inability to sue, without consent, in state or federal courts. Contracting with Indian tribes, including the Mohawks, is not like entering into a normal commercial transaction. That is why boutique practices, like Dorsey's Indian Gaming Law Group, could so successfully develop this new line of legal business.

### II. THE STATE OF NEW YORK COMPACT

In 1993 the Tribe entered into a Compact with the State of New York pursuant to the IGRA. Tab 1, Exhibit 1. The Compact authorized the Tribe to conduct Class III gaming activities on tribal lands, subject to numerous restrictions. Indian gaming operations were to be conducted under the supervision of the Tribal Gaming Commission (set up by the Tribe) and the State Gaming Commission (The New York State Racing and Wagering Board). Section 10 of the Compact provided that:

> In accordance with Section 11(d)(9) of the Act, 25 U.S.C. § 2710(d)(9), the Chairman of the National Indian Gaming Commission shall be responsible for

the review and approval of any management contract for management of Tribal Gaming Operations conducted on the Reservation pursuant to this Compact in accordance with provisions of subsections (b), (c), (d), (f), (g), and (h) of Section 12 of the Act, 25 U.S.C. § 2711.

*Id.* at DW–P000710. The Compact also stated that the Tribe "shall not enter into any management contract … without the approval of the Chairman [of the NIGC] in accordance with the terms of the Act." *Id.* The Compact further required the Tribe to submit any contract relating to the management of its gaming operations to the New York State Racing and Wagering Board, which had authority to do background checks on all principals.

### III. THE MANAGEMENT AGREEMENT

On November 7, 1997, the Tribe and President entered into a Fourth Amended and Restated Management Agreement ("Management Agreement"). Tab 2, Exhibit 2. The NIGC formally approved the Management Agreement on December 26, 1997. Tab 4, Exhibit 4. In the Management Agreement, the Tribe retained President to construct a casino on a turn-key basis for a not-to-exceed cost of $20 million. In return, President was given the exclusive right to manage all gaming operations on all tribal lands for a term of 5 years. The Tribe agreed to pay President no more than 25% (and in no case more than 29.9%) of net revenues from casino operations as a management fee. The Tribe also committed to repay President the construction and development costs out of the Tribe's 75% share of net revenues of the casino.

Paragraph 9.2 of the Management Agreement required that, in compliance with 25 C.F.R. Part 537, "all persons having *a direct or indirect financial inter-*

*est"*[3] in the Management Agreement and "all persons having management responsibility" be screened by the state and federal regulatory authorities. Tab 2, Exhibit 2, D 00834 ¶ 9.2. NIGC, tribal, and state regulatory approval was also required for any changes in the operational control of the manager and any changes in any person with a *"financial interest in* or management responsibility for this Agreement, including without limitation any change in ownership of the MANAGER." *Id.* at D 00834–35 ¶ 9.3. Paragraph 10.7 of the Management Agreement provided that, if the Agreement was terminated for cause before the development costs were repaid in full, the Tribe remained responsible to repay the development costs from the Tribe's share of net revenues from all gaming operations on all of its land. *Id.* at D 00838. The Tribe further agreed, in Paragraph 10.8, to waive sovereign immunity with respect to disputes over the contract. *Id.* Paragraph 11.1 stated, "EFFECTIVE DATE. This Agreement shall be effective and binding as of the date of the approval of this Agreement by the Chairman of the Commission, as provided by 25 C.F.R. § 531.1(N). *The final approval of this Agreement shall be subject to the submission by MANAGER of financing acceptable to the Commission and MANAGER."* *Id.* at D 00840. Paragraph 11.4 provided that the Management Agreement could not be amended without the express written consent of the both President and the Tribe. *Id.*

IV. THE ENGAGEMENT LETTER

As construction proceeded, costs exceeded estimates, and President needed outside funding to complete the job. President contacted B & L Financial, Inc. to structure an anticipated $10 million loan which would provide the added funds to finish the casino. B & L approached Miller & Schroeder. On November 9, 1998, B & L, President, and Miller & Schroeder signed an engagement letter, which provided, *inter alia,* that: 1) Miller & Schroeder and B & L had a 90–day exclusive period in which to structure and place the loan; 2) Miller & Schroeder was to serve as a *placement agent* and B & L was to serve as structuring agent for the borrower, President; 3) Miller & Schroeder had no obligation to fund the loan until it had satisfactorily completed due diligence and had received signed commitments from loan participants for purchase of 100% of the loan; 4) Miller & Schroeder would receive a placement fee and B & L would receive a structuring fee payable at closing; 5) the loan would be senior to existing construction debt owed to President and repayment terms would parallel those in the Management Agreement; 6) the loan would not close until the parties received all necessary regulatory approvals; and 7) President would pay all expenses of the transaction, including attorney's fees. Tab 6, Exhibit 6. The loan would be secured by the Tribe's obligations under the Management Agreement to repay the development costs out of its share of net revenues *and its obligations to pay President management fees.* *Id.* at DW–B 025337. The engagement letter contemplated that the Tribe would provide an estoppel letter acknowledging and agreeing to all terms and conditions of the loan; the priority given to this new loan over the amounts previously advanced by President; and President's right to assign the pledged revenues to the new lender.

---

**3.** Emphases in these findings are not in the original unless otherwise noted. They are designed to be of assistance to the reader.

Steve Erickson (Miller & Schroeder's Vice President in charge of the Native American gaming group) retained Dorsey to represent the lenders in the transaction. Jarboe was given the engagement letter and he opened a new matter file. Since the identity of the loan participants could not be known until the loans were funded and the loans could not be funded until Dorsey finished its work, Dorsey opened the file in the name of Miller & Schroeder and all Dorsey's communications were with Miller & Schroeder.

Shortly thereafter Rindels began to prepare the loan documents using the engagement letter as a starting point. Erickson, Brenden, Rindels and Jarboe all knew and expected that Miller & Schroeder would be named as lender in the loan documents, but it was in fact only a nominal lender, and was Dorsey's nominal client.[4] Miller & Schroeder had its own in-house lawyer to protect its interests as a loan placement agent. They also knew that the as yet unidentified loan participants, on whose behalf Miller & Schroeder had retained Dorsey, were the actual lenders, clients and the beneficiaries of Dorsey's work. Dorsey knew that it must structure the transaction to protect the loan participants, not with respect to the financial soundness of the transaction, but with respect to preparing documentation that would assure the integrity of the collateral and the transaction, as well as the right to foreclose in case of default. The loan participants were the sole beneficiary of Dorsey's work in structuring the transaction with respect to the lender's right to repayment, security, default, collection, etc. and with respect to securing regulatory approval. Miller & Schroeder was merely to receive the loan placement fee from the Borrower (which would be paid out of the loan proceeds) and, following a successful closing, its fees for servicing the loans for participating banks. Dorsey and Miller & Schroeder knew that, upon closing, because Miller & Schroeder would have no money in the transaction, it would no longer be at risk if Dorsey failed to properly structure the transaction and/or obtain regulatory approval.

## V. THE NOTICE AND ACKNOWLEDGMENT OF PLEDGE

Rindels began to draft the key document which was, in essence, the lender's security agreement. In her first draft, entitled "Notice of Acknowledgment of *Assignment*," the Tribe acknowledged that President had *assigned* its interests with respect to repayment of the development costs to Miller & Schroeder and agreed to pay those sums directly to Miller & Schroeder, without set-off, recoupment or assertion of defenses. Tab 9, Exhibit 11. Counsel for President, Walter Horn, redrafted the document as a Notice and Acknowledgment of Pledge. Tab 9, Exhibit 12. Horn made this change, according to Plaintiff's expert, so as to mask or at least diffuse the fact that this was an assignment of an interest in a management agreement. Under NIGC regulations, the NIGC must approve any assignment of an interest in a management agreement. He also deleted the tribal

---

**4.** Jarboe and Rindels, as one might expect given the standing dispute, testified that Miller & Schroeder was the client. Both testified that they knew, however, that their work was being done to protect the loan participants' interests. Erickson testified that he thought Miller & Schroeder was the client, although both he and Brenden knew and acted as though the loan participants must be protected. Their subjective views cannot confine the analysis of whether an attorney-client relationship was created. Otherwise, a lawyer could always win on standing simply by testifying in his own self interest. As for Erickson, as an agent, he had no right to waive his principal's rights.

commitment to make direct payment to Miller & Schroeder, deleted the waiver of setoff and recoupment rights, and modified the warranties so that the Tribe merely acknowledged that President had pledged its rights to receive repayment from the Tribe and reaffirmed its commitment to repay the development costs even if the Management Agreement was terminated. Demonstrating that she knew she was representing the loan participants, Rindels refused to accede to several of his changes, including the request that the Tribe retain its rights to assert against the lender any defenses it might have against President.

Rindels finished and sent to Miller & Schroeder, early in January 1999, the final version of the Notice and Acknowledgment of Pledge. Tab 9, Exhibit 13. Therein the parties recited the Tribe's obligation to make a guaranteed monthly payment of $500,000 to repay President for its development costs; that the obligation survived any termination of the Management Agreement for cause until the development costs were paid in full; that Miller & Schroeder and President had agreed that Miller & Schroeder would be funding a portion of President's obligations to provide development costs; that, as security for repayment, President had pledged the repayment amounts to Miller & Schroeder, defined to be both its right to repayment of the development costs *and its right to receive management fees;* and that, in furtherance of that pledge, President desired to have the Tribe pay sums owed to President under the Management Agreement directly to Miller & Schroeder.

In the Notice and Acknowledgment of Pledge, the parties agreed that the loan was not an obligation of the Tribe (¶ 1) and the Tribe acknowledged the pledge by President of its interest in both the development costs *and the management fees* (¶ 2); the interest rate on the loans (¶ 3); that the obligation to repay development costs survived any termination of the Management Agreement; and, that Miller & Schroeder was lending in reliance on the Tribe's agreement to pay President (¶ 4). The Tribe agreed to pay all amounts owed to President into an escrow account established by President and Miller & Schroeder without any set-off or deduction notwithstanding any prior termination of the Management Agreement or any defense, set-off, counterclaim or recoupment rights it might have against President. (¶ 4) The Tribe also agreed that Miller & Schroeder had not assumed any duties of President under the Management Agreement (although it did not foreclose the lender from doing so) or made any warranties to the Tribe as to the Management Agreement (¶ 5), but it also agreed that, until Miller & Schroeder was paid in full, Miller & Schroeder would be entitled to the *"benefits of and to enforce the agreements of the Tribe under the Agreement relating to the payment of the Repayment Amounts to the same extent as"* President. (¶ 7) The Tribe further agreed that it would make no amendments to the Management Agreement relating to the repayment amounts without the consent of Miller & Schroeder. (¶ 5) The Tribe, President, and Miller & Schroeder also agreed that each could sue or be sued to enforce the terms of the Notice and Acknowledgment of Pledge or to enforce the obligations or rights of the parties in Federal District Court; the Tribe waived its right to insist on venue only in a Tribal Court; and the Tribe expressly waived sovereign immunity from suit to the extent necessary to allow President or *Miller & Schroeder* to bring suit to enforce or interpret the terms and conditions of the Notice and Acknowledgment of Pledge, including the right to sue for monetary damages and to an injunction. (¶ 8)

## VI. The Request for NIGC Approval

After Rindels finished drafting the Notice and Acknowledgment of Pledge, she drafted the remaining loan documents. These included a Loan Agreement, an Escrow Agreement, and a Note in the principal sum of $8,690,000. Tab 12, Exhibit 16. All three of these documents contained provisions designed to dovetail with provisions of the participation agreements that loan participants such as Bremer would sign and to effect the true nature of the transaction; that Miller & Schroeder was a nominal lender which would sell its interests in the loans at or before a closing.

The Loan Agreement named President as the borrower and Miller & Schroeder as the lender, and the closing documents named Dorsey as lender's counsel. [Exhibit H, D00642] In the Loan Agreement, as security for repayment, *President agreed to pledge its interests in the management fees* and development fees to the lender, and further agreed that it had directed the Tribe to pay all pledged revenues to a designated escrow agent. Tab 12, Exhibit 16 DW–P 011761 ¶ 3. In Paragraph 8.06 of the Loan Agreement, President acknowledged, however, "that the Lender [Miller & Schroeder] will be selling participation interests in the Loan" and authorized Miller & Schroeder to disclose to any potential loan participant the loan documents and all financial and other information relating to the transaction. *Id.* at DW–P 011782. In Paragraph 8.08 the parties agreed that,

> Whenever in this Agreement one of the parties hereto is named or referred to, the heirs, legal representatives, successors and *assigns* of such parties *shall* be included and all covenants and agreements contained in this Agreement by or on behalf of the Borrower or by or on behalf of the Lender shall bind and inure to the benefit of their respective

heirs, legal representatives, successors *and assigns*, whether so expressed or not.

*Id.* at DW–P 011783. And, in Paragraph 8.09, the Loan Agreement provided that "[t]his Agreement shall be binding upon and inure to the benefit of the Borrower and the Lender and their respective successors and permitted *assigns*, except that the Borrower may not transfer or assign its right hereunder without the prior written consent of the Lender." *Id.*

The Promissory Note recited that President agreed to "pay to the order of Miller & Schroeder Investments Corporation ('the Lender'), its endorsees, successors *and assigns*" the principal amount of the note. *Id.* at DW–P 011737. In the Escrow Agreement, President as Borrower, Miller & Schroeder as Lender, and U.S. Bank as escrow agent agreed that, to secure its obligations under the Note, President had pledged its interest in the management fees and development fees to the Lender and had agreed to direct the Tribe to pay the pledged revenues due each month to the escrow agent for deposit in a pledged revenues fund. *Id.* at DW–P 011743.

As written, these documents, when coupled with the participation agreements, were designed to place the bank participants in the position of lender, stepping into Miller & Schroeder's shoes, with all the rights of the lender, at the time they funded the loan and entered into their participation agreements.

Rindels had been given the salient data sheet (the short descriptive document prepared by Miller & Schroeder to be sent to loan participants) for St. Regis I. As prepared by Miller and Schroeder it did not state that any NIGC approval would be obtained as a condition of closing. Nonetheless, believing or expecting, or more likely being told by Jarboe, that NIGC

approval was necessary, Rindels included in ¶ 5.01(b) of her first draft of the Loan Agreement a condition precedent to closing that President provide evidence satisfactory to the lender "of the approval of the Notice of Pledge by the National Indian Gaming Commission, or a letter indicating that said approval is not required," Tab 17, Exhibit 19 DW–B009783. In ¶ 4.03 of this first draft the Borrower represented and warranted that "other than, with respect to the Notice of Pledge," the loan documentation did not require any government approval by the BIA, the NIGC, or the New York Gaming Commission that had not been obtained. Tab 17, Ex 19 DW–B009779.

In mid-January 1999, Jarboe asked Karns to determine whether they needed to send the loan documents to the NIGC for approval. Karns Deposition, p. 10–11. Karns spoke with Fred Stuckwish at the NIGC. His notes of that conversation establish that Stuckwish told Karns that NIGC approval was needed if the lender had a security interest in the management fee. On January 19, 1999, Karns sent an email to Rindels calling her attention to the fact that 25 C.F.R. § 533.7 requires that the Commission approve all management agreements with Indian Tribes, and also any "changes in persons with a financial interest in or management responsibility for a management contract." He said,

> While it is our understanding that the terms of the loan from M & S to the St. Regis Mohawk Casino management company do not contain terms which would grant M & S authority to manage the Casino, *and that the interest granted to M & S is merely in the development repayment amounts to the manager (as*

*opposed to the management fee)*, NIGC nevertheless needs to review the loan documents to ensure that the loan agreement does not provide M & S such authority or interest.

Tab 6, Exhibit 14 DW–B 010149. He advised that Stuckwish had told him to submit all the loan documentation so that the NIGC could "ensure that the loan agreement does not provide for management of the Casino, *or an interest in the management fee,* as the security." Tab 6, Exhibit 14 DW–B 010149.

On January 20, Rindels told Karns that she would be talking with President and Miller & Schroeder after which she would be able to put together a substantially final draft of the loan documents which she would want him to deliver to the NIGC for its review. She also said,

> I know there was one document—a Notice and Acknowledgment of Pledge (with respect to the pledge of the management agreement revenues as security for the loan) that required the tribe's signature that *we* had already told the manager had to be submitted to the NIGC for approval.[5]

Tab 6, Exhibit 14 DW–B 010150. Karns responded in an email that she should send the final draft of the loan documents and he would take them over to the NIGC. He also reported that he was working on a letter to the New York State Racing and Wagering Board regarding whether Miller & Schroeder needed its approval to enter into the transaction. Following her discussion with Miller & Schroeder and President that day, Rindels sent an email to Karns, with a copy to Jarboe:

---

5. Rindels and Jarboe both suggested in their testimony that it was Miller & Schroeder that was insisting on NIGC approval. This is simply not credible. Dorsey was hired as regulatory counsel for the lender for its expertise in Indian Gaming Law. The scope of that retention clearly included advising the lender, through Miller & Schroeder, as to whether the transaction could be closed before all regulatory approval was obtained.

During my long meeting/conference call this morning, I noticed the parts of your original e-mail below regarding M & S not having an interest in the management fee. *The way this deal is currently structured they do have such an interest. Both the amounts paid as management fees and the amounts paid as loan repayment amounts secure the loan to the manager.* See the draft Notice and Acknowledgment of Pledge which I've enclosed. Do we still have any chance with the NIGC?

Tab 6, Exhibit 14 DW–B 010150. Karns then spoke by phone with Rindels and followed the phone conversation with an email to Rindels, which he copied to Jarboe. He said,

Mark—As I explained to Paula by phone just now, I don't believe NIGC will be concerned by the security in both payments to the escrow account (mgmt fee and repayment amt.) I think NIGC will be comforted by a "walk through" of the arrangement in a cover letter so that they know what to look for/expect.[6]

*Id.*

The next day, January 21, Rindels sent Karns an email indicating that Jarboe was talking with the State of New York Governor's office regarding the possible need for Miller & Schroeder registering as a principal (and doing a background check). Rindels also revised ¶ 4.03 of the draft Loan Agreement to delete from the Borrower's representations and warranties a reference to the NIGC approval of the Notice and Acknowledgment of Pledge, but she revised ¶ 5.01(b) of the Loan Agreement to provide that a condition precedent to clos-

ing was the lender's receipt of "evidence of the approval of the Loan Documents by the National Indian Gaming Commission, or a letter indicating that such approval is not required." Tab 12, Exhibit 16 DW–P 011767. Rindels testified that, as so revised and at Jarboe's direction, she sent the Loan Agreement, Notice and Acknowledgment of Pledge, Escrow Agreement and Note to Karns, so that he could deliver the loan documents to the NIGC for its approval. Tr. Vol. IV, pp. 45–48.[7]

Karns then, on January 22, 1999, delivered the Loan Agreement, Note, Escrow Agreement, and Notice and Acknowledgment of Pledge to the NIGC with a cover letter. The cover letter suggested a limited nature in the lender's interest in the management fees, for example, pointing out that if the manager were terminated the only source of repayment would be the Tribe's obligation to pay the development repayment amounts. While he urged that Dorsey did not believe that *"by providing the Loan in accordance with the documents outlined above, M & S has a financial interest in* or management responsibility with respect to *the Management Agreement,"* Dorsey was submitting "these documents for your determination and review with respect to the question." Tab 12, Exhibit 16 DW–P 0011736. He requested immediate attention since the closing was fast approaching. On January 25, 1999, he submitted to the New York State Racing and Wagering Board the same drafts of the Loan Agreement, Escrow Agreement, Note and Notice of Acknowledgment of Pledge and asked the Board to

---

6. Jarboe testified that by January 21, 1999, he had reached the conclusion that the Notice and Acknowledgment of Pledge did not need NIGC approval. This is very curious testimony in light of the fact that he was involved in this email string and he did not respond by telling everyone to stop worrying about NIGC approval because no approval was needed.

7. The trial transcript is cited to Volume number; February 8, 2006 in Vol. I; February 9, Vol. II; February 10, Vol. III; and February 15, Vol. IV.

determine whether providing the Loan would constitute "gaming services" under the Compact and thus Miller & Schroeder would need a Board issued gaming service registration.

It is clear that Dorsey lawyers, at this point, were of the view that the loan should not be closed until the Borrower delivered proof that the Notice and Acknowledgment of Pledge had been approved by the NIGC or a declination letter obtained. They were unsure of whether Miller & Schroeder needed to register with the New York State Wagering Board. They also expected that the NIGC would approve the requisite documentation well in advance of the impending closing date.

VII. THE AMENDMENT TO THE MANAGEMENT AGREEMENT AND THE TRIBAL RESOLUTION

The Tribe and President, meanwhile, had been negotiating regarding President's desire to raise the construction cap and bring in an outside lender. The Tribe took the opportunity to secure concessions from President. On January 26, 1999, the Tribe and President signed a letter agreement that acknowledged that President would be incurring additional development expenses up to $29 million and, in connection therewith, President would be "incurring a separate loan obligation *through* Miller and Schroeder Financial, Inc. for the purpose of funding the additional necessary sums." Tab 23, Exhibit 23 PRC 000033. President agreed to make two concessions to the Tribe in return. It agreed to an amendment to § 10.7 of the Management Agreement to limit the Tribal obligation to pay development costs, after termination for cause, to revenues generated solely at the casino that was under construction. President further agreed to increase the Tribe's window from 1 to 1–

1/2 years to secure a reduced interest rate upon early repayment in full.

Based on that understanding, on January 29, 1999, the Tribal Council passed Tribal Resolution No. 99–005. The Resolution recited, *inter alia*, that the Tribe and President desired to amend the Management Agreement to increase the allowable amount of development expenses, change the repayment requirements, amend the sovereign immunity provision and authorize the execution of the Notice and Acknowledgment of Pledge. The Tribe then resolved to approve amendments to change the development cap from $20 million to $28,150,000; change § 10.7 as indicated in the letter agreement; further amend § 10.7 to make clear that the obligations under that paragraph were in addition to any other rights and remedies of the parties under the Management Agreement; lengthen the Tribe's time to secure the early repayment benefit; and clarify that sovereign immunity was waived as to all tribal reservation lands. Most importantly, the Tribe agreed *"that the Tribe hereby authorizes the execution of agreement entitled 'Notice and Acknowledgment of Pledge' for the purpose of assisting the Manager in obtaining a loan for the increased Development Expenses as long as it contains or includes the same changes as are contained in this Resolution."* Tab 27, Exhibit 25 p. 3.

These arrangements between the Tribe and President required an amendment to both the Management Agreement and the Notice and Acknowledgment of Pledge. Horn prepared the amended Notice and Acknowledgment of Pledge by modifying the recitals to mention the fact that there had been an amendment to the Management Agreement as of February 11, 1999, inserting the new early repayment provision, and clarifying the sovereign immunity provisions. He amended the Management

Agreement in paragraphs having to do with increasing the construction costs, early repayment, limitations on repayments in case of termination for cause, and sovereign immunity. On February 8, 1999, he submitted the unsigned Amendment to the Management Agreement to the NIGC for its approval. The Amendment to the Management Agreement and the amended Notice and Acknowledgment of Pledge were signed by the Tribe and President on February 12, 1999. Tab 35, Exhibit 33 DW–P 017930.

## VIII. NIGC DELAY

On January 26, Rindels had a conference with President and learned of the new changes in the Management Agreement and Notice and Acknowledgment of Pledge. The next day, January 27, Rindels sent an email to Karns saying:

> Any word out of either NIGC or the N.Y. state racing board yet? ... I have another conference call this morning at 10:00 with the group and I'm sure they will be asking. FYI–The management company has an amendment to the management agreement increasing the maximum dollar amount of development expenses which can be incurred and making one other change that the tribe wants that they are also trying to get NIGC approval with respect thereto on an expedited basis *(and which has to be done before we can close) so that will also be before the NIGC for approval for such approval in the next couple of days.*

Tab 9, Exhibit 14 DW–B 010154.

Karns responded with an email to Rindels, with a copy to Jarboe, that afternoon, saying:

> Paula/Mark–Recall we sent NIGC a letter and drafts of the loan documents so that they would be comfortable with the fact that M & S's interest in the agreement is NOT management of the casino, per Fred Stuckwisch's (NIGC) request. I explained to Fred the nature of the deal and our approaching anticipated close date and he indicated that a quick turn around was possible.
>
> Well, I called NIGC to find out the status of their review and to answer any questions which may have arisen. I eventually spoke with Elaine Trimbel who told me that she had not looked at the documents yet, and an NIGC attorney wouldn't be assigned to review them until she had finished her initial cut. She also said that it would take approximately 30–60 days for NIGC to finish its review, that they operate on a "first in, first out" basis, there were several others in front of ours, and there was no way to move it up. When I reminded her of our timeline and my discussion with Fred, she said, "there is no way we can turn it around that fast." So much for providing them with a courtesy copy ...
>
> "Anyhow, I spoke with Ginny and she indicated that she did not believe that NIGC's refusal to do a quick turnaround should not hold up the deal. (Ginny, if I mischaracterized what you said, please clarify)."

*Id.* at DW–B 010155.

[Karns then sent an email asking that they ignore one of the "not's" in this last paragraph.]

Boylan immediately responded by saying:

> I concur with Chris' interpretation of what I said. We were just being nice. Besides if the Tribe thought this involved mgmt, it would be up to them to send to NIGC, not us. *Just so long as our client is protected and I am sure*

*Paula and Mark have made sure of that.*

*Id.* at DW–B010157.

On that same day, Karns left a voicemail for Rindels, which she forwarded to Jarboe, in which Karns discussed the fact that the NIGC approval of the loan documents would take 60–90 days. Rindels also conveyed the information to Miller & Schroeder.

Rindels then had misgivings. On Friday, January 29, she emailed Karns, with a copy to Jarboe and Boylan. She recited verbatim the Karns email of January 19 and said, following Karns' prior statement that *"NIGC nevertheless needs to review the loan documents to ensure that the loan agreement does not provide M & S with such authority or interest,"*

> Then why would the NIGC not having reviewed the documents not hold up the deal? How can our client be protected? Is there any chance that, for some unforeseen reason the NIGC later says our loan documents do give M & S a financial interest in the management agreement, either or both of the management agreement and the loan documents would be void? Or is that not what the sentence in the regs says?

*Id.* at DW–B 010159.

The only documented evidence of a response to her request came in an email that same afternoon, January 29, 1999, from Boylan, which was sent to Rindels, Karns, Jarboe and Townsend (another Dorsey attorney). She said:

> This is a very tough issue-however, I would think we have done enough of these to know what NIGC is looking for (and there are "instructions" from them

on this issue)—*if there is a question, then of course we must wait.* However, if it is very similar to others that have been deemed by NIGC to be non-management contracts, then we would probably be okay. It is just so frustrating to be jerked around by folks whose only role in life is using their bureaucratic power over others.[8]

*Id.*

## IX. St. Regis II

In late January 1999, Miller & Schroeder and President had also agreed to do another financing for an additional $3,250,000, which would be used to fund the purchase of furniture and equipment for the casino (St. Regis II). The February 3, 1999, engagement letter for St. Regis II was identical in all respects to that of St. Regis I, except that St. Regis II, while senior to other construction debt, was subordinated to St. Regis I. Tab 29, Exhibit 27 and Tab 31, Exhibit 29 DW–P 000494. Erickson sent the engagement letter and the salient data sheet to Rindels so that she could begin documenting this loan. The salient data sheet, unlike the salient data sheet for St. Regis I, stated that "the Tribe and the Manager amended the Agreement to increase the Development Fees to approximately $28,000,000 and have submitted the amendment to the National Indian Gaming Commission ('NIGC') for approval. *NIGC approval is a requirement to funding the Senior Lien [St. Regis I] and Subordinated Senior Lien Financings [St. Regis II]."* Exhibit O, Tab 1, DW–P 000494. In essence, St. Regis II would parallel St. Regis I, the same collateral would secure both notes, and the original Notice and Acknowledgment of Pledge would cover both loans.

---

**8.** Of course, this was not like other deals they had done because it was not a loan to the Tribe and the collateral included management fees. Further, Jarboe himself has authored at least one law review article in which he said precisely the same thing: if there is any doubt, you must wait because the risks of getting it wrong are so enormous.

## X. The Run-Up to Closing

On February 9, 1999, Rindels forwarded to Miller & Schroeder revised versions of the Promissory Note, Loan Agreement, and Escrow Agreement for St. Regis I and identical documentation for St. Regis II. In this draft, Paragraph 4.03 of the loan agreement to St. Regis II is the same as Paragraph 4.03 of St. Regis I. Both were worded as they had been in the January 22 version of the Loan Agreement for St. Regis I that had been sent to the NIGC. Tab 32, Exhibit 30 MS 103141, MS 103188. But, apparently heeding Boylan's advice to hold up if there was doubt, Paragraph 5.01(b) of the Loan Agreement, for both loans made it a condition of closing that the Borrower furnish proof that the NIGC had approved (or provided a declination letter) for the Notice of and Acknowledgment of Pledge. Tab 32, Exhibit 30 MS 103146, MS 103193.

On February 10, 1999, Patti Fredericks, Miller & Schroeder's Supervisor of Sales on these transactions, sent a memorandum to the sales force telling them that St. Regis I would close when the NIGC approved the changes in the management contract to increase construction costs, which approval was expected by the end of the week. She also advised the sales force they could start selling St. Regis II. Tab 34, Exhibit 32 DW–P 020311.

By letter dated February 16, 1999 (only days after the Tribe and President had submitted them),[9] the NIGC sent a lengthy letter to President and the Tribe stating that it was likely that it would exercise its right to extend the review period on the Amendment to the Management Agreement from 30 to 60 days. The letter raised a series of questions regarding the amendment, asked for a number of documents, and sought additional information. Among other things, the Commission indicated that it had questions about the manner in which the contractor had been selected, the increase in cost of construction, drainage and water issues, and other matters having to do with development. It suggested that President was already in violation of NIGC regulations because it had not obtained NIGC approval when it increased the salary of its professional manager. Tab 35, Exhibit 33 DW–P 017930. Miller & Schroeder and Rindels were given copies. President responded promptly on February 19, 1999, asking the NIGC to approve the Amendment to the Management Agreement so as to allow the casino, which would employ hundreds of Tribal members, to open on time.

Knowing that the NIGC would not approve the Amendments to the Management Agreement prior to closing, Miller & Schroeder decided it could close without such approval. This was a business decision made because Miller & Schroeder believed the main purpose of the amendment to the Management Agreement was to increase the cap on construction costs from $20 million to $28 million, the $12 million being put in by the loan participants had payment priority, and Miller & Schroeder believed that at least $12 million in construction costs had already been incurred in construction of the casino. That left the issue of what to do about the fact that the NIGC had not blessed the Notice and Acknowledgment of Pledge. There are documents suggesting that Fredericks asked Rindels what she should tell her sales force and was told as follows: "Send notice to sales that a notice of pledge has been

9. Boylan testified that she had never in her experience seen a request for approval of an amendment to a Management Agreement turned around that fast. Boylan Deposition, Tr. p. 96.

submitted to NIGC for review which review period may take up to 60 days from the date of receipt. *M & S is highly confident that NIGC will provide approval of Notice of Pledge in due course and is therefore advancing the loans at the closing."* Tab 32, Exhibit 30 MS 103121. And on February 18, 1999, Fredericks did advise the sales force in a memorandum that

> [t]he Borrower is confident that the NIGC will approve the cap increase, however, the Borrower would like to keep the Casino on schedule for its grand opening on April 10, 1999.... [T]he Borrower has requested that Miller & Schroeder close and fund the Loans without the NIGC approval of the cap increase as the Casino is near completion. As the Loans are first to be repaid from the revenues as described above, Miller & Schroeder is recommending the participants close and fund as scheduled.

Tab 43, Exhibit 41 MS 102443. But she still noted that:

> 6. *The Tribe and the Borrower have executed a Notice and Acknowledgment of Pledge ("Notice"), in which the Tribe acknowledges the pledge by the Borrower of the security as described above, to Miller & Schroeder. A draft of the Notice has been submitted to the NIGC for review and the final executed Notice by Miller & Schroeder will be submitted by the Tribe after closing. A positive re-*

*sponse from NIGC is expected to be received in due course.*
*Id.*[10]

Meanwhile, on February 18, 1999, Rindels prepared her final draft of the Loan Agreements for St. Regis I and II and sent them to Horn for signature and closing. ¶ 4.03 of the final version of the Loan Agreement remained as it had been since January 22, with President making no special warranty or representation regarding regulatory approval as to the Notice and Acknowledgment of Pledge. New ¶ 5.01(b), however, deleted the language of the February 9 draft and substituted language that, as a condition of closing, the borrower provide the lender a copy of the Tribal Resolution authorizing the execution and delivery of the Notice of Acknowledgment of Pledge. Exhibit H, Tab 1, D00663.

On February 22, 1999, the New York State Gaming & Wagering Board responded to Karns' letter of January 25. It took the position that, while a loan to the management company would not constitute the provision of gaming service, gaming supplies, or gaming equipment to the Tribe and would not, therefore, require a gaming service registration, there was a separate problem that Karns had not addressed, whether Miller & Schroeder would qualify as a principal of President that needed to be registered, thus triggering the need for Miller & Schroeder to submit to a background investigation. "Absent any information regarding Miller & Schroeder re-

---

10. On February 22, Michael Frank, a member of Miller & Schroeder's sales force, sent a memo to "All St. Regis I and St. Regis II Loan Participants" repeating verbatim the information that Patti Fredericks had supplied in her memo of February 18:

> 6. *The Tribe and the Borrower have executed a Notice and Acknowledgment of Pledge ("Notice") in which the Tribe acknowledged the pledge by the Borrower of the security as*

> *described above. A draft of the Notice has been submitted to the NIGC for review and the final executed Notice by Miller & Schroeder will be submitted by the Tribe after closing. A positive response from the NIGC is expected to be received in due course.*
> Exhibit G DW–B 017831–32. Bremer did not receive a copy of this document apparently due to electronic transmission issues.

garding whether the entity could properly be considered a banking institution," he said, "Miller & Schroeder will be required to submit application as a principal of President R.C.-St. Regis Management Company." Tab 47, Exhibit 44 DW–P 017907. At that point, Brenden testified that, to protect the loan participants, Miller & Schroeder modified the Participation Agreements to facilitate an immediate assignment of all Miller & Schroeder's rights under the Loan Agreement and loan documents to the participating banks who were exempt from registration. She further testified that, while they had decided to attempt to register Miller & Schroeder as a principal, if necessary, Miller & Schroeder was willing to simply assign all its rights as nominal lender in the loan documents to get over this regulatory hurdle. Tr. Vol II, p. 39.

By February 24, 1999, Miller & Schroeder had received the commitments for 100% of St. Regis I and St. Regis II and Rindels emailed to Karns *with a copy to Jarboe:*

A couple of updates:

1. Miller & Schroeder is going to proceed to register as a "principal" of the management company, but post-closing.

\* \* \* \* \* \*

2. *I assume that our request for NIGC review of the Notice of Pledge and other loan documents has not been withdrawn and is still proceeding. We do want it to proceed, especially for the Notice of Pledge. Could you find out whether they want us to submit the executed Notice of Pledge in connection with their review? If so I can send you a copy today. There have been several changes from the version originally submitted and I will highlight those changes as well. It looks like the loans will probably be funded today.*

Thanks for your help.

Tab 9, Exhibit 14 DW–B 010161. He responded that day to Rindels (with a copy to Jarboe) that:

I finally spoke with Elaine Trimble at NIGC. She said that the documents are still under review, but that it will likely take a little bit longer than originally anticipated to conduct their review because the Tribe needs to have the amendment to raise the ceiling up above $20M and has asked that the amendment be processed prior to the loan documents being approved.... *She does want to see the executed Notice of Pledge.* Please fax it to her at [number omitted]. I'm still waiting to her [sic] from Mr. Williams.

*Id.* at DW–B 010162.

In the late afternoon that day, Rindels sent a responsive email to Karns with a copy to Brenden:

I don't think we are particularly concerned at this point-since we've now funded the loans!-with how long it takes. And we would agree that the amendment to the management agreement is first priority-no problem there. Mary Jo, please send me up an executed copy (not the original) of the notice of pledge. I'll also note for Elaine the minimal changes that have been made when I fax it to her.

*Id.* at DW–B 010163. The next day Rindels submitted the fully executed Amended Notice and Acknowledgment of Pledge to the NIGC, indicating that she was underlining the changes from the one that had been submitted on January 22. Actually, consistent with my findings that Dorsey was paying little or no attention to the Management Agreement, she did not underline the amendment to the recital in the Notice and Acknowledgment of Pledge which reflected that the Management

Agreement had been amended on February 11.

On February 25, Miller & Schroeder sent the completed transcripts and the participation agreements to all the participating banks, including Bremer, and Miller & Schroeder asked for a wire transfer the funds to close the transaction. All complied over time.

Miller & Schroeder formally closed the two St. Regis loans on February 26, 1999. By the time of closing, Miller & Schroeder had sold 100% of both loans to 32 separate banking institutions. At closing, President received the net proceeds of the participating banks loans on St. Regis I ($8,015,150) after payment of Miller & Schroeder's placement agent fees ($387,600), B & L's structuring agent fee ($130,350), the placement fees to the banks ($86,900), and other transactional costs ($110,000), including Dorsey's fees ($35,000). It received the net proceeds of the participating banks' loans ($3,250,000), after payment of Miller & Schroeder's placement agent fees ($139,-680), B & L's structuring fees ($52,380), the placement fees to the banks ($34,920), and the transactional costs ($15,020.60), including Dorsey's fees ($15,000). President and Miller & Schroeder signed the Loan Agreement, Note, and Escrow Agreement, and exchanged other closing documents.

The day of the closing, Fredericks sent a memorandum to the loan participants in St. Regis I and St. Regis II. She informed them of the closing and repeated that Miller & Schroeder had recommended closing without approval of the Amendment to the Management Agreement because investors were not threatened by the increase in the cap on construction costs. Once again, however, she said,

> The Tribe and the Borrower have executed a Notice and Acknowledgment of Pledge ("Notice"), in which the Tribe acknowledges the pledge by the Borrower of the security as described above, to Miller & Schroeder. A draft of the Notice has been submitted to the NIGC for review and the final executed Notice by Miller & Schroeder will be submitted by the Tribe after closing. A positive response from NIGC is expected to be received in due course.

Exhibit J, DW–B 024744–45. The memo further stated that the loans would close "pending receipt of . . . a few final due diligence items."[11] *Id.* From this it is reasonable to infer that, even up to and after the closing, Miller & Schroeder believed that NIGC approval of the Notice and Acknowledgment of Pledge was imminent.

Also, on the day of closing, Rindels wrote a letter to President with a list of post-closing issues, in one of which she asked President to send her a copy of a fully executed Amendment to the Management Contract, with evidence of approval by the NIGC, as well as a copy of the NIGC approval of the Notice & Acknowledgment of Pledge or a letter indicating that the approval was not required. She made the same written request of President on more than a dozen occasions thereafter until February 2000, when the Tribe cancelled the Management Agreement with President for cause.

At the time of closing, Dorsey knew that: the Notice and Acknowledgment of Pledge had not been approved by the NIGC; the NIGC had not approved the Amendment to the Management Agreement; the NIGC had indicated in its letter of February 16, 1999, at least preliminarily, that it would not approve the Amendment to the Management Agreement without significant further explanation and that

---

11. Once again, due to fax transmission issues, Bremer did not receive this memorandum.

the entire Management Agreement might be at risk; the NIGC had not approved any of the loan documents on St. Regis I or St. Regis II (indeed, the latter had never even been submitted); and the New York State Gaming and Wagering Board considered Miller & Schroeder a "principal" to the Manager and that Miller & Schroeder was prepared to assign all its rights under the loan documents to the loan participants to get over the New York regulatory issue.[12] Further, by the time they closed, neither Rindels nor Jarboe had focused on any possible importance in Paragraph 11.1 of the Management Agreement which required NIGC approval of financing or on the fact that the Tribal Resolution tied the Tribe's consent to the Notice and Acknowledgment of Pledge to the parties having made the changes to the Management Agreement. While at closing, on behalf of the lender, Dorsey required a standard pre-closing letter opinion from President's counsel, Dorsey did not ask for and did not obtain, as protection for the lender, any opinion from the Tribe attesting to the validity and enforceability of the Notice and Acknowledgment of Pledge.

Dorsey knew that, if its decision to close without NIGC approval was wrong, the Notice and Acknowledgment of Pledge was invalid and the loan participants had no rights to recover against the Tribe. Yet, Dorsey did not tell Miller & Schroeder to abort the closing. Rather, it allowed the transaction to close. Based on Dorsey's judgment that the transaction could close without regulatory approval of the Notice and Acknowledgment of Pledge, the St. Regis loans closed, Bremer advanced its money, and the loan participants' investment (including Bremer's) was disbursed

to President. Miller & Schroeder personnel (Erickson and Brenden) testified that, if Dorsey had said they should wait, Miller & Schroeder would have followed that advice, even though by doing so Miller & Schroeder would have placed at risk its opportunity to close the deal and receive its handsome placement fee from the Borrower. Tr. Vol. II, pp. 99, 208. Jensen testified that Bremer would not have purchased a participation interest in St. Regis II if it had known that there was any risk that the Notice and Acknowledgment of Pledge needed regulatory approval which had not been obtained. He further testified that he relied on Dorsey to make the correct judgments with respect to the need for regulatory approval. Tr. Vol. I, pp. 208–09. Miller & Schroeder, standing at the time in the place of the loan participants, also relied on Dorsey to close a transaction which would be enforceable against the Tribe.

Miller & Schroeder independently made the decision to close the transaction without approval of the Amendment to the Management Agreement, but the question is whether Dorsey was at fault for allowing the closing to go forward without regulatory approval of the Notice and Acknowledgment of Pledge. There was considerable testimony regarding precisely what Dorsey lawyers told Miller & Schroeder before the closing as to NIGC approval. Brenden testified that she had no discussions with any Dorsey lawyer on the subject and learned from Fredericks during the run up to closing that they could go forward based on Dorsey's advice that NIGC approval of the Notice and Acknowledgment of Pledge was not needed. Her clear memory was that Dorsey took no steps to avert the closing. Tr. Vol. II,

12. In my view this is powerful evidence that Miller & Schroeder and Dorsey both knew and understood that the loan participants were the lenders and Dorsey was counsel to the lender.

p. 98, 99. Erickson testified that, at some time prior to closing, either he or Fredericks was told that it was all right to close without NIGC approval, but he could recall no details. Tr. Vol. II, pp. 135–136. Jarboe testified that he knew as early as January 21 that there was no need for NIGC approval of the Notice and Acknowledgment of Pledge and that he reached that opinion based, not on research, but on his past years of experience. He further said that, when he was approached by Rindels with the question, he told her they could close without it. Rindels could remember practically nothing other than one particular conversation with Jarboe when she finally went to him and asked if they could close without NIGC approval of the Notice and Acknowledgment of Pledge and he said that it was not needed and they could go forward. She testified that she then told this to either Erickson or Fredericks and they decided to go forward, knowing the risk, which she also conveyed. Fredericks was not called to testify, and not one of these witnesses had clear recall of the details of any of these conversations.

There are many problems with this testimony. For example, Rindels recanted deposition testimony in which she had testified that she could not recall what conversations she had with Jarboe, Tr. Vol. IV, pp. 116, 120, and she was impeached by her deposition testimony on several more occasions. Jarboe likewise was impeached by contemporaneous documentation [13] and on numerous occasions by his own deposition testimony. The documentary evidence all points in the direction of no such conversation having taken place. The problem with the whole line of testimony is that it is inconsistent with all the documentary evidence, both before and following the closing, in a case that is document intensive. A further problem is that it rests on foggy recollection of several witnesses of conversations that took place 7 years ago.

I doubt seriously that any such conversations ever took place. Rather, it is much more likely that, in the pressure to close, Dorsey made a bad decision to allow the transaction to close without regulatory approval because Dorsey was under pressure to close the transaction in time to allow the casino to open on time and misunderstood the significance of the fact that the lender was taking a security interest in the management fees. Dorsey simply took the risk and made a mistake. But, while this factual dispute consumed a considerable part of the evidentiary record, it does not affect the result. If Jarboe told Rindels and Rindels told Erickson or Fredericks that the Notice and Acknowledgment of Pledge did not need NIGC approval, as a matter of law such advice was erroneous. Thus, while it was important for Dorsey to show that the Chair of its Indian Gaming Department never had a doubt about the issue, presumably for the purpose of shoring up it's expert's testimony on standard of care, whether the conversation took place is of no importance. Either way, Jarboe and the Dorsey lawyers were wrong; they either closed knowing there was a risk to the lenders and deciding it was worth taking, or they concluded that NIGC approval was not needed, which was in error.

XI. MILLER & SCHROEDER'S MARKETING AND BREMER'S PURCHASE OF A PARTICIPATION INTEREST

While Dorsey was documenting the St. Regis loans, and determining whether reg-

---

**13.** A single example is the fact that Jarboe recorded no time on the matter between January 29 and February 23, while the change in the language of ¶ 5.01 was made sometime between February 9 and February 18.

ulatory approval was necessary, Miller & Schroeder was preparing to market participation interests in the loans. Miller & Schroeder's Credit Committee approved St. Regis I on January 15, 1999. The loan was to be in the amount of $8,024,000 and would be senior to existing construction debt. Miller & Schroeder's Credit Committee approved St. Regis II on February 10, 1999. The loan was in the sum of $3,492,000 and was senior to the prior construction loan, but subordinate to the St. Regis I loan. Miller & Schroeder prepared, and its sales force distributed to interested financial institutions, an Offering Memorandum and a Participation Agreement. Dorsey played no role in the preparation of these materials. This was the job of Miller & Schroeder's in-house counsel.[14]

The Offering Memorandum for St. Regis II contained a salient data sheet which identified President as the Borrower, and Miller & Schroeder *as the borrower's Placement Agent,* and set forth the terms of the $3,492,000 loan. Exhibit D, Tab 1 DW–P 000493. The Offering Memorandum stated that St. Regis II was a senior subordinated lien construction loan, paying interest at the rate of 10.25% over a term of 36 months, with interest only from February 15, 1999, to May 20, 1999. The first payment was due on March 20, 1999, and the expected closing funding date was February 15, 1999 (only days, of course, after it was approved and marketed). The loan would be amortized with a final maturity date of February 20, 2002, with 3 months of interest-only payments followed by 33 monthly payments of principal and interest commencing June 20, 1999, to fully

amortize the loan. In addition to interest, President would pay a monthly service fee of .25% of the outstanding principal balance for the cost of servicing the loan, which fee would decline to .125% during the principal amortization period. President could prepay the loan and would be required to do so if the Tribe prepaid. The Use of Proceeds section stated that the proceeds from the loan would be used to fund the acquisition costs for the furniture, fixtures and equipment (not to include slot machines) for the casino. The security for repayment was represented to include both an *"Assignment" by the manager of the management fees due from the Tribe to the Manager for operating the casino* and an *"Assignment"* of the development fees due from the Tribe to the Manager for constructing the casino, which assignments were subordinate only to the Manager's obligations to pay St. Regis I. The offering memorandum stated that:

> The Development Fees have been capped at approximately $20,000,000, however the Tribe and the Manager amended the Agreement to increase the Development Fees to approximately $28,000,000 and have submitted the amendment to the National Indian Gaming Commission ("NIGC") for approval. NIGC approval is a requirement to funding the Senior Lien [St. Regis I] and Subordinated Senior Lien [St. Regis II] financings.[15]

*Id.* at DW–P 000494.

The Tribe was to repay $12,000,000 of the development fees in the form of a loan payable from the Tribe's share in 75% of the net revenues after operating expenses amortized over a 5 year period at an annu-

---

14. Actually, the Participation Agreement was a standard form that Miller & Schroeder had developed long earlier and used and continued to use with respect to participants on hundreds of transactions.

15. Since Bremer never received the Fredericks memos of February 18 or February 26, or the Frank's memo of February 22, Bremer closed its purchase based on this information.

al interest rate fixed at 13.5%. The development fees would be paid by the Tribe to President on a monthly basis in $500,000 increments ("Guaranteed Payments"). The salient data sheet further explained that these pledged revenues would be deposited into an escrow account established with the escrow agent for distribution in the following priorities: first, to payment of any past due and current debt due on St. Regis I, then to payment of any past due or current debt due on St. Regis II, and then to President. As soon as St. Regis I was paid off, St. Regis II would step into first priority. The pro formas projected revenues of close to $175,000,000 in the first two years of operation with ample net revenues to pay off St. Regis I, St. Regis II, and the junior construction and development debt owed to President, in timely fashion.

President had reporting requirements including furnishing the lender with current quarterly monthly financial reports and an annual financial statement on the casino operations beginning with the year ending December 31, 1999. President was also to provide its own financial statements and audited statements on a timely basis. The borrower covenanted that there was no debt senior to St. Regis II, other than St. Regis I, and that construction should be completed by June 15, 1999. To date, the documents indicated, President had provided approximately $15,565,000 in reimbursable development project costs and the loan would be funded in its entirety to President at closing which, together with St. Regis I and the amount previously funded by President, would provide 100% of the reimbursable development project costs for construction.

The Offering Memorandum contained a feasibility study prepared for the Tribe by Economics Research Association ("ERA") in February 1998, and updated as of January 1999. Exhibit D, Tab 4 DW–P 000527. Like the salient data sheet, the feasibility study assumed that NIGC approval of the construction financing for the casino would be obtained. The feasibility study noted that the casino was located in a highly populated area which was not yet served by a full service gaming facility. Large numbers of the gamblers were expected to come from across the nearby Canadian border. It was likely, according to ERA, that casino revenues would begin in the $55 to $85 million per year range. A detailed pro forma by President showed that expenses were in line and net revenue would be 4–5 times debt service. The report emphasized that *with strong marketing* the casino was likely to generate plenty of revenue to service debt. According to the feasibility study, as of January 1999, when the update was done, there were no nearby competitive facilities and there was a large pent up demand, especially on the Canadian side, for the gaming services that this new casino would provide. *Id.* at DW–P 000566. After a thorough analysis of the projections and pro forma prepared by President, the study said there was ample evidence presented to ERA to affirm that the casino would make the money needed to service its debt and provide a good profit for the Tribe. The Offering Memorandum further contained substantial financial information on President showing that it was a company with a strong net worth.

Bremer, like all other loan participants, received the Offering Memorandum and like all of the other loan participants was sent the letter dated February 25, 1999, confirming its purchase of a participation interest in the loans. The letter included a Participation Agreement and transcript of the closing documents. The letter explained that Miller & Schroeder had made changes to the Participation Agreement to take care of the possibility that the New

York State Gaming & Wagering Board might not clear Miller & Schroeder as a principal, in which case Miller & Schroeder would assign its rights as nominal lender outright to the participating banks, who needed no such clearance.

Jensen received the materials and finished his due diligence. In the meantime, Miller & Schroeder, as is apparently common in the business, used its warehouse line to temporarily fund Bremer's $2 million participation interest. Jensen spent approximately 40 hours studying the Offering Memorandum and its enclosures. He was told by Michael Frank, his Miller & Schroeder salesman, that Dorsey had been retained as counsel for the lender to complete the documentation of the transaction, and he testified that he was comforted by that fact and assumed he could, and he did, rely on Dorsey's expertise as lender's counsel to properly document the transaction and secure all needed regulatory approvals. Jensen saw no need to hire independent counsel to duplicate Dorsey's work and thought it would have been foolish and wasteful to have done so. Moreover, while Jensen briefly read the loan documents, as any client might, he relied on Bremer's lawyer, Dorsey, to have documented the transaction properly and secured the proper regulatory approvals. Jensen furnished a written recommendation for funding to the Credit Committee for Bremer on March 31, 1999. He did so only after he had asked and Miller & Schroeder had delivered financial information indicating that President was a financially sound company that had already invested over $17 million of its own cash in the project, which he found impressive.

On March 31, 1999, or soon thereafter, Bremer's Credit Committee approved Jensen's recommendation, and on April 6, 1999, Bremer wire transferred $2,000,000 to purchase its participation interest in St.

Regis II. It also returned to Miller & Schroeder the signed Participation Agreement. As previously discussed in part IX, Jensen testified that Bremer would not have purchased its $2 million participation interest if it had known there was any chance the Notice and Acknowledgment of Pledge was unenforceable, or even potentially so, or that the necessary required regulatory approval had not been received. Tr. Vol. I, p. 209.

## XII. THE PARTICIPATION AGREEMENT

The Participation Agreement reflects that it is dated as of March 1, 1999, although it was signed later. It accomplished two basic legal transactions.

First, in the Participation Agreement, Bremer bought and Miller & Schroeder sold a 57.273% interest in St. Regis II. Second, the Participation Agreement sets forth the rights and remedies of the parties with respect to Miller & Schroeder's acting as servicing agent on the loan.

Paragraph 2 of Participation Agreement provided that Miller & Schroeder sold and the loan participant purchased an undivided interest in the St. Regis II Loan and an undivided interest in the collateral. Exhibit N, DW–B017854. Collateral was defined to include "the Loan Documents, the Property and interests in the Property . . . securing the loan and any and all security interests, security titles, liens, claims, endorsements, and guaranties of whatever nature now or hereafter securing the Loan." *Id.* at DW–B 017851. The parties recited that the relationship was one of purchaser and seller ("*i.e.*, an outright, absolute partial assignment of an undivided interest in and to the Loan, in the Collateral and in the Collections"). *Id.* at DW–B 017854. *The Participant authorized Miller & Schroeder be named as "nominal payee" on the Note, "nominal beneficiary" of any guaranty, and "nomi-*

*nal secured party" under the loan documents,* and subject to the terms and conditions of the Participation Agreement, to *"generally act as agent for all the Participants in the holding and disposition of the collateral." Id.* at ¶ 2.2. Miller & Schroeder also agreed that it held "[t]he security interests and other interests granted by the note and Loan Documents not in its individual capacity but rather *as agent* for the Participants . . . ." Making the nature of their relationship as purchaser and seller and Miller & Schroeder's role as agent for the participant banks even more clear, the Participation Agreement provided that any amounts that Miller & Schroeder was required to disgorge after having paid them (such as to a bankruptcy trustee) would be reimbursed to Miller & Schroeder by the participant. *Id.* at ¶ 2.4.

In Paragraph 3, Miller & Schroeder agreed that it would hold the Loan Documents and other collateral in its name "for the benefit" of Miller & Schroeder and the Loan participants. The Participant acknowledged receiving all the loan documents and having made a complete examination of the same to its satisfaction and the participant agreed to "approve . . . the form and content of the same." *Id.* at ¶ 3.1. The participant also acknowledged having received and reviewed all "financial and other information" that the participant felt necessary to make an informed and independent judgment "with respect to the Collateral, Borrower, and any Obligor and their credit and the desirability of purchasing an individual interest in the Loan." Participant further acknowledged that, without reliance "on Lender, and based upon such documents and information as the Participant has deemed appropriate, [participant] made its own *credit analysis* and decision to purchase its participation interest in the Loan," and that it was making the purchase based on its own analysis of "the financial suitability, the

appropriateness of the investment, and the value and security of the Collateral." *Id.* The parties further agreed that Miller & Schroeder made no representations with respect to the collateral or any document in connection with the Loan and that the participant would look only to the Borrower for repayment. Miller & Schroeder agreed, where consent was required, not to take any action unless 66–2/3% of the total loan participants agreed. The Agreement permitted Miller & Schroeder to deal with the Loan and collateral with respect to normal course transactions, without consent of the participants, but provided that in the event of default, a vote of 66–2/3% of the Participants applied. *Id.* at ¶ 3.3, DW–B 017855. Further, unanimous consent was required whenever the Participant's lien was the subject of action.

In Paragraph 4, Miller & Schroeder agreed to administer the loans as agent for the benefit of the loan participants in accordance with customary policies and procedures, receiving payments from the borrower, making disbursements to the participants, and keeping and maintaining records of doing so. For this it would receive a servicing fee for its ordinary costs of doing business. Extraordinary expenses, such as attorney's fees incurred in collection actions, were to be paid by the participants. Paragraph 4.8 entitled "Litigation Regarding the Loan" stated, "If lender is of the opinion that the services of an attorney should be retained for the protection of the interest of Lender, Participant, any other Participant[s], Lender [Miller & Schroeder] shall select and retain an attorney *to represent Lender, Participant, any Other participants." Id.* at ¶ 4.8, DW–B 017857. Attorney's fees were to be paid by the participants, pro rata.

Paragraph 5 was entitled "Lender's [Miller & Schroeder's] Duty of Care and

Responsibility to Participant." In Paragraph 5 the parties acknowledged that Miller & Schroeder had provided no representations and warranties with respect to the financial soundness of the transaction and made no warranty or representation as to, and would not be responsible for, the due execution, legality, validity, enforceability, genuineness, sufficiency or collectibility of the collateral or any document relative thereto. This implies, of course, that the loan participants would look to the lawyers Miller & Schroeder had retained to represent the loan participants in the transaction should there be deficiencies in the documentation. In Paragraph 5.3 entitled "Duty of Care," in language designed to cloak Miller & Schroeder with the benefit of the business judgment rule, the parties agreed:

In its capacity under this Agreement, Lender shall only be accountable for the management and administration of the Loan in accordance with the customary policies and procedures under which it administers loans for its own account and shall not be liable for any negligence or default save the direct acts or omissions of itself and its employees and then only arising out of gross negligence or willful misconduct. *In the exercise of any of its duties or powers or in its administration of the Loan, the Lender may act on the advice of or information obtained from any accountant, attorney, appraiser, evaluator, surveyor, engineer or architect or other expert and shall not be responsible for any loss occasioned by acting thereon and shall be entitled to take legal or other advice and employ such assistance as may be necessary to the proper discharge of its duties* and to pay proper and reasonable compensation for all such legal and other advice or assistance which compensation shall be an "Extraordinary Expense" and, upon demand of Lender, shall be paid by the Participant in its Participation Percentage. *The Lender shall not be responsible for any negligence or misconduct on the part of any accountant, attorney, appraiser, evaluator, surveyor, engineer, architect or other expert or be bound to supervise the proceedings of any such appointee provided that lender shall use reasonable care in the selection of such person or firm....* Lender shall not be liable to Participant under any circumstances directly or indirectly, for any action taken or omitted to be taken by it in good faith, nor shall the Lender be liable or responsible for the consequences of any oversight or errors of business judgment made in good faith in the exercise of its reasonable judgment.[16]

*Id.* at DW–B 017858–59.

Paragraph 6 dealt with default and enforcement of remedies. Paragraph 6.2 provided that, if enforcement was necessary, Miller & Schroeder "on behalf of itself and all Participants, [shall] enforce any remedies under the Loan Documents ... and in furtherance thereof may select counsel and other professionals of its choice to assist Lender on the following terms and conditions." *Id.* at ¶ 6.2, DW–B 017859. The participants would pay the

---

**16.** Dorsey argues that the italicized language constituted a waiver of the participant's right to sue Dorsey for its malpractice. This provision first of all, is forward looking. But more importantly it has nothing at all to do with the loan participants waiving rights to sue Dorsey, as opposed to waiving any right to sue Miller & Schroeder for taking action on the participants' behalf. Paragraph 5 provides no escape valve for Dorsey; rather, it says precisely the opposite-i.e., if Miller & Schroeder has exercised good business judgment in selecting professionals or in enforcing their rights as their agent, the loan participants may only sue the professionals for malpractice, not Miller & Schroeder.

fees of such professionals; if major actions, such as acceleration of the loan or enforcement rights were necessary, Miller & Schroeder would act on a 2/3 majority decision of the participants; and, Miller & Schroeder would keep the participants apprised of the activities at all times. After the occurrence of an event of default, the 2/3 majority of participants could agree what course of action to take and Miller & Schroeder agreed to follow their instruction. In the event enforcement proceedings were brought after such directions were given, the proceeding could "be instituted by Lender and counsel of its choice." *Id.* at ¶ 6.2.4. Paragraph 6.4 provided that

> [a]t any time after Lender gives such [default] notice, *Lender may (but need not) in its name* demand, *sue, form,* [sic] collect or receive any money or property at any time payable or receivable on account of the Collateral, or grant any extension to make any compromise or settlement with or otherwise agree to waive, notify, amend or change the obligations (including collateral obligations) of any Collateral Obligor.

*Id.* at ¶ 6.4, DW–B 017860. It was further agreed that collection costs would be paid by the loan participants and any recovery from an enforcement action would belong to the participants.

In Paragraph 7.5, the parties agreed that if Miller & Schroeder defaulted in its obligations, a 2/3 majority of the loan participants could demand return of all the loan documents and Miller & Schroeder would be required to "assign . . . the Loan Documents, and other Loan Collateral to one of the Loan Participants" selected by a 2/3 majority of the loan participants, and would be relieved of all obligations as "Lender." In other words, the participants could then step into the place of Miller & Schroeder and service the loan themselves. *Id.* at ¶ 7.5 DW–B 017863.

Finally, in Paragraph 7.7, the Agreement provided that Miller & Schroeder could assign its rights and obligations under the Loan Participation Agreement (as it later did when it assigned its rights in these agreements to Marshall). In language designed to fix the problem raised by the New York Racing & Wagering Board the agreement further provided that Miller & Schroeder could "assign . . . The Loan Documents (1) to an affiliate of the Lender, or (2) to a non-affiliated institution or *to the participants if lender in its sole discretion deems such an assignment necessary to comply with the Tribal State Compact between the St. Regis Mohawk Tribe and the State of New York and the requirements of the New York State Racing and Wagering Board." Id.* at DW–B 017864.

Bremer's expert testified that it was commercially reasonable for Bremer to rely on Dorsey's legal work in connection with the drafting of, negotiation of and regulatory matters with respect to the loan documents without obtaining its own counsel. In fact, he testified that he had reviewed Miller & Schroeder files on 137 loans involving approximately 2000 loan participants and none of them had retained separate counsel. He also testified that it was commercially reasonable for Bremer to expect that the legal requirements for the enforceability of the loan documents were satisfied, any security interest established under the loan documents would be enforceable vis-a-vis President and the Tribe, and for Bremer to expect that the standard of care exercised by Dorsey in connection with its legal services concerning the loan would be heightened because of its representation of a large number of participants who would necessarily suffer harm in the event Dorsey failed to satisfy that standard of care.

I found his testimony persuasive. The bases of his opinion included the fact that

the Offering Memorandum touted the expansive experience of Miller & Schroeder in the Indian gaming area; Dorsey's website and all information available to Bremer touted Dorsey's expertise in Indian Gaming law; all of this suggested, indeed compelled, the conclusion that Miller & Schroeder had exercised care in selecting counsel; Miller & Schroeder's business model, known to all, contemplated that Miller & Schroeder would be a nominal lender and that only bank participants were at risk should Dorsey fail to exercise proper care in its legal analysis; and, given all of this, it would have been economically wasteful and totally unnecessary to secure an independent legal opinion as to the accuracy and completeness of Dorsey's work and its regulatory advice.[17]

Bremer's expert also credibly testified, and I agree, that Bremer's due diligence with regard to the financial underwriting decision was complete, careful and above a commercially reasonable standard for this type of transaction. Nothing in the Participation Agreement suggested that loan participants could not and should not rely on Dorsey's acting with care regarding the documentation and regulatory matters and Dorsey never told Bremer it could not rely on its expertise and judgments. I accept and incorporate this expert testimony in my findings and reject the views of Dorsey's expert testimony to the contrary.[18]

## XIII. Post-Closing Events

The casino opened on April 9, 1999. Seamlessly continuing Dorsey's engagement as counsel for the lender-loan participants, Rindels attended the opening of the casino, and on April 13, 1999, sent a letter to President (one of the many similar ones she was to send) in which she insisted once again that President deliver the NIGC approval of the Notice and Acknowledgment of Pledge and the Amendments to the Management Agreement. Exhibit 47, Tab 53 DW–P 018166. Karns continued to try to get Miller & Schroeder registered as a "principal" in New York. On May 11, 1999, Karns requested direction about what he should do regarding approval of the Notice and Acknowledgment of Pledge. Rindels told him that they had received no word from President on what was happening with the Amendment approval process and "[u]ntil that phase is completed, I think we should not bother Elaine." *Id.* at PRIV 502778.

What Rindels did not know was that on April 16, 1999, the NIGC wrote President and the Tribe stating that it would not act to approve the Amendment to the Management Agreement within a regulatory 60–day time frame.[19] Tab 71, Exhibit 69.

17. In fact he said, if each loan participant needed to get its own Indian gaming lawyer, they could not have done the deal. There probably were not 32 lawyers expert in Indian gaming law available in the country.

18. Dorsey produced 2 experts on banking standards. Their testimony was simply not helpful. Both were impeached regarding ongoing relationships with Dorsey. Neither was given crucial documents connected with the transaction. For example, neither had studied the loan documents or engagement letter. One, a partner in one of the nation's largest law firms which regularly does referral business with Dorsey based his opinions on transactions that bear no likeness to the specifics of this case, such as transactions where there is a lead lender syndicating portions of multi-million dollar loan transactions. Miller & Schroeder was not a lead lender, it was a loan placement agent for the Borrower in a comparatively small transaction, a completely different situation.

19. The April 16, 1999, letter was not found in Dorsey's files or in Miller & Schroeder's. Plaintiffs obtained a copy of the letter pursuant to a FOIA request to the NIGC to obtain its files on the Management Agreement and Notice and Acknowledgment of Pledge.

The effect of this was non-approval of the Amendment to the Management Agreement. Since approval of the Amendment to the Management Agreement was a precondition of the NIGC even looking at the loan documents, the NIGC never took any action on the loan documents or, in particular, the Notice and Acknowledgment of Pledge. The NIGC thus effectively disapproved the Amendment to the Management Agreement by inaction and never acted upon approval of the Notice and Acknowledgment of Pledge.[20]

Under President's inept management, the casino lost money in its start-up period and President had to provide operating capital to keep it going. President supplied Miller & Schroeder with operating financials on the casino which showed losses, at the same time stating that it was continuing to fund the operations during this start-up period. By the requisite votes, the loan participants agreed, at President's request, to two extension agreements with President. The first was executed on September 23, 1999, retroactive to June 20, 1999, and it changed the commencement date of principal payments to September 20, 1999, and the loan maturity date to May 20, 2001. The second was executed on December 23, 1999, retroactive to September 20, 1999, and it changed the commencement date of principal payments to August 20, 2000, and the loan maturity date to April 20, 2004. Dorsey represented the loan participants in connection with these extensions, although Dorsey had all its communications with the servicing agent, Miller & Schroeder, and sent bills for this work to Miller & Schroeder, which passed the costs on to the loan participants pro rata. Rindels drafted the extension agreements and included in both

a requirement that, as a condition of the closing and the grant of the extension, President supply to Miller & Schroeder all of the documents listed in Rindels' post-closing letter of April 13, 1999 (including evidence of NIGC approval of the Amendment to the Management Agreement and NIGC approval of the Notice and Acknowledgment of Pledge). Counsel for President continued to assure Dorsey and Miller & Schroeder (information which Miller & Schroeder then passed on to the loan participants) that President was working on providing the NIGC with the information it wanted and that, in the meantime, it had heard nothing about the approval of the Notice and Acknowledgment of Pledge.

The casino continued to have difficulties. On February 29, 2000, the Tribal Gaming Commission recommended to the Tribal Council that the Tribe terminate President for defaults under the Management Agreement. The Tribe's auditors claimed to have discovered that they could not document nearly $20 million in construction costs. The auditors also believed that hundreds of thousands of dollars in revenue had been diverted to President without tribal approval. On April 17, 2000, the Tribe passed a resolution terminating President's Management Agreement, and it fired most of the key employees. The Tribal Gaming Commission also revoked the gaming licenses of key officers and employees of President, prohibiting them from entering the casino grounds. On that date the Tribe took over management of the casino, and soon thereafter hired Park Place Entertainment, the largest gaming company in the country, to manage the casino on a temporary basis. Tab 85, Exhibit 81 DW–P 017998–99.

---

**20.** Miller & Schroeder also never finished registering as a principal with the New York state authorities.

In spite of these problems, President reported that the casino broke even in March 2000, revenue was on target, and expenses were under control and within budget. However, President defaulted when it failed for the first time to make the interest payment due in February 2000. It never made another payment on the loans, and the Tribe never placed any money in escrow. President believed it had been wrongfully terminated and that Park Place had tortiously interfered with the Management Agreement. Meanwhile, Miller & Schroeder notified President that a default had occurred under the St. Regis loans and advised President that the loan participants were considering exercising their rights to accelerate the debt. The loan participants were regularly kept advised of and asked for their votes on these actions.

On May 8, 2000, Jensen (Bremer apparently held the largest investment in the St. Regis loans) and Erickson traveled to Hogansburg, New York to meet with tribal representatives to discuss the Tribe's continuing obligation to make payments into the escrow account. The meeting was cordial and members of the Tribe, their accountants and their attorneys attended. The Tribe gave Miller & Schroeder the March 2000 operating figures on the casino, which showed a loss or break even. Miller & Schroeder supplied copies of the loan documentation showing the arrangements for the escrow of net revenues. The Tribe indicated that it understood its obligation to repay the St. Regis Loans when net revenues were generated, in spite of the termination of President. Jensen observed that the casino was up and running, looked to be well maintained, and had customers. In a private conversation with Erickson, Erickson told Jensen for the first time that the NIGC had never approved the Amendments to the Management Agreement and he did not know why

it had not been obtained. Tr. Vol. I, p. 181.

Having obtained authorization from the loan participants to do so, on May 9, 2000, Miller & Schroeder notified President that it was accelerating the due date on the St. Regis loans. In its report to the participants, Miller & Schroeder told the participants that the Tribe had acknowledged at the meeting that at least $12 million in development expenses had been expended in the facility (about the amount of the St. Regis Loans) and urged that the acceleration should prevent any flow of funds to President prior to repayment of the St. Regis loans.

## XIV. The President Litigation

On May 25, 2000, Miller & Schroeder reported to the participants that, based on the numbers they had received at their meeting, the casino's finances were steadily improving. But Jensen was not satisfied. He was anxious to move forward and he strongly urged Miller & Schroeder to engage Dorsey in the process and to be more aggressive in representing the loan participants in an enforcement action. In response, on June 7, 2000, Erickson, Brenden, Jan Rolbiecki (head of Miller & Schroeder's loan servicing group), Rindels, and Jensen met to discuss the status of the loans. They spoke by telephone with President, which reported that President and the Tribe were still at odds about construction costs and that Park Place had broken off negotiations with President to buy out its interest in the Management Agreement. They also spoke by telephone with Rick Terrance, a Sub–Chief of the Tribe, who said that the Tribe was willing to talk about assuming President's obligations on the St. Regis loans. Based on advice given by Dorsey at the meeting, Miller & Schroeder issued a bulletin to loan participants recommending that they

attempt to negotiate with the Tribe about the Tribe directly assuming the obligations. Miller & Schroeder reported that it had "asked the Dorsey attorneys to conduct a complete review of the legal documents *and our* rights thereunder. We want to be prepared to move forward with any necessary legal action if we are unsuccessful in our negotiations with the Tribe and President R.C." Exhibit EE.

But Jensen was still not satisfied. On June 9, 2000, he sent a memo to Erickson, urging that Dorsey give a clear and refreshed demand to President and to the Tribe that would set the stage for commencement of a foreclosure action and Erickson told Rolbiecki to have Dorsey prepare *"a legal brief that we can send to our banks so that everyone knows that we have our attorneys involved in the transaction."* Exhibit GG. Rolbiecki apparently then called Rindels who referred the matter to Thomas. To begin his work on the matter, Thomas talked at length with Rindels regarding the original transaction. During those conversations, she testified, she fully disclosed what had occurred prior to closing [Tr. Vol. IV, p. 195] and it is reasonable to infer that both Thomas and Rindels knew and understood the potential problems with the enforceability of the Notice and Acknowledgment of Pledge. Nonetheless, Thomas, with the assistance of Rindels, began preparing the "legal brief" which would advise the loan participants how they should proceed and urge the loan participants to have Thomas serve as the named counsel in a formal enforcement proceeding, even though both knew or should have known or suspected by this time that the Tribe had a defense based on Dorsey's malpractice. It is here that Dorsey began to make its ethical mistakes.

On June 19, 1999, Erickson wrote to all the loan participants, with a copy to Dorsey, stating that he had scheduled a meeting with President followed by a meeting with the Tribal Council on July 5 and 6, respectively, to discuss the Tribe assuming the St. Regis loan debt. But, in addition, he said:

> Recently, Miller & Schroeder met with council [sic], Dorsey & Whitney, asking them to prepare a summary of the original transaction, our security and source of repayment. The summary will also outline Miller & Schroeder's short-term plan of action to negotiate with the Tribe and Management Company, and what plan of action we will take if we are unsuccessful in our negotiations. This information will be forwarded to the participants within the next ten days.

Exhibit HH.

As forecast by Erickson, Thomas, in consultation with Rindels, prepared a memorandum dated June 29, 2000. Exhibit II. This six-page memorandum entitled, "PRIVILEGED DOCUMENT–SUBJECT TO ATTORNEY–CLIENT PRIVILEGE," was addressed to Miller & Schroeder *and* the loan participants. It began: *"At your request, ..."* and went on to explain that the purpose of the memo was to outline the terms of the original transaction, describe and evaluate the nature of the collateral granted to secure President's obligations, identify sources of repayment, and review the legal and business options that were available to the loan participants. The memo contained not one bit of legal advice directed to Miller & Schroeder. The memo stated that the Amendment to the Management Agreement had been approved by the Tribe and President, "but was not ultimately approved by the NIGC." With a total lack of candor, the memo correspondingly said nothing about the lack of approval of the Notice and Acknowledgment of Pledge. The memo noted the current disputes between and

among the Tribe, President and Park Place, and that President had now commenced an action against Park Place alleging interference with contract and was seeking over $30 million in damages. The memo noted that the sole source of repayment for the loan participants *now* was the Tribe's obligation to repay development costs out of net revenue. The memorandum went on:

> The Tribe has signed a Notice and Acknowledgment of Pledge as a part of the original financing documents acknowledging the grant of a security interest in the pledged revenues and has agreed that all amounts due Borrower and assigned to Miller & Schroeder are not subject to any offset or deduction notwithstanding any termination of the Agreement. *The Notice and Acknowledgment of Pledge specifically states that the Tribe recognizes that Miller & Schroeder is entitled to all of the benefits of the Agreement to the same extent as the Borrower.* The Tribe has also waived their sovereign immunity with respect to any rights of Miller & Schroeder on any Loan claims pursuant to that [sic] loan documents.

Exhibit II, DW–B 025139. Again, this was not full disclosure. Thomas was urging the loan participants to rely on the Notice and Acknowledgment of Pledge, without telling the clients that the Tribe could raise the invalidity issue. The memo noted that the most immediate source of payment was a direct action against President on the Notes, but that President was a shell and was judgment proof. Similarly, the general partners were single purpose entities that had few, if any, assets and therefore a judgment against them would

be fruitless. Accordingly, he advised there was nothing to be gained from suing President. However, he said, if President were successful in its suit against Park Place, the loan participants would have a lien on any judgment and could attempt to collect from Park Place. In addition, "[b]ecause the Loan Participants have perfected their interest in the assignment of the Project Revenues," he said "the Loan Participants have a right to notify the Tribe directly that all development cost payments are to be remitted directly to the escrow agent for the benefit of the Loan Participants pursuant to the Pledge previously signed." Tab 85, Exhibit 81, D10–P01799. Since the Tribe had been put on notice of President's default,

> [All] payments that would normally be paid to the Borrower should now be paid to the Escrow Agent by direction of the Secured Party.
>
> Pursuant to Section 10.7 of the Agreement, if the Agreement has been terminated for cause and the development costs have not been repaid, the Tribe is obligated to make monthly payments of $500,000 from the Tribe's share of "net revenues" as defined in Indian Gaming Regulatory Act of 1988, 25 U.S.C. sections 2701–2721 and non-gaming related net revenues from "*any gaming enterprise within Tribe's jurisdiction.*"[21] This provision survives termination of the Agreement.

Tab 85, Exhibit 81 DW–P 017999–018000. Thomas's memo then advised that, in addition, the loan participants could sue the Tribe, *but he advised against it* in favor of a negotiated settlement in which the Tribe assumed President's obligations, and he urged that the loan participants must re-

---

**21.** As previously noted, the Tribal Resolution amended this language, limiting it to the new casino operation and conditioned the Tribe's agreement to the Notice and Acknowledgment of Pledge on an amendment in the Management Agreement so providing. Thomas was apparently ignorant of this fact.

quire the Tribe to provide timely financial reporting to determine if any development costs can be repaid. "We would encourage a business resolution rather than a litigation solution to the business problems of the Project," he said. *Id.* at DW–P 018000. Finally, the memo advised that if negotiations did not result in a favorable resolution and repayment terms of the loans,

> we would suggest commencing suit in Federal District Court for the District of Minnesota against the Borrower and the Tribe. . . . The claim against the Tribe would be for a Declaration by the Federal District Court that Miller & Schroeder *stands in the shoes of the Borrower under the terms of the Agreement and is entitled by virtue of the Pledge and security interest to recover all amounts owed to the Borrower directly from the Tribe.* As part of the claim against the Tribe, we would request that the Tribe provide an accounting of all financial records relating to repayment of development costs and any and all funds owed to the borrower under the Agreement together with all other financial reporting documents that would assist Miller & Schroeder and the Loan Participants in monitoring the status of the Project's net revenues.

*Id.* at DW–P 018000–01. Although Thomas had talked at length with Rindels about the preparation of this memo and she had told him facts which should have established, and I find did establish, that there were potential deficiencies in the matter of their security interest, while assuring the loan participants that they could enforce their collateral, the memo did not correspondingly disclose the email string and gave no hint that Dorsey knew of a possible flaw in the security interest. It said nothing about the fact that, at this point, the integrity of Dorsey's legal work in documenting the transaction was, or could be, in play. Thus, Dorsey was not fully candid with its clients, even at this early point in the President litigation, and failed to disclose crucial information.

Thomas also prepared a cover letter to his June 29, 2000, memorandum addressed to Miller & Schroeder in which he introduced himself and Dorsey to the loan participants. He asserted that he was a seasoned workout lawyer with years of experience in restructuring troubled debt, and urged that, if litigation was necessary, Dorsey had "depth of expertise . . . [and was] ably suited *to represent your interest in this matter . . . .*" *Id.* at DW–P 017992.

Erickson sent the Thomas memorandum and Thomas' cover letter to the loan participants with a copy to Thomas and Rindels. He also prepared his own memorandum to the loan participants urging them to authorize, by the requisite percentage of votes, Dorsey's retention in the collection efforts and further urging them to focus on the options the loan participants had and Dorsey had pointed out in case attempts to restructure the debt were not successful at the upcoming meetings in early July. He said: "Lastly, find a summary on the Dorsey & Whitney firm and a background summary on *our counsel,* John C. Thomas, which Miller & Schroeder Investments Corporation *has retained to represent the Loan Participants.*" Exhibit II, DW–B 025135.

Thomas, having seen Erickson's memo, did not immediately correct Erickson or himself tell any of the loan participants that he was not representing them and they should obtain their own counsel. To the contrary, he emailed Robliecki with a minor clarification. He asked that the next memorandum Miller & Schroeder sent to the participants clarify that the "Dorsey & Whitney firm acts as counsel for Miller & Schroeder Investment Corpo-

ration, as agent. Dorsey & Whitney will be counsel to Miller & Schroeder Investment Corporation in representing its interest and the interest of the participants in all collection, enforcement and restructuring matters relating to the St. Regis loans." [22] Exhibit KK. No such clarification was ever sent to the loan participants and Dorsey undertook representation and continued to represent the loan participants in their attempts to enforce their rights under the loan documents. At no time then or thereafter did Dorsey ever tell any loan participant that it was not representing them. Dorsey did not open a new client file and did not run a conflicts check at this point, apparently believing that the representation in the President litigation was just one more step in the firm's continuing representation of the loan participants in connection with the St. Regis loans. While Dorsey now takes the position that it never represented the loan participants in the President enforcement action, Jensen believed Dorsey was representing Bremer. Tr. Vol. I, p. 167. Erickson also testified that he believed that he had retained Dorsey to represent Miller & Schroeder and the loan participants and that Miller & Schroeder did so in its capacity as agent for the loan participants. Tr. Vol. II, pp. 160–164, 168. Moreover, both Bremer and Miller & Schroeder believed at this point that the interests of Miller & Schroeder and the interests of the loan participants in their enforcement action were fully aligned. Tr. Vol. II, p. 166.

At the July 5 meeting between Miller & Schroeder and President, Kaufman agreed to assign his interest in the loan indebted-ness to the Tribe, but claimed that the Tribe owed him $5 million he had provided in operating funds. He wanted that returned before anyone got paid on the St. Regis loans. Kaufman also indicated that if pressed he would likely be filing for bankruptcy. At the July 6 meeting between Miller & Schroeder and the Tribe, the Tribe agreed to assume the St. Regis I and II indebtedness directly only if President and Park Place would release the Tribe from any claims having to do with the St. Regis loans. Exhibit JJ. This did not happen.

Instead, following these meetings, Thomas and Rindels met with Erickson to decide how to proceed. One of the original thoughts was that they should get the document they forgot to get before the closing, a Tribal acknowledgment that the Tribe had granted a security interest in the pledged revenues to the lender in connection with the closing. After Rindels drafted it, however, Thomas, backing off, thought better of it and asked Miller & Schroeder not to send it. He said:

> [A]fter reviewing the various agreements and acknowledgments that have been given in the financing documents I don't believe this agreement is necessary and *may raise some flags to the Borrower that are not necessary at this time.* As the documents read right now, without further modification or amplification, *you have the right to step into the shoes of the Manager and renegotiate the whole amount of the development costs and terms of the loan and not just the amount that corresponds to the two notes. Putting this document*

---

22. This is consistent with Paragraph 4.8 of the Participation Agreement which authorized the loan servicer to select counsel for the loan participants as an agent for disclosed principals (the loan participants). At trial, in what I viewed as one of the more desperate of defense tactics, Thomas insisted that representing someone's interests is different than undertaking to represent someone. I am certain this distinction would have been entirely lost on the loan participants.

*in front of them and asking them to agree to what they already signed serves to bring this whole issue to their attention.* I can easily convince the tribal attorney of this fact and that may bring a quicker resolution to the development costs issue than the Manager could negotiate so long as we deal with the debt and development costs in good faith with the Tribe.[23]

Tab 87, Exhibit 82. This was, once again, conflicted advice. Thomas and Rindels knew or clearly should have known that, if they asked the Tribe for a renewed acknowledgment, the issue of Dorsey's malpractice might surface.

In the end, they did not ask the Tribe to sign a renewed acknowledgment. Instead, Dorsey prepared for litigation and further negotiation. Rindels, apparently now very concerned about how the validity of the Notice and Acknowledgment of Pledge would play into an enforcement action, had a Dorsey associate try to review and perhaps retrieve the documents they had filed with the NIGC in 1999. A reasonable inference from this action is that Dorsey was worried about what third parties would find and would have preferred to cleanse the NIGC files, if it could. Boylan testified that any such attempt to retrieve documents would have been totally out of the ordinary. Deposition Transcript, Virginia Boylan, pp. 109–110. Rindels also asked another Dorsey associate to make sure they had properly perfected the security interest under the UCC.

On July 26, 2000, Miller & Schroeder reported to the loan participants in a memorandum, with a copy to Dorsey, that *"Our counsel,* John C. Thomas" had not been able to get the Tribe to talk and was in the process of drafting a letter to the Tribe.

The memorandum also reported that now President had sued the Tribe and that upon review of the complaint "with *our counsel,* Dorsey & Whitney, *Dorsey advises* us that it is best if we intervene in the litigation and assert our security interest and right to payment of any amounts found by the Court to be due President R.C." Exhibit L.L. On the same day, Miller & Schroeder, at the direction of Dorsey, advised the Tribe that it would be intervening in the action commenced by President against the Tribe for the purpose of protecting its security interest. The letter made clear, in no uncertain terms, that the loan participants were insisting that they had a security interest in the pledged revenues and that the Tribe had acknowledged that at least $13 million had been incurred in development costs. While stating that Miller & Schroeder was still very willing to discuss restructuring the loans, it said: "[S]ince we hold a security interest and right to payment of the funds alleged by President to be due them, it would be in our best interest to intervene in the lawsuit and assert our security interest and right to payment." *Id.* at CSB0077.

From this point forward, the Tribe's attitude appeared to change. Thomas continued to press the Tribe and President in an attempt to resolve the dispute amicably by restructuring the loans, but by late July, counsel for the Tribe wrote Thomas stating that the Tribe was no longer interested in a restructuring, was still in negotiations with Park Place, and nothing could be done until Park Place came to a management deal with the Tribe. Tab 88, Exhibit 83 B00346. Erickson reported this development to the loan participants

---

23. During his testimony, Jarboe said Thomas was flat out wrong on this issue. Of course, if Thomas was right, the St. Regis loans and the Notice and Acknowledgment of Pledge look like an assignment.

in a memorandum dated August 3.[24] He further reported that, *"Our counsel,* Dorsey & Whitney" was in the process of drafting a stipulation for intervention in the lawsuit between President and the Tribe; the Tribe had now retained a new lawyer to handle the negotiations between Park Place and the Tribe; and, the "Tribe will not give an estimated time frame for conclusion of these discussions." *Id.* at B00345. Also, he reported, Terrance had told Miller & Schroeder that the Tribe and Park Place were still negotiating, although they did not plan to go into serious negotiations until the development costs due President had been resolved. He further noted that Miller & Schroeder had again requested monthly operating numbers on the casino and Terrance had simply responded that he would bring the matter up with the Tribal Council.[25] President also stopped cooperating and refused to stipulate to intervention in its suit against Park Place because, from its perspective, Miller & Schroeder had no standing until it commenced a foreclosure action.

A conference call between loan participants, Dorsey, and Miller & Schroeder was scheduled for early September 2000, as little was being accomplished, and they still had no current financial statements on the casino. In preparation, on August 30, 2000, Thomas sent Jensen copies of the draft intervention motion papers. He advised that he had determined that this was the most expedient way to enforce the rights of the loan participants. The Complaint in intervention would seek judgment against President for all amounts due under the Notes; a full accounting from the Tribe for a determination of all amounts that had been generated by the casino, retrospectively and prospectively; judgment adjudicating the priority of the St. Regis loans in the development costs; and an order that reimbursement of the development costs be paid directly to the escrow agent for the benefit of Miller & Schroeder and the loan participants prior to any amounts being paid to President. The intervention motion was scheduled to be heard on September 21, 2000, in state court. After outlining these steps he said:

> [P]lease be assured that Miller & Schroeder and *the law firm of Dorsey & Whitney* are *proceeding* against President R.C. and the Tribe *without reservation.* I am providing this information to you and to the Loan Participants so that any dialogue that occurs in the conference call next week can be expedited and also that specific questions may be addressed either before, by calling me, or on the conference call. I am obviously willing to discuss this matter with any of the Loan Participants *and I encourage each and all to contact me at the above number,* either prior to or subsequent to the call, if there are any questions or concerns at any time.

Tab 89, Exhibit 84 DW–P003747. Once again, this was conflicted advice. Dorsey was in a position of conflict and it can be

---

**24.** As part of its obligations under the Loan Participation Agreement, Miller & Schroeder regularly advised the loan participants of developments. It always sent copies of its memoranda to the loan participants to Dorsey. The memoranda most often reported advice Dorsey had given as to how they should proceed and the reports were often prepared by Dorsey lawyers. Consistent with its obligations under the Management Agreement, Miller & Schroeder always asked for the requisite votes for major decisions in the enforcement proceedings.

**25.** Under ¶ 4 of the Notice and Acknowledgment of Pledge, the lender had a right to collect from the Tribe net revenues notwithstanding any defense, set-off, counterclaim or recoupment right the Tribe had against President. But, Dorsey was simply not pressing that point.

inferred that Dorsey was not representing Bremer without reservation. It was engaged in attempting to fix the problem for everyone, including the firm, and it didn't tell Bremer or the other loan participants what it was doing.

On that same date, Thomas emailed a copy of the pleadings in intervention to Erickson and said, "Finally, *since there are purported rumors of possible claims by the Participants against M & S I would like to review all communications to the Participants BEFORE any such communications are sent.*" [26] Tab 90, Exhibit 85.

On September 6, 2000, Miller & Schroeder held a conference with the loan participants. During the discussion, Miller & Schroeder told the participants that Terrance had referred Miller & Schroeder to Harry Cook, Chairman of the St. Regis Mohawk Tribal Gaming Commission, when Miller & Schroeder asked for financial information. *Id.* A main point of discussion was the participants' desire to get a list of all the participants in the St. Regis loans which Miller & Schroeder agreed to do. The participants also insisted that Dorsey meet again with the Tribe to make clear their grievances. Erickson sent a memo to all participants describing this as a conference call "in which *our Dorsey Counsel* outlined the status of the litigation and the estimated time frame going forward." Tab 88, Exhibit 83 B00309.

A meeting was arranged for October 3, 2000. To prepare for the meeting, Erickson wrote to Cook (with a copy to Thomas) reminding the Tribe of its obligation to provide financial information on casino operations. "Since the Tribe is required to provide this information pursuant to the Management Agreement and pursuant to

the Notice and Acknowledgment of Pledge under sections 4 and 7 they are required to provide the same information to M & S." *Id.* at MS 105017. Further, Thomas wrote to the Tribe's litigation counsel, John Piasecki, requesting that Piasecki attend the meeting and suggesting that the agenda include the current financial operations of the casino; the Tribe's commitment to improving casino operations; the status of negotiations between Park Place, the Tribe and President; and information on who was managing the casino. Thomas said he wanted the Tribal Gaming Commission present and they should discuss "any other issue that the Tribe feels is important for Miller & Schroeder to be aware of." *Id.* at MS 111813. Thomas also wrote to Cook asking again for financial information and noting that "as of that date the Tribe had failed to respond to Miller & Schroeder's many phone calls to his office in an attempt to ascertain the status of receipt of the financial information." *Id.* at MS 111811. In further preparation for the meeting, Thomas wrote again to Piasecki trying to get confirmation that Piaseki would attend the meeting and would deliver the much needed financial information. Thomas was clearly, thus, viewing this as an important meeting where they should try to bring the matter to conclusion. The Tribe and its lawyers did not respond.

On September 27, 2000, in preparation for his attendance at the upcoming meeting with the Tribe, Jensen went to Miller & Schroeder's offices and reviewed its files on the St. Regis loans. What he saw surprised him. He read the 1999 email string and concluded that the loan closed in a "chaotic" fashion and did not live up to standards he expected from a firm like Dorsey. By this time, Jensen began to

---

26. Jensen said he knew nothing about such reported rumors until much later. Once again it can be inferred that Dorsey was taking actions designed to protect itself, as well as others.

question the integrity of the representation that the loan participants were receiving in the enforcement proceedings. On his way out, he told Miller & Schroeder personnel to take a good look at the files because there were "red flags all over it," and said they should consider removing Dorsey from the case. Jensen testified that Miller & Schroeder declined to do so. Tr. Vol. I, pp. 193–94. Of course, Miller & Schroeder was still itself getting conflicted advice from Dorsey.

There were also developments in the suit between President and the Tribe. At the September 21 hearing, the state court judge told President it was going to dismiss the case because the Tribe's waiver of sovereign immunity was to suit in federal court not state court. Upon learning this, Thomas decided not to go forward with a motion to intervene. Instead, he decided they would commence an action in Minnesota Federal District Court against the Tribe and President. The loan participants agreed. Dorsey prepared a draft complaint, which, pursuant to Paragraph 6.4 of the Participation Agreement, named Miller & Schroeder as nominal Plaintiff and the Tribe and President as Defendants. The Complaint sought judgment against President for amounts due on the Notes, turnover and an accounting from the Tribe regarding financial information, and an order directing the Tribe to pay any sums owed to President to Miller & Schroeder. The Complaint specifically alleged, with respect to its claim against the Tribe, that the Tribe "also agreed in the Acknowledgment that M & S was entitled to the benefits of the Agreement *and could enforce the obligations of the Tribe under the Agreement relating to payment of sums due. The rights granted include the rights of M & S to be provided information generated or required to be kept by the Tribe under Sections 8.10, 10.6 and 10.7.*" Tab 94, Exhibit 89, p. 8 ¶ 30. The Complaint was filed in Federal District Court in Minneapolis on September 29, 2000.

At the meeting on October 3, 2000, the Tribe had in attendance five of the six members of the Tribal Council; Piasecki, its litigation attorney; and Cook, Chairman of the Tribal Gaming Commission. In addition, in attendance was Jensen, Anthony Palumbo from North Country Bank (another loan participant), Thomas and Erickson. The beginning discussions focused on the Tribe's insistence that payment to President was dependent on whether Park Place and President could agree that Park Place could buy out President's position. The Tribe also complained about President's failure to document construction costs. There was only the most superficial discussion of what Dorsey, Miller & Schroeder, and the loan participants had gone to New York to discuss. When they raised the Tribe's obligation to pay into the escrow and the continuing delinquencies in providing financial information, Terrance, on behalf of the Tribe, stated that the Tribe had no obligation to pay Miller & Schroeder at all because the Notice and Acknowledgment of Pledge had never been approved by the NIGC. He said that, if Miller & Schroeder could prove otherwise, the Tribe might change its mind, but in the meantime, the loan participants would not receive anything from the Tribe.[27] At this point, the meeting ended with no production of financial information and no resolution. *See* Tab 96, Exhibit 94. The Tribe had thus formally and publicly surfaced, for the first

---

27. Significantly, he did not say they did not need to pay because the casino was not generating net revenues.

time, its view of the deficiencies in the enforceability of the Notice and Acknowledgment of Pledge that Dorsey lawyers had worried about before closing the St. Regis loans. After he left the meeting, Thomas immediately called Rindels, who, he testified, advised that Terrance's position was wrong. In the airport, Thomas told Jensen that Terrance was wrong; approval of the Notice and Acknowledgment of Pledge was not needed. Tr. Vol. I, p. 199.

Privately however, Jensen felt that, based on his review of the file and what had just happened, he needed another lawyer. On October 5, 2000, he asked Miller & Schroeder to check whether the NIGC had approved the Amendment to the Management Agreement or the Notice and Acknowledgment of Pledge or any of the other loan documents. Miller & Schroeder, still under the conflicted advice it was receiving, responded that the NIGC had not done so. In language ghosted by Thomas (*see* Tab 95, Exhibit 92), it said, "The loan documents were sent to them but only as a courtesy inasmuch as the loan was not to the Tribe, but rather to the management company." Tab 95, Exhibit 93 ¶ 4, DW–B 017934. On October 13, 2000, Jensen had his first meeting with Winthrop and Weinstein lawyers. *See* Stipulated Bills of Winthrop and Weinstein.

Dorsey and Miller & Schroeder took the Tribe's comments about the invalidity of the Notice and Acknowledgment of Pledge seriously. On October 4, the day after the New York debacle, Rindels met with Miller & Schroeder. She attended yet another meeting with Miller & Schroeder on October 6, and following that meeting Erickson sent an internal memorandum to his staff and a memorandum to the participants in which he reported his recollection of the meeting in New York. The memorandum to participants contained the following paragraph which had been carefully revised by Thomas and which Dorsey lawyers knew, but Miller & Schroeder did not, was once again very conflicted advice:

> At the meeting *one of the Tribal Council members*[28] took the position that the President loan was not approved by the National Indian Gaming Commission and, as a consequence, the Tribe does not have to recognize or comply with the Notice and Acknowledgment of Pledge and Miller & Schroeder's secured interest in the Development Expenses. *Our attorneys have advised us that that conclusion is incorrect and not sustainable as the loan was not to the Tribe but rather to the management company retained by the Tribe under the Management Agreement.*[29] The NIGC did approve the Management Agreement and amounts, up to $20,000,000, for the construction of the Casino, which includes the amount of the Loans to President. The Tribe in separate documents, i.e. Tribal Resolution 99–005 approved of Development Expenses of up to $20,000,000. That Resolution was attached to the Notice and Acknowledg-

---

**28.** Again, in one of its more indefensible defense positions, Dorsey kept insisting that the statement was made by only one member of the Council, suggesting that it was not a stated Tribal position. This was specious. They had been dealing with Terrance for months on the issue, he was a Tribal Sub–Chief, and no one representing the Tribe who was in attendance at the meeting questioned his statement or his authority to make it. Dorsey spent considerable trial time, once again, trying to dance around documented evidence.

**29.** Over time Dorsey's explanation for why approval was not needed changed and expanded. At times Dorsey claimed that no loan needed NIGC approval regardless of who it was made to.

ment of Pledge and signed by the Council on behalf of the Tribe.

Tab 96, Exhibit 96, DW–P 005537–38 (*see* original draft at Tab 96, Exhibit 95).

That same day, Thomas wrote to Paisecki saying they would be amending the Complaint to add an additional claim against the Tribe for an accounting of how the lender's money had been spent. Tab 96, Exhibit 98 DW–P 018225–26. He also told Piasecki that he had reviewed the NIGC question with Dorsey's Indian & Gaming Department, and Terrance's "position was not well taken." *Id.* at DW–P 018226. He did reiterate he would suspend the litigation against the Tribe if the Tribe would agree to furnish financial reports and agree to escrow net revenues to the escrow account.

In mid-October, apparently now really worried about a challenge to the validity of the Notice and Acknowledgment of Pledge, Rindels spent five hours reviewing Dorsey's 1999 files. By mid-October, other loan participants were starting to question Miller & Schroeder, and with respect to each, Miller & Schroeder sent Dorsey ghosted and carefully reviewed letters denying any liability. The conflict was starting to blossom. Miller & Schroeder was merely reiterating what it was being told, i.e., that Dorsey had not done anything wrong.

Finally, apparently sensing that a conflict was coming to the forefront, on November 6, 2000, Jarboe (the billing partner) told Rindels and Thomas to go through their October time sheets and transfer to a new file any time relating to the potential claims of participants against Miller & Schroeder. Tab 98, Exhibit 99. Up until this time, all of Dorsey's legal services for the loan participants and Miller & Schroeder had been billed to the file Jarboe had opened in December 1998.

Because the Tribe had not and would not consent to service of process, on November 8, 2000, Thomas served the Tribe with the Complaint in the Minnesota action. Although it had no right to do so under ¶ 4 of the Notice and Acknowledgment of Pledge, the Tribe was still insisting that it would do nothing to satisfy the lender until President and Park Place agreed to resolve their lawsuit. Thomas, thus, attended a meeting on November 6, 2000, with representatives of Park Place and President. At the meeting, Park Place advised it had turned the casino operations around and the casino was now breaking even. Park Place further reported it had a Management Agreement with the Tribe pending before the NIGC and that background checks had been completed. President and Park Place discussed terms of a global settlement in which Park Place offered to pay $9 million to buy out President's interest in the Management Agreement. While receptive, President insisted upon being paid the several million dollars it claimed to have provided for operations ahead of the loan participants. The terms of the loans would be substantially restructured. After returning, Thomas prepared a memorandum addressed to Miller & Schroeder and the loan participants which recorded this meeting, and Erickson sent it to the loan participants. Exhibit RR. Miller & Schroeder then called a meeting of the loan participants for November 15, 2000, to decide how to respond to the settlement proposal. Apparently most loan participants voted to continue negotiations and to make a counteroffer.

By December 8, 2000, the negotiations regarding the possible global settlement were at a standstill and Erickson advised the loan participants that President was not willing to give up anything. He further advised that Thomas had sent a letter to the Tribe instructing them not to pay

any money to President and further that Park Place was no longer on the job and the casino was being operated by a tribal member with some knowledge of the gaming industry. Once again the participants were advised that the Tribe was refusing to furnish financial information on the casino. Erickson reported that no global settlement was possible, even though the loan participants had apparently made a counter-offer. Thus, Park Place and President were continuing their lawsuit, President and the Tribe were still litigating and now the President litigation was continuing in Federal District Court in Minneapolis.

Sometime between December 8 and December 11, however, Dorsey decided to dismiss the Tribe as a defendant in the President litigation [30] and Thomas told counsel for the Tribe that he would instead pursue the claim for an accounting of the development costs by way of third party subpoena against the Tribe during discovery. Tab 105, Exhibit 107 MS 111707. There was no credible explanation given at trial for why Dorsey made this strategic decision to dismiss the Tribe at all or at this time. I conclude that Dorsey decided to drop the Tribe from the President litigation because it knew that, if it didn't, Dorsey's potential malpractice would surface immediately. Moreover, it had been told on December 7, that it was an unnamed but potential targeted defendant in Bremer's lawsuit. The decision to drop the Tribe from the litigation came within days after Dorsey met with Winthrop and Weinstein and representatives of Bremer during which it learned that Bremer was considering suing Miller & Schroeder for fraud and might name Dorsey as a defendant and assert that the validity of the

NIGC pledge was in play. When it decided to drop the Tribe from the litigation, apparently with no consultation with Miller & Schroeder or the participants, it was in a conflicted position. With this step and others, Thomas was following, and continued to follow, a pattern of avoiding a situation where it would have to actually prove up the validity of the Notice and Acknowledgment of Pledge.

Dorsey formally dismissed the Tribe as a defendant in the President litigation effective January 29, 2001. Miller & Schroeder paid Dorsey $285,844.72 and Marshall paid Dorsey $5,183.59 in attorney's fees and costs in the President litigation. Miller & Schroeder attempted to pass these costs on to the participants but most did not pay and Miller & Schroeder ended up out of pocket on most of the bills. The President litigation went on even though everyone knew that President was insolvent and would likely file for bankruptcy relief, and that the only possible value in obtaining a judgment against President was whatever value it might have to Park Place or the Tribe as a bargaining chip in their disputes with President. No further action was commenced against the Tribe while Dorsey continued to serve as counsel and Dorsey never subpoenaed financial records on the casino operations as it had told the loan participants and Miller & Schroeder it was going to do. As a result, Miller & Schroeder and the loan participants have no financial records on the operations of the casino after March 30, 2000.

During the President litigation, President counterclaimed against Miller & Schroeder contending that it was entitled

---

**30.** I do not find credible Thomas' explanation that he believed dismissal of the Tribe would make the lawsuit more streamlined and permit the plaintiff to obtain an enforceable judgment faster. Not given the timing. As it turns out, pursuing a defendant (President) with no money in a suit on a note took nearly 18 months and cost around $300,000 in legal fees.

to priority for at least $3.5 million in operating costs that it had provided for casino operations while it was manager. It also asserted that the Loan Agreement contained ambiguous language that provided defenses. The case came to an end on February 21, 2002, when Judge Doty granted summary judgment in favor of Miller & Schroeder on its breach of contract claim and dismissed with prejudice President's counterclaim. President and Miller & Schroeder then entered into a stipulation for an award of damages. The judgment on St. Regis I was in the amount of $11,092,422.92, covering interest and principal under St. Regis I, and a total of $28,061.49 in servicing fees, for a total judgment of $11,120,484.21. The judgment on St. Regis II was in the amount of 4,493,767.50 in interest and principal, and a total of $11,276 in servicing fees, for a total judgment of $4,505,043.75. The parties agreed that the Court would enter an order for judgment in Miller & Schroeder's favor for $11,120,484.41 on St. Regis I and $4,505,043.75 on St. Regis II, with interest to accrue on both amounts pursuant to 28 U.S.C. § 1961(a) at a rate of 2.24% from February 21, 2002, through the date of payment. The stipulated interest rate was significantly below the contract interest rate. On April 10, 2002, over eighteen months after it began, Judge Doty entered judgment against President in that amount. Since President was judgment proof, the judgment was essentially worthless, unless it had some strategic value to the Tribe or Park Place.

## XV. The Bremer/Miller & Schroeder Litigation

At his first meeting with the St. Paul law firm of Winthrop & Weinstein, Jensen asked the firm to review the situation. Jensen no longer trusted the information he was getting from Dorsey. He did not then know that all written communications to him were being ghosted or carefully reviewed by Dorsey.[31] On November 30, Thomas sent a memo to Palmer saying, "Bremer/Bud Jensen has not given any direction [on the pending global settlement discussed at the November 6, 2000 meeting] (he holds 57% of the Subordinated debt). Bremer wants a meeting next week and they want to bring Bobby Weinstein (ugh)." [32]

Thomas, Weinstein, Erickson and a representative for Bremer (not Jensen) met on December 7, 2000. At the meeting, Weinstein handed Thomas a draft complaint of a fraud action to be commenced by Bremer against Miller & Schroeder in Ramsey County District Court. The Complaint alleged that Miller & Schroeder defrauded Bremer by fraudulently misrepresenting that the loan had received the required NIGC approval for the Notice and Acknowledgment of Pledge when, in fact, it had not. Paragraphs 16, 17, 18 and 19 of the Complaint made allegations suggesting that Dorsey's advice was defective and at the center of the dispute and that Dorsey was a targeted, if unnamed, defendant. For example, Paragraph 16 alleged:

> Miller & Schroeder retained *the law firm of Dorsey & Whitney* (the "Law Firm") to provide legal representation to Miller & Schroeder in connection with the Loans. While preparing for the closing of the Loans, Miller & Schroeder and the Law Firm knew that it was critically important to obtain NIGC approval of the Amendment. Without

---

**31.** Indeed, once Bremer sued Miller & Schroeder, Miller & Schroeder apparently stopped sending regular reports of progress on the President litigation.

**32.** I could only speculate as to what he meant by "(ugh)," although one reasonable interpretation is that he knew the problem was now really coming to a head.

NIGC approval, Miller & Schroeder and the *Law Firm* knew that the Amendment would not be enforceable against the Tribe. Without an enforceable Amendment, Miller & Schroeder *and the Law Firm* knew that the Tribe would not be obligated to reimburse President R.C. for more than $20,000,000 of the Development Expenses.

Exhibit TT, PRIV 502145–46.

Paragraph 17 of the proposed Complaint alleged:

As experts in Indian gaming, Miller & Schroeder *and the Law Firm* also knew that it was critically important to obtain NIGC approval of the Pledge Agreement. Without NIGC approval, Miller & Schroeder *and the Law Firm* knew that the Pledge Agreement would not be enforceable against the Tribe. The enforceability of the Pledge Agreement was critical to the repayment of the Loans ... Without an enforceable Pledge Agreement, Miller & Schroeder *and the Law Firm* knew that Miller & Schroeder could not compel the Tribe to comply with the terms of the Pledge Agreement and that the prospects for repayment of the Loans would be materially impaired. Accordingly, Miller & Schroeder made NIGC approval of the Pledge Agreement an express condition precedent to the closing of the Loans.

*Id.* at PRIV 502146–47.

Paragraph 18 of the proposed Complaint alleged:

On the Closing Date, Miller & Schroeder closed and funded the Loans even though NIGC approval of the Amendment or the Pledge Agreement had not yet been obtained. As of the date of this Complaint, the NIGC has still not

approved the Amendment or the Pledge Agreement. As a result, neither the Amendment nor the Pledge Agreement is enforceable against the Tribe. The Tribe has declared that neither the Amendment nor the Pledge Agreement is enforceable against it.

And finally, Paragraph 19 alleged:

On ... the Closing Date, Miller & Schroeder *and the Law Firm* knew that the NIGC had not approved the Amendment or the Pledge Agreement. Consequently, Miller & Schroeder *and the Law Firm* knew that neither the Amendment nor the Pledge Agreement was enforceable against the Tribe. Miller & Schroeder *and the Law Firm* therefore also knew that the prospect for repayment of the Loans was materially impaired.

*Id.* at 502147. Bremer sought rescission and/or, alternatively, damages and attorney's fees. Weinstein gave Thomas some time to respond.

Thomas returned to his office and prepared a memo to Rindels and Palmer reporting on the meeting. Rather than immediately admitting that Dorsey was in a terribly conflicted situation, he stated that he had been given a copy of the Salient Data sheet on St. Regis II, which indicated that NIGC approval was necessary, but added, "I also understand that Dorsey & Whitney subsequently determined and informed Miller & Schroeder that the Consent of the NIGC was not necessary inasmuch as this was a loan, not to the St. Regis Mohawk Tribe but rather directly to President R.C., as a non-Indian Borrower." He opined that the fallacy in Weinstein's argument was that even if there were problems, the casino was not producing revenue anyway,[33] and said,

33. It is questionable that he really thought so and, despite numerous attempts to obtain the

information, had no revenue information to support such a statement. To the contrary, it

I also understand but have not confirmed that when the determination was made to proceed with the closing without the consent of the NIGC to the Pledge that letters were sent to all of the prospective participants. Miller & Schroeder is trying to verify whether or not the particular notice that the closing was going to proceed without the Pledge was sent to Bremer.

Tab 102, Exhibit 103, PRIV 502656. He also noted that Bremer's claim that the Amendment to the Management Agreement was not approved was irrelevant because the increase in cap on construction costs would not impact the loan participants. He asked Rindels to confirm the facts as he understood them. Sensing that there were possible ethical problems (if the wrong ones), he sent a copy to Tinkham and Wernz. He also sent a copy to Jarboe. He said:

> By a copy of this to Tom and Bill, note that although not named as a defendant, a number of allegations are made by Bremer that Dorsey & Whitney was negligent in the preparation of the documents, not obtaining NIGC approval for the Amendment and "as experts in Indian gaming, Miller & Schroeder and the law firm knew that it was critically important to obtain NIGC approval of the Pledge Agreement." I suspect that our mention in the draft Complaint is for the purpose of trying to disqualify us as counsel to Miller & Schroeder if this proceeds to litigation. I would ask that Bill review this to determine whether or not we are disqualified from the representation merely because Paula may be a fact witness. My general understanding is that that does not per se disqualify us. *Oppenheimer Wolff & Donnelly*

*is lobbying Miller & Schroeder to represent them on this issue but I would obviously prefer to keep all of this within the firm to the extent we can.*

*Id.* at PRIV 502657. In so seeking to keep the business "within the firm to the extent we can," it is more likely than not that Thomas' motives were mixed. One of his concerns is likely to have been that, if Oppenheimer or any other law firm was retained as counsel for Miller & Schroeder to defend the litigation, that outside firm would have been able to cast an independent eye on a potential claim against Dorsey or, in fact, decide that Dorsey should be the only defendant. Also, clearly there was the profit motive in being retained to represent Miller & Schroeder in a major piece of litigation and to keep that business away from a competitor.

Rindels responded to Thomas with a copy to Palmer and Tinkham, indicating that Miller & Schroeder was the client in the 1999 transaction, not the loan participants, and that all Dorsey's work since then was for Miller & Schroeder: "We did not advise any of the loan participants directly." Tab 102, Exhibit 105, DW–B 022631. Her memorandum was eerily silent with respect to the claims that Dorsey had malpracticed set out in the draft Complaint. It can be reasonably inferred that by this time she knew of Dorsey's malpractice problems and already had Dorsey's standing defense in mind. Thomas then discussed the matter with Wernz and Tinkham, who advised that the firm could represent Miller & Schroeder even though Rindels might likely be a fact witness. They were not asked to think about any other conflict issue and, in spite of the fact that it must have been clear that Dorsey's malpractice was at issue, they did nothing

is likely that the casino was or would be making money. Park Place, presumably a sophisticated gaming company, only weeks

before had offered, in his presence, to buy out President's interest in the Management Agreement for $9 million.

more.[34] Thomas also discussed the case with Jarboe who, still without researching the issue, opined that NIGC approval was simply not needed. At Thomas's request, Miller & Schroeder gathered its files and Thomas asked Miller & Schroeder to check once more to see whether there were any other notices sent around this time regarding NIGC requirements and whether Bremer had received them.[35] Thomas also sought the facts regarding why the Salient Data Sheet on St. Regis II was different from the Salient Data Sheet on St. Regis I.

Even though it should have been clear to Thomas, Rindels, Jarboe and others at Dorsey by this point that the finger was pointed at the advice it had given in February 1999, and that Miller & Schroeder or the loan participants had a potential serious claim against Dorsey for malpractice, Dorsey did not tell Miller & Schroeder to seek an independent opinion on the subject and Miller & Schroeder did not get one. Nor did Dorsey fully disclose to Bremer and ask Bremer's consent to conflicted representation. Instead, once again Dorsey kept the problem in-house. Thomas' December 8 memo to Miller & Schroeder advised that "I have reviewed this with Paula, Mark Jarboe and three of my litigation partners and all express the view that NIGC approval is irrelevant." Tab 102, Exhibit 104. That is the extent of the inquiry Dorsey made. Dorsey decided that it could be retained as counsel and Miller & Schroeder retained Dorsey to represent Miller & Schroeder in the Bremer/Miller & Schroeder litigation. The Dorsey conflict-check ran two names, Miller & Schroeder and Bremer, which turned up no conflict.[36]

On December 18, having discussed the matter within the firm, but not having obtained an outside opinion on the issue of validity of the Notice and Acknowledgment of Pledge or telling the clients to do so, Thomas wrote to Weinstein. Thomas took the position that the loan was not to the Tribe, but was a loan to President, thus no approval of the Notice and Acknowledgment of Pledge was needed. In addition, Thomas opined that non-approval was irrelevant because the casino had never generated revenue. As a result, he said, the issue of non-payment to the participants was not due to any NIGC failure to approve the Notice and Acknowledgment of Pledge, but rather was caused by the fundamental inability of the project to generate revenues that would permit payment of the pledged revenues to President. He asserted that the Notice and Acknowledgment of Pledge had been duly recorded in the proper UCC filing office. And, finally, he reiterated that the approval of the Amendment to the Management Agreement was irrelevant because the loan participants were in first priority with respect to payment. Having talked with Rindels, Thomas testified, he put in the following paragraph:

> *MS concluded with the concurrence of my firm* that NIGC approval was not required with respect to the loan documents and the Notice and Acknowledg-

---

34. Was there nondisclosure within the firm itself? Do lawyers in large law firms sometimes not tell their ethics counselors or their conflicts people everything they should? It happens, for sure. Whether it happened here is a fact I need not and do not address.

35. Dorsey later determined it could not prove that Bremer had received any of the memos.

36. It could not have because Dorsey's files did not reflect that since 1998 Dorsey had been representing loan participants, including Bremer, with respect to the St. Regis I and II loans.

ment of Pledge.[37] Conversations with the NIGC had indicated that they were only interested in whether MS's interest in the management fees and the payment of development expenses would give MS the ability and authority to manage the casino in the event of nonpayment of accounts due. As you know, MS has no such management rights, and the NIGC was only interested in verifying that fact.[38]

Exhibit XX, DW–B 025318. While Thomas acknowledged that at the October meeting "one of the Chiefs made that statement, however, that is not the official position of the Tribe," [39] he urged that one of the Tribal attorneys had confirmed that the Tribe was bound by their documentation.[40] *Id.* at DW–B 025319. Finally, he argued,

> a notice, attached to this letter, was sent to all participants in February of 1999 that MS was going to proceed with the closing notwithstanding the fact that as of that date the NIGC had not approved the cap *increase to the Management Agreement*.[41] MS phone records indicate that this was sent to Bremer. MS

records also indicate that Bremer executed a revised Participation dated as of March 1, 1999 and the loan was actually funded on April 5, 1999. This knowledge was therefore available to them as it was to all other participants at the time of the purchase.

*Id.* He attached to the letter an undated (with no addressee) Fredericks' memorandum which she did send to most participants on February 18, 1999. If one carefully reads this letter, one can conclude, and I find, that while Dorsey was purporting to represent Miller & Schroeder against a fraud claim by Bremer, it was also trying to deflect the suit away from itself.

On December 21, 2000, Bremer served its Complaint in the Bremer/Miller & Schroeder litigation. Perhaps accepting Dorsey's deflection attempts, the allegations of the quoted paragraphs of the Complaint had been changed. There were no references to Dorsey & Whitney in the quoted paragraphs of the Complaint that was served.[42] Dorsey served the Answer

---

37. This was not true. Thomas knew Bremer's lawyers might name Dorsey as a defendant. While purporting to represent Miller & Schroeder, once again, Dorsey sought to lay blame on its own client, Miller & Schroeder. From a professional ethics viewpoint, this is unacceptable conduct. The Dorsey firm was clearly responsible for providing regulatory guidance.

38. This was also plainly inaccurate. The NIGC had indicated no such thing. Stuckwish had indicated that it was interested in whether Miller & Schroeder had a security interest in management fees.

39. I have found this position to be utterly defenseless. Terrance spoke for the Tribe. Dorsey knew it.

40. There is no evidence in this record to support this statement.

41. He made no mention of what that memo said about NIGC approval of the Notice and Acknowledgment of Pledge.

42. One can only speculate on why one large law firm in the Twin Cities chose not to sue the largest law firm in Twin Cities. There is no record with respect to why this change was made. One could infer that law firms do not like to sue other law firms if they do not have to. One might also infer that Bremer's lawyers saw what they would be facing, a suit in which Dorsey kept saying it was all the client's fault, and accordingly declined to further complicate their lawsuit. In other words, Winthrop & Weinstein as a litigation tactic accepted, at least initially, the position stated by Thomas in his letter, that the fraud, if there was such, was Miller & Schroeder's doing. Neither side developed this issue. I don't think it makes any difference.

the next month. The litigation went on for another 15 months.

Prior to undertaking representation of Miller & Schroeder in the Bremer/Miller & Schroeder litigation, Dorsey:

a) did not advise Miller & Schroeder that: the Pledge needed NIGC approval, Miller & Schroeder and Bremer had a claim against Dorsey, or that Dorsey itself was the proper defendant in Bremer's action;

b) did not obtain, or counsel that Miller & Schroeder to obtain, an independent third party opinion on the question of validity of the Notice and Acknowledgment of Pledge;

c) did not withdraw in the face of conflict;

d) did not fully disclose the contents of its files on the original transaction or explain that it might have been wrong;

e) did not explain the potential conflict and obtain from Miller & Schroeder and/or Bremer a consent, written or oral, to waive any such conflicts;

f) did not fully disclose the extent of Dorsey's exposure for malpractice; and

g) steered Bremer in the opposite direction of suing Dorsey, suggesting instead it was all Miller & Schroeder's fault.

The perils of representing a client when the law firm was conflicted surfaced early in the Bremer/Miller & Schroeder litigation. The case was staffed by Palmer and Dornbos. Several Dornbos documents demonstrate that Dorsey spent a lot of time and effort during this lawsuit in the early part of 2001 avoiding getting to the issue of the propriety of the advice it had given in 1999. At the commencement of his work, Dornbos reviewed the files and prepared an internal time-line of what had happened. In doing so, he had before him the June 29, 2000, memorandum, and, af-

ter reviewing that memorandum, concluded that Thomas's words meant what they said. He made the following entry for June 29, 2000, "Participation update re: retention of John Thomas as counsel for participants and enclosing Thomas's memo to participants re: St. Regis Loans." Tab 121, Exhibit 124, DW–B 010882. No one at Dorsey told him otherwise, and from the beginning Dornbos saw some difficulty in representing the participants in one case while at the same time defending against the same participant in later litigation, although he seemed to limit that concern to the unseemliness of Dorsey having to put one of its lawyers on the stand to defend the integrity of its work. As discovery proceeded, Dornbos was increasingly faced with the difficulty of trying to protect the internal emails from discovery requests by Bremer.

On May 6, 2001, Dornbos sent Thomas and Palmer an update on the case in order to prepare Thomas for a meeting with Miller & Schroeder. He noted that they were in the midst of written discovery and, while Dorsey had produced most requested documents, claiming privilege, it had not produced internal emails. He also noted that Bremer had scheduled depositions, was working its way up the ladder and would eventually get to deposing Erickson, Brenden and Fredericks. He said he knew Bremer would not accede to Dorsey's refusal to produce the emails on attorney client privilege grounds. Also, he noted that there was no sense from their perspective to deposing anyone at NIGC: "Deposing someone from the NIGC would probably be pointless as we've discussed before and would probably undercut whatever our NIGC expert might have to say on the issue." Tab 121, Exhibit 123, DW–B 012263. He said he understood that they were going to get an expert on the NIGC issue, hopefully one who "is a Dor-

sey friend." He noted that Bremer's strategy was to focus on the misrepresentation count and that in response they had to show that Frank had affirmatively told someone at Bremer that they were closing without approval of the Pledge, attack the causation element of the misrepresentation claims, emphasize that Bremer had a duty to do its own due diligence in order to show that Bremer entered the transaction with its eyes wide open as to risk, and demonstrate through an expert (the "friend of Dorsey") that NIGC approval was not necessary.[43] He outlined the "problems" with the case. They included that Miller & Schroeder could not locate any proof that Bremer had ever received Fredericks's memo of February 18 so there was no "smoking gun;" also, as to the attorney client privilege,

> by allowing Bud Jensen access to all files, including the legal file (which included email correspondence between Paula Rindels and Chris Karns on the NIGC issue), Miller & Schroeder likely waived the attorney-client privilege as to that issue, if not to all issues. There are really three representations involved in this case-the first is Dorsey's representation of Miller & Schroeder with respect to the Loans, the second is Dorsey's representation of Miller & Schroeder and the participants with respect to the action against President R.C., and the third is Dorsey's representation of Miller & Schroeder with respect to Bremer's action against Miller & Schroeder. The privilege as to the first was likely waived by Miller & Schroeder when Bud was given access. The first two present privilege problems. *The privilege as to the second probably also no longer exists because Bremer is really a former client and has appeared to waive that privilege by suing Miller & Schroeder.*[44] The privilege as to the third likely remains, though who knows how Judge Lindman will handle it. Based on his scheduling order, I am not confident he will be able to resolve those problems in a manner that is sensitive to the complexity of the situation.

*Id.* at DW–B 012264. Their final problem and the one that concerned him most was the following:

> Dorsey's involvement in the Loans. If we are unable to beat Bremer's case on summary judgment [and he had previously said that he did not think they could], we are likely going to have to withdraw from representing Miller & Schroeder because we will then have potential adversity with the client. Bremer has made it clear that it will make several Dorsey attorneys witnesses. Perhaps Winthrop is bluffing, but their aggressive pursuit of Dorsey communications leads me to believe that they have Dorsey's transaction advice at the center of their strategy. *Combine that with the privilege issues and it is difficult for me to see how we could represent Miller & Schroeder at trial, even if it is technically possible.*

*Id.*

One might dismiss these comments as those of an experienced young attorney, except for the fact that Dornbos left the firm on July 1, 2001, and at his deposition he testified that during all the time he worked on the President and Bremer/Miller & Schroeder litigation, he was never

---

43. There are many of the same defenses it asserts in this case.

44. He testified that he did not remember why he had used "former," although Bremer suggests he may have been referring to Dorsey's representation of Bremer in the St. Regis Loan Transactions.

told that someone at Dorsey had orally advised Miller & Schroeder that there was no need for NIGC approval prior to the closing, nor was he disabused of any of the statements made in his memos. Dornbos Deposition Transcript, pp. 23, 27–28. It is unclear whether Thomas or Palmer ever conveyed Dornbos' concerns to Miller & Schroeder. What is clear is that Dorsey did not withdraw, and the Bremer/Miller & Schroeder litigation went on until February 22, 2002, when Ramsey County District Court Judge Lindman issued an order granting summary judgment against Bremer on the claims Bremer had added against Erickson and Frank, and stayed the action against Miller & Schroeder in light of Miller & Schroeder's having filed for Chapter 7 bankruptcy relief on January 22, 2002. During that litigation, Miller & Schroeder paid Dorsey attorney's fees and expenses for conducting the defense in the amount of $550,499.60 and Marshall paid Dorsey $45,916.29 in defense of the litigation.[45]

## XVI. The Efforts to Collect Against The Tribe

When Marshall purchased the loan syndication assets of Miller & Schroeder on August 31, 2001, it became a sub-agent of Miller & Schroeder and took on responsibility for servicing the St. Regis loans as agent for Miller & Schroeder, and it inherited the two lawsuits. Marshall made no change in attorneys in either of those cases, but continued to use Dorsey as counsel for the loan participants. When Marshall stepped into Miller & Schroeder's shoes, Dorsey made no disclosures to Marshall regarding its malpractice issues and did not seek or obtain Marshall's consent to any conflicted representation.

Even though, by August 2001, the developed evidence would have suggested to Dorsey it was absolutely necessary, Dorsey did not tell Marshall to get an outside opinion. The lawsuits simply carried on as they had been going.

In late 2001, however, Marshall, which apparently could afford to litigate no longer or concluded that enough was enough, approached the Tribe once again in an attempt to get paid and to receive financial information. The Tribe ignored these approaches. However, on March 15, 2002, Russell Barr, counsel to the Tribe, wrote to Marshall, suggesting that the Tribe would produce financial information, but only if the Notice and Acknowledgment of Pledge had received NIGC approval under 25 C.F.R. §§ 2701–2721 ("Would you kindly provide me with documentation indicating that the NIGC has approved the Pledge? Upon receipt of such documentation, I would be happy to discuss the current lawsuit between the Nation and President, as well as the current financial condition of the casino."). Tab 109, Exhibit 11, DW–P 016851. Importantly, he made no suggestion that the Tribe didn't owe anything because there were no net revenues. Soon thereafter there were tri-party discussions between Park Place, the Tribe and Marshall. During these discussions, Park Place suggested it would be interested in buying the President judgment at a discount, but only if Marshall could have Dorsey demonstrate the fact that it had given advice in February 1999 that the Notice and Acknowledgment of Pledge did not need NIGC approval. Dorsey initially declined to do so. Marshall and Dorsey then had heated discussions over whether Dorsey was backing away from the advice that it

---

**45.** The parties estimated that $90,000 of these total fees were paid to defend Erickson and Frank.

said it had given. In a memorandum dated April 30, 2002, Jarboe memorialized this heated discussion and Dorsey's inability to immediately provide the client with any proof of the advice Dorsey claimed it had given. Tab 54, Exhibit 48 DW–P 004624. Throughout April, Dorsey lawyers, knowing that the issue had once again reared its ugly head, spent approximately $30,000 of legal time researching the question of whether the Notice and Acknowledgment of Pledge needed NIGC approval (which they charged to the client). On May 2, 2002, using the benefits of that research, Jarboe delivered a written opinion at Marshall's request in which he opined that they had, indeed, given the advice "in connection with the closing" (but he did not say when, to whom, or how) and further opined as to why that advice was correct. He was clearly referencing an oral statement.[46]

On May 9, 2002, Marshall's new CEO, Tablovich, sent Jarboe's letter to the loan participants and told them that he had urged Park Place to expeditiously move forward to resolve the matter. If not, he sought the participants' consent to sue the Tribe to enforce all rights under the Notice and Acknowledgment of Pledge and/or negotiate a sale of the judgments to the Tribe or to Park Place. Tab 112, Exhibit 113 DW–P 007221.

In the meantime, Dorsey found itself in yet another difficult situation. That same month, May 2002, Bremer made a demand on Marshall to poll the loan participants on whether they should commence a malpractice action against Dorsey. Marshall, which just like Miller & Schroeder, seems never to have understood just how conflicted Dorsey was, asked *Dorsey* to give Marshall an opinion on whether to accede to that demand. In response, rather than telling Marshall that it was in no position to opine on its own negligence, Jarboe and Palmer prepared a memorandum to be sent to Tablovich, John Jagiela and Erickson at Marshall. Not surprisingly, the memorandum recommended against such action. The memorandum was reviewed before it was sent by Thomas. It begins,

We should note at the outset that we are hardly disinterested in this matter or in the decision that Marshall may make in response to Bremer's request. Nevertheless, in our role as your counsel we will, as best we can, give you our objective analysis of the request and the effect such an action would likely have on the other participants.

Tab 114, Exhibit 114. The memorandum proceeds to reiterate the line that Dorsey had been taking (NIGC approval was never necessary and besides it did not make any difference because the casino never made money and Dorsey had a friendly expert witness ready to so testify if needed). The memorandum states the author's view that "in order for the Participants (including Bremer) to bring a malpractice action against Dorsey, the Participants would have to establish that an attorney-client relationship existed between them and Dorsey or that the participants were third-party beneficiaries of the attorney-client relationship that existed between M & S and Dorsey." *Id.* Next to that language, drafted by Palmer and Jarboe, are Thomas's notes, "Aren't they?", suggesting that he at least was troubled by the claim that the loan participants had no standing. In conclusion, the memorandum urged that such a demand should be rejected because,

---

46. Again, it seems most peculiar that the associate at Dorsey, Dornbos, who worked on both of these pieces of litigation, had not heard about such an oral conversation until Dorsey lawyers were preparing him for his deposition in the loan participant's lawsuit against Dorsey.

if an action against Dorsey was commenced, then the negotiations with Park Place and the Tribe to purchase the President judgment would be jeopardized. After all, the memorandum noted, both Park Place and the Tribe were asking for assurance that Dorsey had opined that NIGC approval was not necessary and Jarboe had recently written his letter of May 2, 2002, to that effect.

> If the Pledge is unenforceable, then there is little reason for the Tribe or Park Place to acquire the judgment from M & S. If Marshall and the participants were to claim, in litigation against Dorsey, that the Pledge required NIGC approval and is unenforceable because such approval was not obtained, then Marshall and the participants would likely scuttle the discussions with the Tribe and with Park Place. Marshall and the participants would also provide support to the Tribe should the Tribe determine to resist making payments under the Pledge, as the Tribe would simply point to Marshall's allegations in the suit against Dorsey as admissions by Marshall that the Pledge was unenforceable. Marshall and the participants cannot, in discussions with the Tribe and Park Place or in potential future litigation against the Tribe, claim that the Pledge is enforceable and the Tribe is obligated to make payments to M & S under it and simultaneously claim, in litigation against Dorsey, that the Pledge is unenforceable.

*Id.* at DW–B 022447. What the memo does not say is that, if Bremer was right, the loan participants had a real shot at getting paid in full from Dorsey rather than a shot at chasing recovery on a judgment that was uncollectible and had no value except for strategic purposes.

Marshall, in the meantime, had received authorization from the loan participants to negotiate the sale of the judgment against President and to initiate legal action against the Tribe to enforce rights of the loan participants under the Notice and Acknowledgment of Pledge. The Bremer demand was ignored or rejected and Thomas continued once again to try to persuade the Tribe to come to the table. Thomas wrote to the Tribe and said, "I am afraid that the *Participant Banks* will conclude that their only recourse *will be to direct us to commence a legal action against the Tribe to enforce the Tribe's contractual obligations* under the Pledge Agreement, to seek an accounting and to require the Tribe to pay over the amounts described in the Pledge Agreement."[47] Tab 115, Exhibit 115 DW–P 016949. He urged that he was optimistic that they could resolve their differences without suit.

The Tribe, however, continued to ignore Thomas, and Marshall finally went elsewhere for legal advice. It hired Dewey Ballantine, a New York law firm of high reputation, to commence an action against the Tribe. Dewey prepared the Summons and Complaint, which was expected to be served on July 22, 2002, but the suit was never commenced. (*See* discussion of Neil Hamilton testimony in part IV A.) Finally, on December 13, 2003, nearly five years after the loans had been closed, 31 of the 32 participating banks (not including Bremer), Marshall, and the Trustee, represented by a solo practitioner from New York and a law firm from Atlanta, commenced an action against the Tribe for

---

**47.** In spite of all his statements to this effect in which he called the loan participants his client, wrote documents to them and called them clients, gave them written or oral advice as clients, and met with them in negotiating sessions as their advisor, Dorsey took the position that Bremer was *not* its client in the President litigation. This document is just one of many demonstrating that Dorsey knew the loan participants were Dorsey's client.

breach of the Notice and Acknowledgment of Pledge, unjust enrichment, and an accounting and imposition of a constructive trust. As Dorsey had feared all along, in response the Tribe, represented by Barr, commenced a qui tam action against the Plaintiffs in which the Tribe asserted that the Plaintiffs in the first action were wrongfully attempting to enforce a claim against the Tribe based on an invalid Notice and Acknowledgment of Pledge. On April 11, 2005, the Tribe, the lenders that had sued, and Bremer, which was not a party to any of these lawsuits, entered into a global settlement pursuant to which the Tribe purchased the judgment against President, the settling parties dismissed any pending actions between them, the Tribe agreed to cooperate in pending actions against Kaufman and Horn, the Tribe paid the other loan participants approximately $3.5 million, the Tribe made a separate payment to Bremer in the amount of $650,000, and the parties entered into mutual releases. The pending actions between them were dismissed. The amount paid, of course, was nowhere near complete recompense to the loan participants for the damage that had been done.

## CONCLUSIONS OF LAW

I. JURISDICTION/CORE–NON CORE [48]

A. Jurisdiction of Counts I, II and III in the Bremer Case: Core—Non–Core

 Bremer and Dorsey are non-parties to the bankruptcy case. Bremer's causes of action do not "arise under title 11," or "arise in cases under title 11," but they are "related to" a case under title 11. 28 U.S.C. § 1334(c)(1). The Eighth Circuit has adopted the "conceivable effect" test for determining "related to" jurisdiction:

> [T]he test for determining whether a civil proceeding is related to bankruptcy is whether the *outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy* .... An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action ... and which in any way impacts upon the handling and administration of the bankrupt estate.

*Dogpatch Prop., Inc. v. Dogpatch U.S.A., Inc. (In re Dogpatch U.S.A., Inc.)*, 810 F.2d 782, 786 (8th Cir.1987) (emphasis in original) (*citing Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3rd Cir.1984), *overruled on other grounds by Things Remembered, Inc. v. Petrarca*, 516 U.S. 124, 116 S.Ct. 494, 133 L.Ed.2d 461 (1995)). The "conceivable effect" for federal subject matter jurisdiction is tested when the jurisdiction of the federal court is invoked. *See Freeport–McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 111 S.Ct. 858, 112 L.Ed.2d 951 (1991). "The presence or absence of jurisdiction must be evaluated based on the state of affairs existing at the time the adversary complaint was filed ... not at some later time when, for example, it was ultimately determined ... that the Estate had no interest in the [matter]." *Cont'l Nat'l Bank of Miami v. Sanchez (In re Toledo)*, 170 F.3d 1340, 1346 n. 8 (11th Cir.1999).

Bremer timely filed three separate claims against the various debtors. Since the trustee has not yet objected to the claims of Bremer, the claims are allowed as filed. *See* 11 U.S.C. § 502(a). In *Titan Energy*, the Eighth Circuit held that

---

**48.** None of the parties raised these issues, but I considered it essential to deal with them before deciding these disputes.

"even a proceeding which portends a mere contingent or tangential effect on a debtor's estate meets the broad jurisdictional test articulated in *Pacor.*" *Nat'l Union Fire Ins. Co. v. Titan Energy, Inc. (In re Titan Energy)*, 837 F.2d 325, 330 (8th Cir.1988); *see also, Randall & Blake, Inc. v. Evans (In re Canion)*, 196 F.3d 579, 585–587 (5th Cir.1999) (a claim between two non-debtors that will potentially reduce the bankruptcy estate's liabilities produces an effect on the estate sufficient to confer "related to" jurisdiction); *Owens Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124 F.3d 619, 626 (4th Cir.1997)(finding "related to" jurisdiction when a creditor's claim against a non-debtor would reduce its claim in bankruptcy); *Kaonohi Ohana, Ltd. v. Sutherland*, 873 F.2d 1302, 1306–07 (9th Cir.1989) (upholding "related to" jurisdiction over third-party action as specific performance remedy in third-party action would reduce damages in breach of contract claim against bankruptcy estate). A recovery against Dorsey for legal malpractice will reduce Bremer's claims against the estate. As a result, Bremer's claims are related to the bankruptcy case.

 Core proceedings under 28 U.S.C. § 157 are those which arise only in bankruptcy or involve a right created by federal bankruptcy law. *Specialty Mills, Inc. v. Citizens State Bank*, 51 F.3d 770, 773–74 (8th Cir.1995); 28 U.S.C. § 157(b)(2). Although, a non-core claim will be considered core if it "arises out of the same transaction as the creditor's proofs of claim ... or ... [its] adjudication ... would require consideration of issues raised by the proofs of claim ... such that the two claims are logically related," (*see, e.g., In re Iridium Operating L.L.C.*, 285 B.R. 822, 832 (S.D.N.Y.2002)), in this instance, Dorsey has not asserted a claim against the estate and the trustee has not objected to any of the claims filed by Bremer. Although Bremer's claim arises from the same transaction, its claims are not "core" proceedings. As to these claims, Dorsey has not consented to the entry of judgment by the Bankruptcy Court.

B. Jurisdiction of Count IV in the Bremer Case and Count IV in the Miller & Schroeder Case; Core—Non–Core

 There is also jurisdiction of the estate's claim (Count IV) in the Bremer case (contribution and indemnity) and the estate's and Marshall's claim (Count IV) in the Miller & Schroeder case because their resolution has directly to do with the administration of the estate and resolution of claims made in the case. "Related" matters include those whose resolution "may have a direct and substantial impact on the asset pool available for distribution." *Diamond Mortgage Corp. v. Sugar*, 913 F.2d 1233, 1239 (7th Cir.1990). In Count IV of the Bremer case, the trustee asserts that, if Bremer is unable to recover from Dorsey, then Bremer has a claim against debtor for in excess of $2 million for fraud, misrepresentation and breach of contract; those damages were the result of Dorsey's malpractice; and, therefore, the trustee has a contribution and indemnity claim against Dorsey. In Count IV of the Miller & Schroeder case, the trustee claims that Dorsey breached its fiduciary duties to Miller & Schroeder (Marshall) by representing Bremer in the President litigation while at the same time undertaking the defense of the Bremer/Miller & Schroeder litigation and by failing to fully disclose to Miller & Schroeder (Marshall) the non-frivolous potential malpractice claim against Dorsey. Any recovery obtained by the trustee against Dorsey under Count IV in the Bremer case and Count IV in the Miller & Schroeder case will impact on the

administration of the estate. Any recovery against Dorsey on Count IV of the Miller & Schroeder case may be apportioned to Marshall and that apportionment may impact the estate.

These claims, however, do not arise only in bankruptcy or involve a right created by federal bankruptcy law. *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 846 (6th Cir.2002) (breach of fiduciary duties and fraud claims are non-core proceedings); *Diamond Mortgage*, 913 F.2d at 1239 (7th Cir.1990) (holding that a claim alleging breach of fiduciary duties was a non-core related proceeding); *but see, Glinka v. Abraham & Rose Co. Ltd.*, 1994 WL 905714, at *8 (D.Vt.1994) (breach of fiduciary duty claims are core as they are "matters concerning the administration of the estate" under § 157(b)(2)(A)). The claims are the same pre-petition claims as could have been brought by Miller & Schroeder and Marshall even if Debtors had not filed for bankruptcy. They are, therefore, non-core proceedings.

Dorsey has not consented to the entry of judgment by the bankruptcy court on Count IV in the Bremer case (Case No. 05–4051), but has consented to the Bankruptcy Court's entry of judgment on Count IV in the Miller & Schroeder case (Case No. 03–4291).

## II. BREMER'S MALPRACTICE CLAIMS IN THE BREMER CASE

 In order to recover on a legal malpractice claim in a case based on a transaction, a plaintiff must prove: (1) the existence of an attorney-client relationship; (2) acts constituting negligence or breach of contract; (3) that such acts were the proximate cause of the plaintiff's damages; and (4) but for defendant's conduct, the plaintiff would have obtained a more favorable result in the underlying transaction than the result obtained. *Jerry's Enter., Inc. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 711 N.W.2d 811, 819 (Minn. 2006); *see also, Noske v. Friedberg*, 713 N.W.2d 866 (Minn.Ct.App.2006); *Rouse v. Dunkley & Bennett, P.A.*, 520 N.W.2d 406, 408 (Minn.1994); *Togstad v. Vesely, Otto, Miller & Keefe*, 291 N.W.2d 686, 692 (Minn.1980) (per curium); *First Bank v. Olson*, 557 N.W.2d 621, 623 (1997); *Fiedler v. Adams*, 466 N.W.2d 39, 42 (Minn.Ct. App.1991); *TJD Dissolution Corp. v. Savoie Supply Co., Inc.*, 460 N.W.2d 59, 62–63 (Minn.Ct.App.1990); *Veit v. Anderson*, 428 N.W.2d 429, 431 (Minn.Ct.App.1988).

### A. Res Judicata and Collateral Estoppel

Before addressing the merits of Bremer's malpractice claim, I must reach a jurisdictional issue raised by Dorsey in a motion made just days before trial. Dorsey sought dismissal of Counts I, II and III in the Bremer case on the grounds of collateral estoppel (issue preclusion) and res judicata (claim preclusion) based upon the state court's decision in *McIntosh County Bank v. Dorsey & Whitney*, No. 27CV05–3024, slip op. (Minn.Dist.Ct. Jan. 17, 2006). *See* n.1, supra at 115. This motion was taken with the case. The Court concludes it is meritless.[49]

 A federal court gives a state-court judgment the same preclusive effect that judgment would receive under the law of the state in which it was rendered. *See Migra v. Warren City Sch. Dist. Bd. of*

---

49. In the week before trial, in spite of my pretrial order precluding further motions, Dorsey made three motions: this motion on jurisdictional grounds, a motion in limine seeking to bar plaintiffs' negligence expert, and a motion to dismiss Count IV of the Bremer case. I deny the first; I denied the second before trial; and the third was unnecessary and repetitive and is now rendered moot.

*Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 335 F.3d 752, 758 (8th Cir.2003). Minnesota courts have stated that "collateral estoppel" is available where: (1) the issues are identical to those in prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party in the previous action; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issues. *Manion v. Nagin*, 394 F.3d 1062, 1066 (8th Cir.2005); *Lyon Fin. Servs. Inc. v. Waddill*, 625 N.W.2d 155, 158–59 (Minn. Ct.App.2001). The elements necessary for application of "res judicata" are essentially the same. A subsequent claim is barred under the doctrine of res judicata when: (1) the earlier claim involved the same claim for relief; (2) the earlier claim involved the same parties or their privies; (3) there was a final judgment on the merits; and (4) the estopped party had a full and fair opportunity to litigate the matter. *State v. Joseph*, 636 N.W.2d 322, 327 (Minn.2001).

■■■■ In seeking to bind Bremer to the decision of the state court, Dorsey ignores the history of this case. The state court's grant of summary judgment was not a *prior* adjudication on the merits of the same issues raised by Dorsey in this case. This Court's order denying Dorsey's motion for summary judgment was issued on November 9, 2005. The state court's grant of Dorsey's motion for summary judgment occurred on January 17, 2006. This Court's order denying summary judgment determined that summary judgment was not appropriate because Bremer raised issues of material fact and law regarding the scope of Dorsey's representation in connection with the transaction, as well as raising other material fact issues. The District Court denied Dorsey's motion

for leave to appeal the standing issue and for a stay pending appeal. *See Bremer Bus. Fin. Corp. v. Dorsey & Whitney LLP*, Civil No. 05–2768 (D.Minn. February 7, 2006). Only *after* Dorsey's motion for summary judgment was denied by this court did the state court grant Dorsey's motion as to the other 31 bank participants involved in the state court litigation. Thus, this Court's decision was prior to, not subsequent to, the state court decision.

■■■■ Moreover, Bremer was not a party or in privity with a party in the state court litigation. Dorsey argues for an expansive reading of the virtual representation theory. Under the doctrine of virtual representation, "a person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative." *Aerojet–Gen. Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir.1975). In addition, "[c]laim preclusion 'may bar non-parties to earlier litigation . . . when the interests involved in the prior litigation are virtually identical to those in later litigation.'" *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 90 (2nd Cir.2005) (*quoting Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 345 (2d Cir.1995)). The Eighth Circuit in *Tyus v. Schoemehl*, 93 F.3d 449 (8th Cir.1996), generally recognized three categories of nonparties who will be considered in privity with a party to the prior action and who will be bound by a prior adjudication: (1) a nonparty who controls the original action; (2) a successor-in-interest to a prior party; and (3) a nonparty whose interests were adequately represented by a party to the original action. *Tyus*, 93 F.3d at 454 (citation omitted).

■■■■ This is not the scenario for applying virtual representation as contemplated by the Eighth Circuit. Certainly Bremer did not control the state court litigation

nor was it a successor-in-interest to a prior party. Therefore, for Bremer to be bound under the doctrine of virtual representation it must have been a nonparty "adequately represented" by a party in state court. According to the Eighth Circuit the determination of "adequately represented" should be applied on a case-by-case basis using a fact-specific inquiry guided by the following factors: (1) identity of interests between the two parties; (2) a close relationship between the prior and present parties; (3) participation in the prior litigation; (4) apparent acquiescence; (5) "whether the present party deliberately maneuvered to avoid the effects of the first action"; (6) "adequacy of representation ... viewed in terms of incentive to litigate"; and (7) "whether case raises a public law issue or private law issue." *Id.* at 455–56. "A court should consider these factors when it balances an aspiring litigant's right to its own day in court with the need for judicial economy." *Am. Forest Council v. Shea*, 172 F.Supp.2d 24, 31 (D.D.C.2001). None of these factors come into play when contemporaneous litigation is occurring and the party that fails to prevail in a motion for summary judgment in a federal court, then seeks to bind the prevailing party because of its successful motion for summary judgment against others parties to the same transaction in state court. In addition, Bremer does not possess a close relationship, such as a fiduciary or agency relationship, with any of the banks involved in the state court litigation. They are each separate purchasers of participation interests in the St. Regis loans. Bremer did not participate in the state court litigation or otherwise acquiesce to the action. Bremer has consistently demonstrated an incentive to litigate independently of the other bank participants. It

parted ways with the other loan participants when it sued Miller & Schroeder in December 2000. It did not join the suit against the Tribe, as did the 31 other participating banks, and it settled separately with the Tribe. Thus, even if I had not denied Dorsey's motion for summary judgment prior to the state court action, I would still not apply the doctrine of virtual representation.

In conclusion, since my decision on summary judgment against Dorsey was issued *prior* to the state court rendering judgment and since Bremer was not a party or in privity with a party to the state litigation, neither the doctrine of res judicata or collateral estoppel applies in this case. Dorsey's motion to dismiss on those grounds is denied.

## B. Standing

Bremer has standing to sue Dorsey for malpractice for alternative reasons: first, Bremer had a direct attorney client relationship with Dorsey; and alternatively, and at a minimum, if Bremer was a nonclient, then Bremer was a third-party beneficiary of Dorsey's legal services.[50]

### 1. Direct Attorney–Client Relationship

In Minnesota a party can establish a direct attorney client relationship by proving either a direct contract for representation or one implied in fact or in law. *See, Gramling v. Mem. Blood Ctrs.*, 601 N.W.2d 457, 459 (Minn.Ct.App.1999); *Admiral Merch. Motor Freight v. O'Connor & Hannan*, 494 N.W.2d 261, 265 (Minn.1992); *Anoka Orthopaedic Assoc., P.A. v. Mutschler*, 773 F.Supp. 158, 166 n. 11 (D.Minn.1991). In the absence of a

---

50. Having determined that Bremer has standing under two alternative theories, I find it unnecessary to determine whether Bremer also may have standing as a result of its purchase of a participation interest.

written representation agreement, and there was none, an attorney client relationship is established under the implied contract theory if the parties implicitly agree that the attorney will provide legal services for the client. *Schuler v. Meschke,* 435 N.W.2d 156, 161 (Minn.Ct.App.1989). A contract can be express or implied from the conduct of the parties. *Pine Island Farmers Coop v. Erstad & Riemer, P.A.,* 649 N.W.2d 444, 448 (Minn.2002). A direct attorney client relationship sufficient to be the basis of a malpractice suit can also arise based on a tort theory. *See, Togstad v. Vesely, Otto, Miller & Keefe,* 291 N.W.2d 686, 693 n. 4 (Minn.1980), referencing Comment, *"Attorney Malpractice: Use of Contract Analysis to Determine the Existence of an Attorney–Client Relationship,"* 63 MINN. L. REV. 751, 759 (1979); *Gramling,* 601 N.W.2d at 459; *Admiral Merch. Motor Freight,* 494 N.W.2d at 265; *Anoka Orthopaedic Assoc.,* 773 F.Supp. at 166 n. 11. Under either the contract or tort theory there is no requirement of formality nor any requirement that the client actually pay the fees of the attorney. *See Togstad,* 291 N.W.2d at 693 n. 4; *see also, Ramette v. Bame (In re Bame),* 251 B.R. 367, 376 n. 6 (Bankr.D.Minn.2000) ("The existence of an attorney-client relationship and privilege is not dependent on the client himself paying the attorney. The relationship and the privilege may exist even though the attorney's fees are paid by a third party."); *George v. Caton,* 93 N.M. 370, 600 P.2d 822 (1979) (no formal contract, arrangement, or attorney fee is necessary to create the relationship of attorney and client; the contract may be implied from the conduct of the parties). The contract is created when the attorney commences work based on the express or implied contractual relationship between the parties. *Pine Island Farmers,* 649 N.W.2d at 448; *Togstad* at 686. Moreover, an agent acting on behalf of a disclosed principal can make a contract for retention, in which case the agent does not become part of the resulting attorney client relationship. *See* RESTATEMENT (SECOND) LAW OF AGENCY § 320 ("[A] person making or purporting to make a contract for a disclosed principal does not become a party to the contract.").

■ When Erickson and Jarboe met in December of 1998 regarding St. Regis I they did not write a retainer agreement. Nor was there any discussion between Dorsey and Miller & Schroeder as to retention when St. Regis II came into play. Dorsey simply commenced work on both transactions, no doubt because they had a well-developed course of dealing together which established the known and understood obligations of each. Dorsey and Miller & Schroeder fully understood and intended that Miller & Schroeder was a nominal lender and that Miller & Schroeder was retaining Dorsey to represent the loan participants under the participation agreements. The evidence was compelling that Miller & Schroeder was not understood nor intended to be, and was not, the actual client (it was the placement agent for the borrower), although the file was opened in its name (because the names of the participants were not then known) and the bills were sent to Miller & Schroeder (because that is what the participation agreement called for and that is how they had done business in the past).

The evidence is also compelling that the loan participants, including Bremer, were intended by all to be, and in fact were, the clients. The evidence in support of this conclusion is powerful and includes, for example, 1) Dorsey knew, understood, and acted as though it was representing the lender (indeed it was identified as counsel for the lender); 2) Dorsey knew the lender was not Miller & Schroeder but rather the loan participants; 3) Dorsey drafted loan

documentation that acknowledged the nominal role that Miller & Schroeder would play; 4) Dorsey received and fully understood the terms of the engagement letter which set forth Miller & Schroeder's limited role as placement agent for the borrower and the fact that the loan would not be closed until the loan was fully participated out; 5) Erickson and Brenden testified that they would not have closed the transaction if Dorsey had told them to hold up (action which could only be of benefit to the loan participants); 6) everyone knew and understood that if Dorsey made a mistake Miller & Schroeder was not the party who would have damages; damages would fall solely on the loan participants; 7) the parties had done business like this many times and Miller & Schroeder had always been "out of the money" at the closings; 8) Dorsey knew that Miller & Schroeder was marketing the loan participation interests and representing that Dorsey was counsel for the lender; and 9) Dorsey simply continued the representation following the closing without any separate discussion and without opening a new file. That Dorsey now claims Miller & Schroeder was its client is to be expected, but is irrelevant. That Erickson testified he thought Miller & Schroeder was the client is likewise irrelevant. Whether Dorsey and the loan participants had a direct attorney client relationship is a matter of objective analysis of all the facts and circumstances, and that documented objective evidence demonstrates that Dorsey was counsel to the lender and the lender was the loan participants, including Bremer.

## 2. Third–Party Beneficiary

■ Second, Bremer was, at a minimum, a third party beneficiary of any retention agreement between Dorsey and Miller & Schroeder. As a leading treatise states, "[t]he modern trend in the United States is to recognize the existence of a duty beyond the confines of those in privity to the attorney-client contract.... A duty exists under two principal theories. The first approach is a multi-criteria balancing test, which originated in California. Another approach is the concept of a third-party beneficiary contract." 1 Ronald E. Mallen & Jeffrey M. Smith, LEGAL MALPRACTICE § 7.8 at 838–89 (2006 ed.). California first formulated the balancing test in the seminal case of *Lucas v. Hamm*, 56 Cal.2d 583, 15 Cal.Rptr. 821, 364 P.2d 685 (1961), *cert. denied*, 368 U.S. 987, 82 S.Ct. 603, 7 L.Ed.2d 525 (1962). Under the *Lucas* balancing formula the courts use six criteria to determine whether the plaintiff, who is a nonclient in a malpractice case, has standing (i.e., is owed a duty of care and other fiduciary duties attendant with the attorney client relationship). *Id.* at 687. These are: the extent to which the transaction was intended to affect the plaintiff; the foreseeability of harm to the plaintiff; the degree of certainty that the plaintiff suffered injury; the closeness of the connection between the defendant's conduct and the injury; the policy of preventing future harm; and, whether recognition of liability under the circumstances would impose an undue burden on the profession. Some states, instead, use the alternative third-party beneficiary theory pursuant to which, either in contract or in tort, there is standing if the plaintiff was the foreseeable third-party beneficiary of the attorney's work. Mallen & Smith, § 7.8 at 844.

■ In *Marker v. Greenberg*, the Minnesota Supreme Court referenced the balancing test set forth in *Lucas v. Hamm*, and noted "that an intended beneficiary [who is a nonclient] may bring an action for legal malpractice against the decedent's attorney where the attorney's negligent act caused the named beneficiary

to lose the intended bequest," but found the facts of the case did not call for its application. *Marker v. Greenberg*, 313 N.W.2d 4, 5 (Minn.1981). "The relaxation of the strict privity requirement is very limited ... [e]specially in probate proceedings" and "[t]he cases extending the attorney's duty to non-clients are limited to a narrow range of factual situations in which the client's sole purpose in retaining an attorney is to benefit directly some third party." *Id.* Subsequently, in a decision arising out of a commercial transaction, Judge Doty, quoting *Marker*, held that "Minnesota permits nonclients to assert claims for malpractice if the nonclients are the intended beneficiaries 'of the lawyer's services.'" *Anoka Orthopaedic*, 773 F.Supp. at 166. He also said, "[a]lthough the *Marker* court applied the *Lucas* test in the estate planning context, other courts have applied a similar balancing test to allow legal malpractice claims by third parties." *Id.* at 167 (citing *Vereins–Und Westbank, AG v. Carter*, 691 F.Supp. 704, 709 (S.D.N.Y.1988); *Donald v. Garry*, 19 Cal.App.3d 769, 97 Cal.Rptr. 191 (Cal.Ct. App.1971); *Morales v. Field, DeGoff, Huppert & MacGowan*, 99 Cal.App.3d 307, 160 Cal.Rptr. 239 (Cal.Ct.App.1979)). Judge Doty determined that a Minnesota court would apply the *Lucas* test to the facts of that case (beneficiaries of a retirement plan who sued the lawyer for the plan) to determine whether the plaintiff doctors were the third party beneficiaries of the contract between their retirement plan and its lawyer. He refused to grant summary judgment for the defendant. *Id.* at 171–72. Then in *Admiral Merchants,* again a

commercial setting, the Minnesota Court held that summary judgment was inappropriate because

> an intended third-party beneficiary may bring an action for legal malpractice in those situations when the client's sole purpose is to benefit the third party directly, and the attorney's negligent act caused the beneficiary to suffer a loss. In these limited situations, the determination is a matter of balancing the extent to which the transaction was intended to affect [the third party], the foreseeability of harm to [the third party], the degree of certainty that [the third party] suffered injury, the closeness of the connection between the law firm's conduct and the injury, and the policy of preventing future harm.

*Admiral Merch.*, 494 N.W.2d at 266 (*citing* both *Marker* and *Lucas v. Hamm* ) (citations omitted). *See also, Goldberger v. Kaplan, Strangis & Kaplan, P.A.*, 534 N.W.2d 734, 738 (Minn.Ct.App.1995) (discussing "sole purpose" language in *Admiral;* determining that the nonclient must only be the "direct intended beneficiary;" and not reaching a multi-factor analysis: "It seems, then, that the supreme court [sic] intended the *Lucas* factors as an aid in determining whether the nonclient is a third-party beneficiary and that is how we have analyzed this case."); *Holmes v. Winners Entm't, Inc.*, 531 N.W.2d 502, 505 (Minn.Ct.App.1995) (determining third party was not an intended beneficiary and not reaching multi-factor analysis); *Francis v. Piper*, 597 N.W.2d 922 (Minn.Ct.App. 1999) [51] (recognizing that the third party

---

**51.** *Piper* cited favorably the Restatement (Third) of the Law Governing Lawyers § 73(3) (Tentative Draft No. 8, Mar. 21, 1997) which provided that an attorney owes a duty "to a non-client when and to the extent that; the [attorney knows] that the client intends as one of the primary objectives of the represen-

tation that the [attorney's services] benefit the non-client." Section 73 of the Tentative Draft became § 51 of the Restatement (Third) of the Law Governing Lawyers. *See also,* RESTATE-MENT, § 51, cmt. (f):

> A non-client's claim under *Subsection (3)* is recognized only when doing so will both

beneficiary doctrine is applicable Minnesota law, but finding that the plaintiff was not the intended beneficiary of the attorney's activities because of the potential for conflict under the circumstances of the case). *See also,* Mallen & Smith, § 7.8 at 848, 853 ("The inquiry ... is whether the plaintiff was *the* person *intended* to be benefitted by the legal services. In other words, the inquiry is whether the expressed intent of the client to benefit the plaintiff was the direct and agreed purpose of the transaction or relationship. Thus, the inquiry is whether *both* the attorney and the client intended that the plaintiff to be the beneficiary of the legal services? ... A person whose relationship is adverse to the client cannot be the beneficiary of the attorney's retention."). *And see Witzman v. Gross,* 148 F.3d 988 (8th Cir.1998) (Under Minnesota law, "[a] non-client may sue an attorney for professional malpractice when the non-client is a direct, intended beneficiary of [the attorney's services]."). Most recently, Judge Tunheim, in denying Dorsey's motion for leave to file an appeal from my pre-trial standing ruling and for a stay pending appeal, stated that "[u]nder Minnesota law, an attorney-client relationship may be found to exist under an implied contract or by the use of a tort or third-party beneficiary analysis." *Bremer Bus. Fin. Corp. v. Dorsey & Whitney,* Civil No. 05–2768, Slip Op. at 3 (D.Minn. Feb. 7, 2006).

Bremer has established all the *Lucas* factors: 1) the transaction was intended to affect Bremer; 2) there was a clear foreseeability of harm to Bremer; 3) there was a great degree of certainty that Bremer would suffer injury if Dorsey performed negligently; 4) there was a close connection between Dorsey's conduct and the injury; 5) there is a clear policy favoring prevention of harm in these types of commercial transactions; and 6) the recognition of liability under the circumstances would not impose an undue burden on the profession. Moreover, the evidence showed that Dorsey acted as though it owed a duty of care to the loan participants and this was not a case where the interests of the client and the interests of the nonclient (if that is what Bremer was, which I do not believe) were adverse. Both Miller & Schroeder and Bremer would benefit when Dorsey did the job right: everyone involved (except for perhaps the Tribe) was working toward the same goal, e.g., closing a transaction that would preserve and protect the interests of the loan participants. Accordingly, if Bremer does not have standing as a direct client, and I believe it does, it has standing on the third party beneficiary theory to assert a claim for legal malpractice against Dorsey.

Dorsey has urged that this is an airtight defense. It asserts that finding that Bremer has standing to sue for malpractice will render attorneys engaged in these types of commercial practices liable to wide-ranging claims for malpractice. To the contrary, this decision merely applies well-settled Minnesota law to a very complicated set of facts. Dorsey did not know the names of its clients because they could not be identified by name until Dorsey had

implement the client's intent and serve to fulfill the lawyer's obligations to the client without impairing performance of those obligations in circumstances of the representation. A duty to a third person hence exists only when the client intends to benefit the third person as one of the primary objectives of the representation ... the scope of the intended benefit depends on the client's intent and the lawyer's undertaking.

The Minnesota Supreme Court has not said whether § 51 is the law in Minnesota and my conclusion does not rest on the Restatement position.

completed its work and closed the deal, but Dorsey knew that some bank would become a participant and that Miller & Schroeder was closing the loan on behalf of that bank participant. Once Bremer purchased a participation interest, it became at a minimum a "disclosed principal." *See* RESTATEMENT (SECOND) OF AGENCY § 4. Dorsey knew it was representing the loan participants to protect their interests and it acted that way. There was no conflict between Miller & Schroeder and Bremer and never would have been if Dorsey had performed in a non-negligent manner. Dorsey was familiar with the participation agreements, knew precisely the type of participants who were being solicited, was well aware of Miller & Schroeder's business pattern, and knew that the only people who could be damaged if it malpracticed were the banks who would be purchasing parts of the loan. Dorsey did not have communications with the bank participants because it was having communications with the loan participants' agent, Miller & Schroeder.

Importantly, as a matter of public policy, if Dorsey can escape liability for activities that constitute malpractice in this situation on a standing defense, the integrity of these types of commercial transactions are at risk. If Dorsey is right, it has been paid $50,000 to work on a loan transaction under circumstances that could never render it liable in damages for providing negligent advice. It cannot be sued for malpractice by the loan participants because they do not have standing; it cannot be sued by Miller & Schroeder because Miller & Schroeder has no damages. Surely, and rightfully, courts should be rigorous in avoiding any expansion of the scope of a lawyer's exposure to persons who mistakenly claim to have engaged in an attorney client relationship with them. *See Mc-Donald v. Stewart,* 289 Minn. 35, 182 N.W.2d 437, 440 (1970) ("an attorney act-ing within the scope of his employment as attorney is immune from liability to third persons for actions arising out of that professional relationship."). But, given the facts of this case, the interlocking and closely coordinated nature of the documentation, the parties' clear intentions that Dorsey carefully do what careful lender's counsel are to do, and Dorsey's full and complete knowledge of all the facts, Dorsey's attempt to escape responsibility for its mistakes with its "parade of the horribles" defense is unavailing. *See Donahue v. Shughart, Thomson & Kilroy, P.C.,* 900 S.W.2d 624, 629 (Mo.1995) ("The legal profession will not be unduly burdened by being required to act competently toward identifiable persons that a client specifically intends to benefit when such persons have no other viable remedy and where such persons are not in an adversarial relationship to the client.").

## C. Negligence

■■■■■ The next element of proof was establishing that Dorsey acted negligently when it gave advice or furnished an opinion. *See Day v. Dorsey & Whitney,* Civil No. 98–1425, 2001 WL 228437, Slip op. at 11 (D.Minn. Feb. 21, 2001) (Memorandum Opinion and Order on Defendants' Motion for Summary Judgment); *Gustafson v. Chestnut,* 515 N.W.2d 114, 116 (Minn.Ct. App.1994); *Fiedler v. Adams,* 466 N.W.2d 39, 42 (Minn.Ct.App.1991) (*citing Togstad,* 291 N.W.2d at 693, n. 4). "Attorneys have a 'duty to exercise that degree of care and skill that is reasonable under the circumstances, considering the nature of the undertaking.'" *Jerry's Enters.,* 711 N.W.2d at 817 (*quoting Prawer v. Essling,* 282 N.W.2d 493, 495 (Minn.1979)); *Sjobeck v. Leach,* 213 Minn. 360, 6 N.W.2d 819, 822 (1942). "Expert testimony is generally required to establish the 'standard of care applicable to an attorney whose conduct is

174

alleged to have been negligent, and further to establish whether the conduct deviated from that standard.'" *Jerry's Enters.*, 711 N.W.2d at 816–17 (*quoting Admiral Merch.*, 494 N.W.2d at 266).

■■■ The question of whether Dorsey's actions in advising or allowing the St. Regis loans to close without obtaining NIGC approval of the Notice and Acknowledgment of Pledge rests, initially, on analysis of provisions of the IGRA and regulations promulgated thereunder by the NIGC.

In 1988, Congress passed the IGRA "to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences" and "a statutory basis for the operation of gaming by an Indian tribe as a means of promoting economic development, self sufficiency, and strong tribal governments." 25 U.S.C.A. § 2702; *see First Am. Kickapoo Operations, L.L.C. v. Multimedia Games, Inc.*, 412 F.3d 1166, 1166–67 (10th Cir.2005). To further these purposes the IGRA provides for extensive federal oversight of virtually all forms of Indian gaming. *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Fla.*, 63 F.3d 1030, 1033 (11th Cir.1995). The IGRA established the NIGC. 25 U.S.C.A. § 2704. The IGRA did not take effect until 1993, at which time the Commission was estab-

lished and its Regulations were issued. Until then the pre-existing BIA regulatory scheme for gaming on Indian lands remained in place. 25 U.S.C.A. § 2709.

The IGRA provides that the NIGC is to approve any "management contract" for Indian gaming operations and all "collateral agreements to such [management contracts] that relate to the gaming activity." 25 U.S.C.A. § 2710(d)(9), 2711(a)(1), (a)(3).[52] NIGC Regulations define a "management contract" as "any contract, subcontract, or collateral agreement between an Indian tribe and a contractor or between a contractor and a subcontractor if such contract or agreement provides for the management of all or part of a gaming operation." 25 C.F.R. § 502.15.[53] The Regulations define "collateral agreement" as "any contract, whether or not in writing, that is related either directly or indirectly, to a management contract, or to any rights, duties or obligations created between a tribe ... and a management contractor or subcontractor ...." 25 C.F.R. § 502.5. The Regulations further provide that the Commission must approve any modification of a management contract (25 C.F.R. § 535.1), including, in particular, any modification that involves a change in a "person(s) having a direct or indirect financial interest in the management contract or having management responsibility

**52.** Although Class III gaming is not specifically referenced, Class III gaming contracts are reviewed pursuant to most of the standards set forth in § 2711. *See* 25 U.S.C. § 2710(d)(9). "25 U.S.C. § 2710(d)(9) does not, however, explicitly apply the collateral agreement standard in § 2711(a)(3) to Class III gaming contracts, but the NIGC has done so by regulation." *U.S. ex rel. The Saint Regis Mohawk Tribe v. President R.C.-St. Regis Management Co.*, 451 F.3d 44, 53–54 (2nd Cir. 2006). *See* 25 C.F.R. § 533.1 (requiring agency review of management contracts for Class II and Class III gaming); 25 C.F.R. § 502.15.

**53.** The Commission has issued some regulatory guidance on the question of whether a consulting agreement is a management agreement. See Bulletin No. 94–5, October 14, 1994, "Subject: Approved Management Contract v. Consulting Agreements (unapproved Management Contracts are Void.")." In that bulletin the Commission states that the answer may turn on whether the "consultant provides development and construction costs incurred or financed by a party other than the Tribe," and cautions that in case of doubt one should check with the Commission.

for the management contract." 25 C.F.R. § 535.1(c)(4). The Commission must also approve any assignment by the Manager of its rights under a management contract. 25 C.F.R. § 535.2.

Management contracts and *changes in persons with a financial interest in* or management responsibility for a *management contract,* that have not been approved by the Secretary of the Interior or the Chairman in accordance with the requirements of this part, are void. 25 C.F.R. § 533.7. *See also* 25 U.S.C. § 2711(f) ("The Chairman ... may void any contract if he subsequently determines that any of the provisions of this section have been violated"). Further, any modification that required approval and did not receive it is void (25 C.F.R. § 535.1) and any assignment that does not receive regulatory approval within 60 days of being submitted it is deemed to be disapproved, unless the time period is extended by the Chairman. 25 C.F.R. § 535.1(d).

The Regulations broadly define "*a person* having a direct or indirect financial interest in a management contract" to encompass entities related to the person with such a financial interest. For example, if a partnership has a financial interest in a management contract, then all its general partners have such an interest. 25 C.F.R. § 502.17(c). But, they do not provide further guidance on the question of who qualifies as a person with a "direct or indirect financial interest in ... a management contract."

Thus, the Notice and Acknowledgment of Pledge needed to be approved by the NIGC if it was a management agreement or an agreement collateral thereto, or if it was an assignment of, or a modification to, a management agreement or of or to a collateral agreement. Further, any such management agreement, agreement collateral thereto, or assignment or modification

thereof, and any change that involved a change in a person who had a "direct or indirect financial interest in the management contract ..." was void unless it had been approved.

Plaintiffs' expert, Zenas Baer, a former General Counsel to the White Earth Band of Chippewa, testified that the Notice and Acknowledgment of Pledge effected an assignment of a financial interest in the Management Agreement, or could also be considered a subcontract within the meaning of 25 C.F.R. § 502.15. Referring to the interlocking provisions of the loan documents, the Management Contract and the Notice and Acknowledgment of Pledge, he said, "To me it screams of assignment of interest in the management contract and this is precisely the issue the NIGC wants to be aware of." Tr. Vol. III, p. 248. He suggested that counsel for President knew precisely what he was doing when he modified Rindels' first draft so as to call it a pledge and not an assignment hoping that this would drop the document below the NIGC radar screen. However, he said the title given to the document did not affect the true nature of the transaction. He further pointed specifically to ¶ 7 which, as Thomas himself had opined, gave Miller & Schroeder all the rights and benefits of President in the case of a default, including the "right to step into the shoes of the manager" if necessary, and manage the casino in order to generate revenues and ¶ 5, which while it did not burden the lender with management obligations, also did not foreclose the lender from managing if it had to in order to generate revenue. He pointed out that the Loan Agreement contained no provision for enforcement rights in the case of default, presumably in recognition of the interlocking nature of the Loan Agreement and the Management Agreement. Unlike an ordinary loan to the Tribe, this

arrangement gave the lender an assignment of an interest in the management fees. "The NIGC's regulations are designed to ensure that the people who are involved in Indian gaming, *whether they be in the finance side or the management side,* but if they have their hand in the till, that they are above reproach." Tr. Vol. III, p. 222. Here, the lender was given an assignment of President's rights under the Management Agreement, not only with respect to repayment of the loan for the development costs, but also with respect to management fees. The lender thus had a "direct or indirect financial interest in the management contract" and, absent approval, this change in the person with such a financial interest, was void under 25 U.S.C. §§ 535.1(c)(4), 533.7. This is the precise advice that Stuckwish gave to Karns and Kams relayed to Rindels in his January 19, 1999, email.

Plaintiff's expert further testified that, from a regulatory perspective, since the sole collateral was revenues generated from a gaming management contract, Dorsey should have advised the lender that the only assurance of protection of rights was to obtain approval of the transaction by the NIGC or to obtain a declination letter. This was especially true, he said, because lender's counsel had not obtained an opinion of Tribal counsel acknowledging the validity of the Notice and Acknowledgment of Pledge. The standard of care, he said, in this situation was the same standard of care applicable where any attorney is representing a secured lender in documenting a loan. The lawyer must use reasonable care to make sure the lender can foreclose and reach its collateral, without dispute, following default.

> I don't think any prudent attorney would advise a client to go forward and close a transaction if there was a question about whether or not a transaction required governmental approval [because] a consequence of not getting it is that the transaction is void . . .; You're sitting holding an empty bag. That's the downside risk of rolling the dice and saying, nah, I don't think we need approval of this. You know, there's some ambiguity in the regulations. We can argue that this doesn't need approval but that doesn't get you anyplace in Indian finance. It may if there were a federal court or a court of jurisdiction that was able to hear it, but without that approval, you don't have a waiver of sovereignty and the band can hide behind sovereignty and say sue me. Where are you going to sue? Where are you going to get jurisdiction? That's the downside risk.

Tr. Vol. III, pp. 244–246. In any case, he opined, where there was "an inkling that a transaction requires NIGC approval," it would have been prudent to follow the NIGC bulletins suggesting that management contracts, including financing documents, be submitted to the NIGC and approved or declined. *Id.* He pointed to NIGC bulletins which indicate that management contracts that have third party involvement in financing development costs may have indicia of a management contract that need to be approved. In light of the many "red flags," Dorsey, as a prudent attorney to the lender, he said, should have delayed the closing or, at the very least, obtained a declination letter. Thus, he testified that, even if the Notice and Acknowledgment of Pledge did not require NIGC approval, Dorsey should have held up the closing.

Further, he said, the February 16 NIGC letter should have caused Dorsey to rethink its client's contractual position; i.e., whether, absent an approved amendment to the Management Agreement, the Notice and Acknowledgment of Pledge was enforceable as a matter of contract.

In his opinion, it was not. This is because the Tribal Resolution gave Tribal consent only if the amendments the Tribe wanted became part of an approved Management Agreement, the recitals in the Notice and Acknowledgment of Pledge recited that it was interlocked with such amendments, and Paragraph 11.1 of the Management Agreement required NIGC approval of financing arrangements. Without an approval of the Amendments to the Management Agreement, the parties had no enforceable contract because the Tribal Resolution conditioned the Tribe's obligations on an approved amendment to the Management Agreement. That did not occur. He pointed also to ¶ 4.03 and ¶ 5.01 as they were finally written, in the first of which the Borrower took no position on whether regulatory approval was necessary and in the second of which the Borrower was only required, as a condition precedent to closing, to deliver an executed Tribal Resolution. These he found to be totally inadequate to protect the lender.

His final opinion was that Dorsey had a duty to advise the lender that, absent NIGC approval of this financing agreement, this lender was taking a financial interest in the management fees as security, and the contract was void and unenforceable without approval. Without it the Tribe had sovereign immunity and there was no forum in which to resolve any disputes. A reasonably prudent lawyer would have advised the client of such risks. In this case, he emphasized, Dorsey had failed to obtain an adequate waiver of sovereign immunity.[54]

These opinions appear to be both credible and correct. Indeed, the witness's background was similar to most of the attorneys the Tribe retained to defend the enforcement action and before and during the President litigation their actions forecast Plaintiffs' expert opinions. Dorsey violated the standard of care with respect to this transaction when it closed the St. Regis loans without first obtaining NIGC approval of the Notice and Acknowledgment of Pledge. As a matter of regulatory law, the Notice and Acknowledgment of Pledge was an assignment of a management agreement and a change in the person with a financial interest in the management contract, and void. Dorsey committed malpractice by closing without NIGC approval in the face of so many "red flags" and contract enforceability problems. Dorsey's actions left the loan participants in the one position no lender wants to be: having to fight with the borrower over whether the borrower has a

---

**54.** Dorsey's expert witness expressed no opinion regarding the contract question and had no opinion on the enforceability of the Notice and Acknowledgment of Pledge. He opined solely on the regulatory question. He was of the view that the Notice and Acknowledgment of Pledge was not a management agreement nor an assignment of, amendment to, or modification of a management agreement, and it was not an agreement collateral to the management agreement. He further opined that the lender had no financial interest, direct or indirect, in the management contract because this was a loan and there was no possibility that the lender would manage the casino. He did not believe the February 16 letter ought to have raised any "red flags" and he opined that Dorsey satisfied the applicable standard of care by providing Miller & Schroeder with correct advice. However, in reaching these conclusions he too narrowly read ¶¶ 5 and 7 of the Notice and Acknowledgment of Pledge. He was also impeached with testimony he had given before Congress not long before this trial in which he made clear that, in his view, the NIGC regulations remain unclear and that they overreach because they attempt to regulate loans and other financing transactions similar to the one involved in this case. Prepared Statement of Kevin K. Washburn, Associate Professor, University of Minnesota Law School, before the Committee on Indian Affairs, United States Senate, Wednesday, April 27, 2005.

security interest that is valid and enforceable.[55]

### D. Causation

■■■■■ An essential element of a legal malpractice claim is that the attorneys' acts were the proximate cause of the claimed damages. *Wartnick v. Moss & Barnett*, 490 N.W.2d 108, 112 (Minn.1992); *CPJ Enters. Inc. v. Gernander*, 521 N.W.2d 622 (Minn.Ct.App.1994). The test for proximate cause in legal malpractice cases set forth by the Minnesota Supreme Court is as follows: "For negligence to be the proximate cause of an injury, it must appear that the act is one which the party ought, in the exercise of ordinary care, to have anticipated was likely to result in injury to others." *Rouse*, 520 N.W.2d at 409. Thus Bremer must prove that, but for Dorsey's advice regarding enforceability of the Notice of Acknowledgment of Pledge and exercise of discretion to advise a closing without one, Bremer would not have been damaged. In *Jerry's Enterprises Inc.*, the Court stated precisely the test to be used in judging the evidence in this case. "In legal malpractice cases . . . not involving damage to or loss of a cause of action, we have previously indicated that a plaintiff must demonstrate 'but for' causation between defendant's negligence and plaintiff's injury in order to show proximate causation." *Jerry's Enters.*, 711 N.W.2d at 819. The Court cited its prior opinions in *Ross v. Briggs & Morgan*, 540 N.W.2d 843, 847 (Minn.1995), and *Blue Water Corp. v. O'Toole*, 336 N.W.2d 279, 282–84 (Minn.1983). The Court then held:

> that in an action for legal malpractice arising out of representation in transactional matters, the fourth element of the cause of action is modified to require a plaintiff to show that, but for defendant's conduct, the plaintiff would have obtained a more favorable result in the underlying transaction than the result obtained.

*Jerry's Enters.*, 711 N.W.2d at 819 (*citing Viner v. Sweet*, 30 Cal.4th 1232, 135 Cal. Rptr.2d 629, 70 P.3d 1046, 1054 (2003)).

■■■■■ Bremer needed only to "introduce evidence which affords a reasonable basis for the conclusion that it is more

---

**55.** There are a number of reported decisions consistent with this conclusion, though decided on somewhat different facts. *See First Am. Kickapoo*, 412 F.3d 1166, 1174 (10th Cir. 2005) (finding persuasive NIGC opinion letter and Bulletin 94–5 that considered construction financed by non-tribal party, contract establishing ongoing relationship between tribe and non-tribal party and compensation based upon percentage fee all to be indicative of a management contract); *United States ex rel. Bernard v. Casino Magic Corp.*, 293 F.3d 419, 425 (8th Cir.2001) (two documents, a consulting agreement and a loan agreement between the Tribe and the bank, should be read together, the question is whether the effect of the two agreements is to give the consultant management control); *Machal, Inc. v. Jena Band of Choctaw Indians*, 387 F.Supp.2d 659, 667–68 (W.D.La.2005) (agreement that allocates 30% of the total net gaming revenues to developer is a contractual provision that provides for the management of all or part of a gaming operation that is void without NIGC approval); *Sonoma Falls Developers, LLC. v. Dry Creek Rancheria Bank of Pomo Indians of California*, No. C–01–4125. Slip op. at 9 (N.D.Cal. Dec. 26, 2002) (loan agreement entered into in connection with an agreement to build and manage a casino is a collateral agreement and not "just a loan;" on its face the loan agreement provided that it was subject to approval by the Commission as part of the Management Agreement); *Catskill Dev. LLC v. Park Place Entm't Corp.*, 154 F.Supp.2d 696, 703 (S.D.N.Y.2001) (development and construction agreement which includes aspects of management of the casino is void as an unapproved management contract); *but see Jena Band of Choctaw Indians v. Tri–Millennium Corp.*, 387 F.Supp.2d 671 (W.D.La.2005) (only collateral agreements that also provide for the management of all or part of a gaming operation are void without NIGC approval).

likely than not that the conduct of [Dorsey] was a cause in fact of the result." *Viner v. Sweet,* 135 Cal.Rptr.2d 629, 70 P.3d at 1053 (internal quotations omitted); *see also* George S. Mahaffey, Jr., *Cause–In–Fact and the Plaintiff's Burden of Proof with Regard to Causation and Damages in Transactional Legal Malpractice Matters: The Necessity of Demonstrating the Better Deal,* 37 SUFFOLK U.L. REV. 393, 416–420 (2004). There was evidence in the record to show that had Dorsey not acted as it did and given the advice it gave, there would have been no deal. The evidence, in fact, is undisputed; if Dorsey had advised Miller & Schroeder to wait for NIGC approval to close, Miller & Schroeder would have followed that advice, there would have been no loan, and Bremer would not have made the investment. *See, e.g., Estate of Fleming v. Nicholson,* 168 Vt. 495, 724 A.2d 1026, 1029 (1998) (an attorney has a duty to inform and explain to the client the implications of any clouds on the title that would influence a reasonably prudent purchaser not to purchase the property).

Bremer is surely less well off than it would have been, since it has not received a full return on its investment, or even the amount of its original investment, has had to tie up that money with no return over the years, and has had to commence litigation to collect anything at all. None of that would have happened if Dorsey had exercised the requisite care.[56] All the evidence is consistent on this point. If Dorsey had done what Boylan recommended and advised Miller & Schroeder to wait, rather than proceed with closing, Bremer would still have its money and would simply not be involved in this case.

Bremer met its burden of proof by showing that, but for Dorsey's malpractice,

Bremer would not have entered into the Participation Agreement and therefore would have been better off (the "no deal" scenario), and, in the alternative, would have had a more advantageous agreement had NIGC approval been obtained or a declination letter received (the "better deal" scenario). *Viner v. Sweet,* 135 Cal. Rptr.2d 629, 70 P.3d at 1050.

Moreover, while not required as an element of proof, there is ample evidence to show that the casino opened and was up and running and no evidence to show that it ever closed. Until the Tribe settled with Bremer and others, the Tribe was obligated to pay the St. Regis I and II loan obligations before it paid itself and the manager was required to pay its share of net revenue to the loan participants first also. The remaining net revenues that belonged to the Tribe had to be paid immediately to the loan participants and into escrow. There is evidence that the casino's problems in its first year of operation were turned around under the management of Park Place, and that by the spring and fall of 2000, under Park Place management, the casino was doing very well since Park Place was willing to pay President $9 million for President's up to 29.9% share of net revenues. There is further evidence that as of the Fall of 2000, the Tribe was not arguing that it didn't need to pay the loans because there weren't any net revenues. Rather, it expressed willingness to do so, but not without proof that the Notice and Acknowledgment of Pledge was an enforceable document. Couple this with the fact that the Tribe has apparently been able to pay for its casino, originally valued at at least $20 million or so, with other people's money, and it is not unreasonable to assume that the casino generat-

---

**56.** The late settlement between the Tribe and Bremer only mitigated Bremer's damages. Dorsey gave negligent advice to close the loan, and "but for" such advice Bremer would never have needed to litigate against the Tribe.

ed revenues sufficient to pay back the $12 million or so owed to the St. Regis I and II loan participants.

█ Given the fact that Dorsey in the President litigation was in a position to obtain financial statements on the casino operations and, while conflicted, failed to press the issue, Bremer cannot be required to prove more. In other words, it was Dorsey's own negligence that made it impossible to obtain any financial statements on the casino from and after March 2000, and it was Dorsey's dismissal of the Tribe while in a conflicted representation that in large measure cut off the rights of the loan participants to obtain financial information or Bremer to obtain such in discovery in this litigation. Bremer was not, as Dorsey has insisted throughout, obligated to show that the casino generated revenues sufficient to make payments on the Note. Any speculation by Dorsey that the casino did not generate revenue, is Dorsey's burden, not Bremer's. Dorsey caused injury to Bremer and Dorsey's malpractice made it difficult if not impossible to obtain the revenue information from the Tribe. It is a general legal proposition that a wrongdoer should bear the burden of uncertainty as to damages when the uncertainty is a result of the wrongdoer's own wrongful conduct. *See Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1946). All of this leads to the conclusion that Bremer has met the requisite burden, if it had to, of showing that the casino would have made enough to pay back the St. Regis I and II loan participants who, once again, were the first secured priority debt.

█ A final point with respect to causation. Dorsey asserts that all this

misses the point because reliance in fact is an element of proof. Dorsey cites *Day v. Dorsey & Whitney*, Civil No. 98–1425, 2001 WL 228437 (D.Minn. Feb. 21, 2001). That is, Dorsey argues there can be no recovery in a malpractice case, even if the lawyer gives bad advice, if the client didn't rely or, on an objective basis, could not reasonably have relied. *Id.* That is a correct statement of the law, but it makes no difference in this case. Judge Tunheim, in *Day,* while recognizing that the issue of reliance and its reasonableness is normally a question of fact, found on summary judgment that a lawyer could not have reasonably relied on an opinion letter which made patently clear the risks involved in the transaction. I have found as a matter of fact that Bremer did rely on Dorsey's acting prudently as lender's counsel and not closing a transaction that lacked needed regulatory approval and I have further found that such reliance was reasonable. The absence of a direct communication between Dorsey and Bremer simply has no import in this transactional setting.

E. Damages

Bremer seeks return on its investment,[57] interest at the contract rate from the date that it invested, and the costs it incurred in the Bremer/Miller & Schroeder litigation, with credit given for the $650,000 it was paid in connection with the settlement with the Tribe. Dorsey asserts that at most Bremer is entitled to return of its investment, interest at the statutory rate, with such credit given, and that under no circumstances should Bremer be entitled to receive any of the fees it was required to pay Winthrop & Weinstein to pursue its

---

**57.** Dorsey raised an issue during trial as to whether Bremer's damages should be reduced by a $20,000 fee paid to Bremer as part of the loan transaction. Bremer's fee at closing, however, did not create a reduction in the $2,000,000 loan amount and, therefore, the fee is irrelevant to the court's damage calculation.

rights against Miller & Schroeder in the Bremer/Miller & Schroeder litigation.

As for Bremer's claim for contract interest, Minnesota Statute § 549.09, subdivision 1(b) provides, in part, that prejudgment interest is to be awarded from the time of the commencement of the action except as otherwise provided by contract or allowed by law, as the statutory exception is not applicable to these facts. MINN. STAT. § 549.09 subd. 1(b). "[T]he statute provides compensation for the loss of use, i.e., the time-value, of the plaintiff's money. Such compensation appears to be an element of damages designed to make the plaintiff whole." *Zaretsky v. Molecular Biosystems, Inc.*, 464 N.W.2d 546, 550 (Minn.Ct.App.1990). "Minnesota law provides that interest is properly allowed from the date of the breach where the sum claimed as damages for breach of contract is liquidated or, if unliquidated, capable of being made certain by mathematical computation." *Northern States Power Co. v. ITT Meyer Indus.*, 777 F.2d 405, 413 (8th Cir.1985) (citing *Potter v. Hartzell Propeller, Inc.*, 291 Minn. 513, 189 N.W.2d 499, 504 (1971); *Spurck v. Civil Service Bd.*, 231 Minn. 183, 42 N.W.2d 720, 728 (1950)). In this instance, the Tribe did not breach the agreement, the agreement itself was unenforceable due to Dorsey's negligence. The proper measure of damages is, therefore, Bremer's loss of the time-value of its money, not the loss of the benefit of the contract. "Prejudgment interest may be deemed to be part of the damages occasioned by the initial wrong, although one might say that such interest is a remedy for a second wrong, i.e., the delay in payment." *Zaretsky*, 464 N.W.2d at 550. The initial wrong was the closing of the loan without NIGC approval. As a result, Bremer is entitled to receive interest at the judgment rate as calculated under the statute from February 23, 2005, the date of commencement of the case.

Dorsey makes several arguments as to why Bremer's costs in pursuing the Bremer/Miller & Schroeder litigation should not be allowed including that attorney fees and expenses are not generally included in the measure of recoverable damages for negligence. Under the American rule, parties must pay for their own attorney's fees absent a specific contract or statutory authorization. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Key Tronic Corp. v. United States*, 511 U.S. 809, 819, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994); *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 363 (Minn. 1998). An exception to the American rule is that a plaintiff can recover attorney's fees when "the defendant's tortious act thrusts or projects the plaintiff into litigation with a third party." *OnePoint Solutions, LLC v. Borchert*, 2006 WL 1174223, *3 (D.Minn.2006) (quoting *Stickney v. Goward*, 161 Minn. 457, 201 N.W. 630, 631 (1925)). This third-party litigation exception applies only to litigation with third parties, not antecedent litigation between the same parties. *Id; see also, Champion Parts, Inc. v. Oppenheimer & Co.*, 878 F.2d 1003, 1006 (7th Cir.1989) (permissible form of damages for legal malpractice may be attorney's fees from a third party case where "one consequence of [Defendant's] actions is to involve [Plaintiff] in litigation with others."). Certainly, Dorsey's malpractice created the problem that put Bremer into litigation with Miller & Schroeder, but it was Dorsey's failure to disclose its malpractice to both Bremer and Miller & Schroeder that created an additional problem. As a result of Dorsey's non-disclosure of its own malpractice, Bremer sued the wrong party and Dorsey knew it, but allowed and indeed forced

Bremer to expend hundreds of thousands of dollars pursuing someone other than itself, while Dorsey continued to collect hundred's of thousands of dollars defending Miller & Schroeder and insist that it did nothing wrong.

When Bremer began introducing evidence with respect to these fees, Dorsey's counsel objected that it was surprised that this was a claimed element of proof. It could hardly have been so, however, and if it was, the surprise was of Dorsey's own making. Bremer's Complaint sought an order granting judgment for Plaintiffs against Dorsey & Whitney "in an amount to be proved at trial," an order awarding Plaintiffs pre and postjudgment interest, reasonable costs and disbursements and attorneys' fees, and an order granting such other and further relief as the Court deemed just. In spite of the blitz of discovery activity in this case, Dorsey took no steps during discovery to obtain information on the nature of Bremer's damage claim. If, during all of its vast discovery activity, Dorsey did not bother to find out what damages Bremer would be seeking, it cannot now argue that the proof of damages for the Winthrop & Weinstein bills was outside the pleadings (it was not), and not litigated by consent. Moreover, it cannot now argue surprise. Bremer paid attorney's fees pursuing a third party for damages incurred from a loan closed as a result of Dorsey's negligent advice, and Bremer is entitled to recover those fees.

## III. THE TRUSTEE'S CLAIM IN CASE NUMBER 05–4015—INDEMNITY AND CONTRIBUTION

In a pre-trial motion, Dorsey requested dismissal of the Trustee's contribution and indemnification claim arguing that the Trustee's claim was not ripe for adjudication. In the alternative, Dorsey requested that the adjudication be stayed until the estate's liability to Bremer was determined. On February 7, 2006, I denied the motion as untimely and reserved ruling on the merits. The issues raised in the motion are meritless or moot. Initially, this court does not need to determine the validity of Bremer's claim against estate since the claim is allowed as filed, unless objected to by a party in interest. 11 U.S.C. § 502(a). The Trustee has a duty to object to Bremer's proof of claim "if a purpose would be served", but only if it is "improper." 11 U.S.C. § 704(5); *see also, In re Ebel,* 338 B.R. 862, 873 (Bankr. D.Colo.2005); *In re Balco Equities Ltd., Inc.,* 323 B.R. 85, 97 (Bankr.S.D.N.Y.2005). Neither the Trustee nor any other party in interest objected to Bremer's proof of claim and it is therefore allowed as filed. Secondly, having decided that Bremer may recover directly from Dorsey, probably resulting in the elimination of Bremer's claim against the estate, the Trustee does not require contribution or indemnity from Dorsey making the Trustee's claim moot. *See, e.g., Nieters v. Sevcik (In re Rodriquez),* 258 F.3d 757, 759 (8th Cir.2001) ("Generally, federal courts are not empowered to give opinions on moot questions or declare rules of law which cannot affect the matter in issue in the case before it.").

## IV. THE TRUSTEE'S AND MARSHALL'S CLAIMS IN CASE NUMBER 03–4291

The Trustee's and Marshall's claims are based on breach of fiduciary duties owed by an attorney to a client, namely the duty to disclose to a client all information relating to possible claims and defenses necessary to allow the client to make an informed decision and the duty of undivided loyalty. They assert that, under Minnesota law, an attorney's violation of provisions of the Rules of Professional Conduct can inform the court's decision on whether such a breach has occurred. Neil Hamilton, Director of the Center for Ethical

Leadership in the Professions, University of St. Thomas Law School, testified that Dorsey's actions in this case violated the Minnesota Rules of Professional Conduct ("MRPC"), that Dorsey breached these fiduciary duties, and that the proper remedy in this case is disgorgement of all fees and expenses paid by Miller & Schroeder and Marshall to Dorsey for work in connection with the President litigation and the Bremer/Miller & Schroeder litigation.

A. MRPC 1.7(a)

■ MRPC 1.7(a)(1) and (2) provide that "[a] lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) each client consents after consultation." MINN. R. OF PROF. CONDUCT 1.7(a)(1) and (2). The 1993 comment to the Rule states:

> "Loyalty is an essential element of the lawyer's relationship with a client . . . As a general proposition, loyalty to a client prohibits undertaking representation directly adverse to that client without the client's consent . . . Thus, a lawyer ordinarily may not act as an advocate against a person the lawyer represents in some other manner, even if it is wholly unrelated."

MINN. R. OF PROF. CONDUCT 1.7 cmt. (Loyalty to Client). Section 128 of the Restatement (Third) The Law Governing Lawyers states the same rule.

Professor Hamilton testified, and I agree, that as of June 29, 2000, there was an attorney client relationship established between Dorsey and the loan participants. He based this opinion on Paragraphs 4.8 (which permitted Miller & Schroeder to retain counsel for the loan participants as its agent) and 2.2 (which described Miller & Schroeder's position as one of agent) of the Participation Agreement. Miller & Schroeder was therefore the agent for a disclosed principal in connection with the retention and Dorsey knew of the agency relationship. See RESTATEMENT (SECOND) OF AGENCY § 4(1) (1958) ("If, at the time of a transaction conducted by an agent, the other party thereto has notice that the agent is acting for a principal and of the principal's identity, the principal is a disclosed principal."); RESTATEMENT (SECOND) OF AGENCY § 9.1 (1959) ("A person has notice of a fact if he knows the fact, has reason to know it, should know it, or has been given notification of it."); RESTATEMENT (THIRD) OF AGENCY § 6.01(2006) ("When an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal, (1) the principal and the third party are parties to the contract; and (2) the agent is not a party to the contract unless the agent and third party agree otherwise."); see also, RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 14, cmt. C. In reaching this conclusion he referred to numerous documents in evidence supporting the notion that Dorsey well understood that Miller & Schroeder was acting in an agency capacity, including Dorsey's knowledge of the terms of the participation agreements; the June 29, 2000, Thomas memorandum; Thomas' cover letter of that date; and Erickson's own memorandum covering both when they were sent to the loan participants. His opinion was further buttressed by the July 12, 2000 Thomas memorandum to Rolbiecki in which Thomas made clear that he had carefully read the participation agreement, indicating that Dorsey knew the nature of the arrangement. He found Thomas' statement in his July 12 memorandum to be a virtual restatement of Paragraph 4.8 of the Participation Agreement.

184

He further testified that a contract for retention could be implied from the conduct of the parties. A contract for retention can be based, in part, he said, on the reasonable and apparent expectations of the person or entity whose status as a client in question. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 14, cmt. F. Applying that test to the facts of this case, he found that it was a reasonable and apparent expectation of the loan participants that Dorsey had been engaged as their counsel to represent them in connection with the President litigation. Evidence supporting this conclusion included the Dornbos time line and the Dornbos memorandum to Thomas and Palmer assessing the litigation in the Spring of 2001, as well as Jensen's testimony that he believed Dorsey was representing Bremer, the many conference calls and memoranda in which Dorsey communicated with the loan participants as though they were Dorsey's clients and the several meetings that were attended by Dorsey and the loan participants where Dorsey purported to act as its counsel.

He found no significance in the fact that loan participants were not named, along with Miller & Schroeder, as a plaintiff in the President litigation. He viewed that as a "tactical call" which Dorsey and Miller & Schroeder were free to make on their own. According to Professor Hamilton, "the whole construct of the participation agreement is that Miller & Schroeder is the nominal lender of the agent so it seems to make common sense that they would be

the named party here to me." Tr. Vol. III, p. 29.[58]

He further opined, and I agree, that Dorsey violated MRPC 1.7(a) when, at a time when it was still representing Bremer as a loan participant in the President litigation, Dorsey agreed to represent Miller & Schroeder in the Bremer/Miller & Schroeder litigation. At that point, Dorsey was "on the opposite side of a current client in a closely related matter. It was representing Miller & Schroeder and the bank participants in the President R.C. matter and now it's on the opposite side of Bremer in the Bremer versus Miller & Schroeder action." Tr. Vol. III, p. 32. Based on the facts as they developed between June 29, 2000, and December 2000, Dorsey's defense of Miller & Schroeder in the Bremer/Miller & Schroeder litigation created an impermissible conflict under MRPC 1.7(a) because their interests were by that point demonstrably and openly adverse. Under the circumstances, Professor Hamilton said Dorsey had a duty to both clients to fully disclose the situation (including the potential serious deficiencies in its own work) and to seek informed consent from both. At the time, an oral consent after full disclosure from both clients would have been adequate, he said, although obtaining a written one would have been prudent. But, since Dorsey neither fully disclosed nor sought such consent from either of the clients, Dorsey should have never taken on the representation, and it should never have continued it.[59] I concur.

**58.** Dorsey's expert opined that no client relationship was established and that Dorsey was merely keeping Miller & Schroeder advised. His independence was successfully challenged and this opinion was seriously undermined during cross examination by counsel for the plaintiffs.

**59.** Dorsey's expert on this subject found no violation of MRPC 1.7(a), but his opinion was based on a mistaken assumption that an attorney client relationship had not been created in connection with the President litigation. He agreed that, if Bremer was a Dorsey client in the President litigation, Dorsey was in violation of MRPC 1.7(a) and had breached its fiduciary duty of loyalty to Bremer.

## B. MRPC 1.7(b) and 1.4

 MRPC 1.7(b) provides that "[a] lawyer shall not represent a client if the representation of that client may be materially limited by . . . the lawyer's own interests, unless: (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation." MINN. R. PROF. CONDUCT 1.7(b)(1) and (2). The Comment to this Rule states that, "[i]f the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice." MINN. R. PROF. CONDUCT 1.7 cmt. (Lawyer's Interests). MRPC 1.4 further requires that a lawyer keep a client reasonably informed about the matter so that the client can make intelligent decisions with respect to the representation. MINN. R. OF PROF. CONDUCT 1.4 (1993). " 'It is the undoubted duty of an attorney to communicate to his client whatever information he obtains that may affect the interests of his client in respect to the matters entrusted to him.' " *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.* 644 N.W.2d 72, 77 (Minn.2002) (*quoting Selover v. Hedwall,* 149 Minn. 302, 184 N.W. 180, 181 (1921)).

Professor Hamilton opined that the required disclosure under Rule 1.4 includes a full analysis of all potential claims, defenses, and strategies that the client may have, including discussing the potential for commencing a third party complaint and the potential for commencing a well-founded malpractice action. Where the lawyer's own self interest may be implicated there is an extra obligation to make sure that the client understands all the implications that might arise from such self interest and to advise the client to seek an outside independent opinion. The experts differed over how far the lawyer must go in disclosing to his own client the fact that the lawyer may have committed malpractice. Dorsey's expert opined, without benefit of citation to helpful authority, that a lawyer need only disclose facts, not causes of action. According to Professor Hamilton, however, in order to comply with MRPC 1.4 (duty of disclosure) and 1.7(b) (duty of loyalty), an attorney must disclose the existence of a nonfrivolous claim for malpractice so long as that claim could be made in good faith. *See* MINN. R. PROF. CONDUCT 3.1; FED. R. CIV. P. 11. While he found no Minnesota decisions directly on point, he did point to three Ethics Opinions from other states: New Jersey Ethics Opinion 694 ("The Rules of Professional Conduct require an attorney to notify the client that he or she may have a legal malpractice claim even if notification is against the attorney's own interest"); Wisconsin Ethics Opinion E–82–12 [60] ("[A]n attorney is obligated to inform his or her client that an omission has occurred which may constitute malpractice and that the client may have a claim against him or her for such omission"); and New York State Bar Association Opinion 734, 2000 WL 33347720 (N.Y. St. Bar Assn. Comm. Prof. Eth.2000) (an attorney "has an obligation to report to the client that it has made a significant error or omission that may give rise to a possible malpractice claim. In such a situation, the [law firm] will be required to withdraw as counsel if its continued representation would be adversely affected by its interest in avoiding civil liability."). He further pointed to *Circle Chevrolet Co. v. Giordano, Halleran & Ciesla,* in which the New Jersey Supreme Court stated that "[t]hus, an attorney who realizes he or she has made a mistake must immediately notify the client of the mistake as well as the client's right to obtain new counsel and sue

60. Available at www.wisbar.org.

the attorney for negligence." *Circle Chevrolet Co. v. Giordano, Halleran & Ciesla,* 142 N.J. 280, 662 A.2d 509, 514 (1995), *overruled on other grounds, Olds v. Donnelly,* 150 N.J. 424, 696 A.2d 633 (1997). Indeed, Dorsey's expert on this subject had published an article in which he said as much. See Charles E. Lundberg, *Self-Reporting Malpractice or Ethics Problems,* 60 BENCH & BAR 24 (2003) ("the attorney is under a duty to disclose any material matters bearing upon the representation and must impart to the client any information which affects the client's interests"); *see also,* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 20, cmt. c (a lawyer should inform the client of a conflict of interest; in addition, "If the lawyer's conduct of the matter gives the client a substantial malpractice claim against the lawyer, the lawyer must disclose that to the clients,"); *Matter of Discipline of Schmidt,* 402 N.W.2d 544, 550 (Minn.1987) ("the attorney has the affirmative obligation before taking a liability release from a client to advise the client of the client's right to seek other counsel and to advise the client as to the nature and existence of any potential claim."); *In re Tallon,* 86 A.D.2d 897, 447 N.Y.S.2d 50, 51 (1982) ("An attorney has a professional duty to promptly notify his client of his failure to act and of the possible claim his client may thus have against him.")

Having reviewed the evidence, Professor Hamilton found it "clear ... from the record that they knew they may have malpracticed." Tr. Vol. III p. 43. He made clear that the duty to disclose and advise both Miller & Schroeder and the loan participants to obtain separate counsel existed as early as June 2000 when Thomas and Rindels discussed the facts, although the problems began to come out into the open at the meeting in New York, and were further fleshed out with the allegations contained in the original draft of the Bremer/Miller & Schroeder litigation. He also noted that Thomas acknowledged the problems in his memorandum following the meeting with Winthrop & Weinstein in which, in particular, he stated that it would be good to keep the business away from Oppenheimer. In addition, Professor Hamilton had looked at an opinion of a former general counsel of the NIGC (Michael Cox) who had opined NIGC approval was necessary and at a memorandum prepared by Dewey Ballantine in July 2002 wherein, for four separate reasons, the firm opined that the approval was a requirement of enforceability of the Notice and Acknowledgment of Pledge.

Accordingly, in Professor Hamilton's opinion, Dorsey violated both MRPC 1.4 and 1.7(b) by failing to fully disclose, from June of 2000 forward, all of the facts relating to the potential claim for malpractice and not advising Miller & Schroeder and the loan participants to seek separate independent counsel to look at the question. The disclosure, he emphasized, would have to be complete, including all of the documentation and a full statement of how a decision was made, who participated in it, and what the impact of the facts might have on the on-going litigation. Under the circumstances Dorsey had an obligation, he said, and I agree, to tell Miller & Schroeder and the loan participants to seek independent counsel and at a minimum to tell them that it was very possible that they had a nonfrivolous potential claim against Dorsey. Having failed to make that disclosure, and failed to advise the clients to seek outside independent help, Dorsey was placed in a position of conflict beginning in June 2000 and continuing throughout these representations because it was reasonable to see that its representation could be materially limited by Dorsey's own self interest, and the

client had not consented after full disclosure.[61]

The MRPC do not require a client to prove that a conflict actually affects the eventual representation; but in this case, it surely did. *See* MINN. R. OF PROF. CONDUCT, 1.7(b) ("lawyer *shall* not represent a client if the representation ... *may* be materially limited"). The evidence here shows, however, that in fact Dorsey's counsel in the lawsuits was materially affected by its conflicted position of trying to repair its own malpractice while representing its clients.[62] Beginning with the Thomas memorandum of June 29, 2000 (Tab 85, Exhibit 81), Dorsey failed to provide the loan participants with the information they needed to make informed decisions. Dorsey named the Tribe as a defendant in the President action and then, for unexplained reasons, under suspicious circumstances, dropped the Tribe as a defendant when the potential errors in Dorsey's work began to come to light. Dorsey continued to insist with the loan participants and with Miller & Schroeder that the work it had done was unassailable, thus misleading them to pursue paths that made little sense. When Bremer sued, Dorsey told Miller & Schroeder the claim regarding the Notice and Acknowledgment of Pledge was unfounded. In the Spring of 2001, when Dombos told Thomas that they would have trouble in the Bremer case because Dorsey's transactional malpractice was at the heart of the transaction, Dorsey continued the representation, throughout which it stonewalled on document produc-

tion that would show its malpractice. On numerous occasions, when the loan participants, including Bremer, urged Dorsey to pursue the Tribe, Thomas advised that they should back off and try to negotiate. Most egregiously, when Bremer insisted that Miller & Schroeder consider polling the loan participants as to whether Dorsey should be sued, Dorsey stepped in and advised Miller & Schroeder that would not be wise. This was not just a situation where the law firm was giving bad legal advice. A malpractice case, of course, should not rest on a court second-guessing litigation tactics. *See, e.g., Noske v. Friedberg*, 713 N.W.2d 866 (Minn.App.2006) ("[A] client cannot prevail on a legal-malpractice claim based on a lawyer's failure to pursue a particular strategy.") (citing *Dziubak v. Mott*, 503 N.W.2d 771, 776 (Minn.1993)); *Wartnick v. Moss Barnett*, 490 N.W.2d 108, 113 (Minn.1992); *Glenna v. Sullivan*, 310 Minn. 162, 245 N.W.2d 869, 873 n. 3 (1976) (jury should not be allowed to second-guess the attorney on questions of professional judgment and trial tactics which arise every day in every lawsuit). See also, *Wagenmann v. Adams*, 829 F.2d 196, 220 (1st Cir.1987) ("attorney's choice of trial tactics does not subject him or her to malpractice liability"). This was a case where the advice was arguably bad, but certainly conflicted. Having placed itself in that conflict situation, this court is entitled to draw reasonable inferences against the law firm regarding its intentions during the representation.

**61.** Dorsey's expert testified that there was no violation of MRPC 1.7(b) and 1.4, because the clients knew about the email string, and disclosure of facts, not causes of action, is all that is required. I simply considered Professor Hamilton more credible on this subject, for multiple reasons, including Mr. Lundberg's having rendered an opinion that the loan participants were not clients of Dorsey in

the President litigation, which I believe is close to a specious position.

**62.** Claims repair is a term of art in the professional malpractice arena. It covers actions an insurer or its insured undertake to fix a problem and diminish the damages. The problem with this claims repair was no one told the clients it was happening.

### C. Waiver

█ Dorsey never sought or obtained consent from either Bremer or from Miller & Schroeder and never advised them to seek an independent opinion. In fact, by keeping the cases in-house Dorsey kept the clients from doing so. Dorsey argues that Bremer and Miller & Schroeder waived the conflict because both were aware of the email string, Miller & Schroeder as early as February 1999 and Bremer as early as September 2000, and both merely allowed the dual and conflicted representations to proceed. However, Dorsey misconstrues the law with respect to consent.

█ Consent means, if not at the time a written consent, at least that both clients' agreed to such representation after a full disclosure of the pertinent facts.

[T]he standard for such waiver is whether the waiver of conflict was given after consultation and full disclosure of the potential risks; in order for informed consent to be valid, a lawyer must prove by clear proof that his adverse interest was disclosed to the client and was perfectly understood; such consent must be knowing, intelligent, and voluntary.

*Briggs v. LaBarge (In re McGregory)*, 340 B.R. 915, 922 n. 20 (8th Cir. BAP 2006) (*citing State ex rel. Nixon v. American Tobacco Co.*, 34 S.W.3d 122, 135 (Mo. 2001)).[63] Consent cannot be inferred in this case from the failure of either Bremer or Miller & Schroeder to object to Dorsey's representation in either case because Dorsey failed to make the full disclosure (or indeed any disclosure) of all the pertinent facts. It is undisputed that Dorsey never said to Miller & Schroeder or Bremer, "we have analyzed this transaction and

there is a good chance you have a cause of action against us." In addition, Dorsey never sought or obtained written or oral waivers of these conflicts. The clients could not waive a conflict because they were never asked to and because they did not have all the facts before them (by reason of Dorsey's nondisclosures). Dorsey never referred to independent counsel for an independent position and, as Dorsey's expert acknowledged, it was not Miller & Schroeder's, Bremer's, or Bremer's counsel's obligation to ferret out the conflict. That was Dorsey's obligation. Moreover, Bremer at points did ask that Dorsey be removed from the President litigation and, on the advice of Dorsey, that request was ignored. Bremer did not have enough votes to compel removal.

█ Similar to consent, waiver involves the "voluntary relinquishment of a known right whose essential elements are both intent and knowledge, actual or constructive." *Meagher v. Kavli*, 251 Minn. 477, 486, 88 N.W.2d 871, 878 (Minn.1958); *see also, Ill. Farmers Ins. Co. v. Glass Serv. Co.*, 683 N.W.2d 792, 798 (Minn.2004) (waiver is the "voluntary and intentional relinquishment of a known right"). Dorsey, by alleging that Bremer and Miller & Schroeder either consented or waived any conflict, must provide evidence that Bremer and Miller & Schroeder had both knowledge of the specific right and the intention to waive the right. *Id.* Waiver must be based on more than course-of-dealing evidence and must show an intentional relinquishment of the known right on the disclosed facts. *Citizens Nat'l Bank of Madelia v. Mankato Implement Inc.*, 441 N.W.2d 483, 487 (Minn.1989). Since Dorsey never disclosed its own malpractice, or

---

**63.** MRPC 1.7(a) and the Missouri Rule of Professional Conduct 4–1.8(f)(1998) at issue in *Nixon* both mirrored the Model Rules of Professional Conduct. *See also, Pritchett v.*

*Clifton*, 738 F.2d 319, 320 (8th Cir.1984) (similar state statutes may be compared for the purpose of statutory construction).

even admitted the possibility of a mistake in legal judgment, or of a potential conflict, and in fact steered the clients away from considering such action, any waiver by Miller & Schroeder, Marshall or by Bremer could not have been an "intentional relinquishment of a known right" making any waiver ineffective.

### D. Dorsey Breached its Fiduciary Duties of Loyalty and Full Disclosure

In *Rice v. Perl,* 320 N.W.2d 407 (Minn.1982), the Minnesota Supreme Court said that an attorney has a fiduciary duty to the attorney's client. There are essentially three elements of that fiduciary duty; to represent the client with undivided loyalty; to preserve client's confidence; and to disclose any material matters bearing on the representation. *Id.* at 410. *Rice* states that a client is reasonably entitled to receive such information before making a major decision in the case, such as settlement. *Id.* at 411. *Rice* relies on the general common law of fiduciary duty.

The Court's Rules of Conduct governing attorneys can be used as a guide and to provide case law for analyzing an attorney's conduct. *See* RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 1, cmt. b ("...courts have held that lawyer-code provisions may be relevant in determining... a lawyer's fiduciary duty to a client..." and "[t]he lawyer codes and much general law remain complimentary.") Similarly, comment c to Section 37 of the Restatement, regarding fee disgorgement, notes that fee forfeiture results from a lawyer's serious violation of a duty owed to a client and that the source of that duty may be the "applicable lawyer code." RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 37, cmt. c.

In this case, Professor Hamilton opined, and I concur, that Dorsey breached the duty of loyalty and the duty of full disclosure, which are part of the common law of fiduciary obligations. These same fiduciary duties are articulated in MINN. R. OF PROF. CONDUCT 1.4, 1.7(a) and 1.7(b), and Dorsey's violation of these Rules informs this conclusion.

### E. Disgorgement

Section 49 of the Restatement (Third) of Law Governing Lawyers provides that a lawyer is civilly liable to the client if the lawyer breaches a fiduciary duty to the client set forth in § 16(3). RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS §§ 16(3), 49. These duties include the duty to inform the client under § 20 of the Restatement and the duties to avoid impermissible conflicting interest. *Id.;* RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS, § 20(1). In *Rice,* the Minnesota Supreme Court said, "[t]his court has repeatedly stated that an attorney (or any fiduciary) who breaches his duty to his client forfeits his rights to compensation." *Rice,* 320 N.W.2d at 411; *see also, In re Kiernat,* 338 B.R. 809, 814 (D.Minn.2006) (under Minnesota law, a violation of fiduciary duty can result in the forfeiture of compensation otherwise due to the fiduciary) (*citing Bolander v. Bolander,* 703 N.W.2d 529 (Minn.Ct.App.2005)). When a fiduciary engages in "actual fraud or bad faith towards the trust or its beneficiaries in the matter of his employer, he is not entitled to any pay for his services." *Gilchrist v. Perl,* 387 N.W.2d 412, 414 (Minn. 1986). As recognized in *In re Estate of Lee's*:

> It is ... well settled that an attorney at law who is unfaithful in the performance of his duties forfeits his right to compensation. An attorney is an officer of the court, sworn to aid in the administration of justice and to act with strict fidelity to both the clients and the courts. Un-

questioned fidelity to their real interests is the duty of every attorney to his clients. When a breach of faith occurs, the attorney's right to compensation is gone. *In re Lee's,* 9 N.W.2d 245, 251 (1943). In *Rice* the court said,

> ... the law has traditionally been unyielding in its assessment of penalties when a fiduciary or trustee, or agent has breached any of his obligations. The underlying policy is a strong one. It recognizes that insuring absolute fidelity to the principal's or beneficiary's interests is fundamental to establishing the trust necessary to the proper functioning of these relationships.

*Rice,* 320 N.W.2d at 411. "Minnesota law is clear that the penalty for the breach of fiduciary duty is the loss of the right to any compensation based on that duty." *Kiernat,* 338 B.R. at 816.

Professor Hamilton testified that, under *Lee, Rice,* and *Gilchrist,* disgorgement is appropriate if there is a blatant conflict of interest constituting a lack of good faith, on the attorney's part, or, if the breach was unaccompanied by intentional wrongdoing or actual fraud, if there is constructive fraud. *See* RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 37 ("Lawyer engaging in clear and serious violation of duty to client may be required to forfeit some or all of the lawyer's compensation."). In his view, and I agree, Dorsey's actions constituted a blatant conflict of interest and disgorgement is appropriate in this case. Dorsey violated multiple provisions of the MRPC including: §§ 1.4, 1.7(a), and 1.7(b). As a fiduciary it failed to disclose a most basic piece of information; that the loan participants and Miller & Schroeder had a very substantial claim to be made that Dorsey was responsible to them for a full recovery. As Professor Hamilton opined, the failure to disclose,

which resulted in the continuing representation, went on for years. The conflict was patent. It damaged the clients because it engaged them in expensive (one might say outrageously expensive) litigation which should never have had to happen, not the way it did. For several years Dorsey charged its clients for legal work which was in large measure directed at protecting Dorsey's own malpractice. It is only right that Dorsey reimburse the clients for their having paid for Dorsey's conflicted representation.

According to Professor Hamilton, Dorsey's argument that disgorgement is inappropriate because the conflicted representation actually produced results (the "no harm/no foul" defense) has no merit, and I agree. Dorsey's conflicted representation in the President litigation produced a large judgment against a judgment proof defendant and when it was sold to the Tribe the loan participants were not made whole. The focus in these matters, Professor Hamilton opined, must be on the intent of the lawyer at the commencement of the engagement, not on whether the lawyer is able to eek out a somewhat satisfactory result. Here, for example, through Dorsey's representation the loan participants took a less than full settlement and gave up rights against parties that could have helped them in this litigation. As Professor Hamilton noted, the ethics rules should not reward a lawyer who violates the Code and his fiduciary duties to the client, then represents that client in settlement negotiations that result in less than a complete recovery, and turns around and argues that the lawyer has salvaged something out of his own fiduciary lapses.

One final point. Dorsey's expert opined that a blatant violation of multiple rules of professional responsibility is not enough and that disgorgement is only appropriate if the attorney acted with fraudulent or ill-

intent. If that is the correct standard, and I doubt that it is, Dorsey's conduct meets that test. Dorsey withheld information from its clients, amounting to a material nondisclosure. It did so to protect itself. These activities support a finding of ill-intent, bad faith and intentional non-disclosure of material facts

### F. Marshall Investments' Claim— Breach of Fiduciary Duty

▮ In addition, Dorsey argues that the above analysis should not apply to Marshall because Marshall did not exist at the time of the commencement of the Bremer/Miller & Schroeder litigation and that no privity of contract or attorney-client relationship existed between Marshall and Dorsey. Marshall responded, citing *Cerberus Partners, L.P. v. Gadsby & Hannah*, 728 A.2d 1057 (R.I.1999), that when Marshall entered into the Subservicing Agreement for St. Regis I and II, that Marshall, as assignee acquired any legal malpractice action Dorsey possessed by Miller & Schroeder. These arguments ignore the reality of the transaction. Marshall did not acquire a malpractice claim against Dorsey by assignment, nor does Marshall allege malpractice. When Marshall purchased essentially all of the assets of Miller & Schroeder, Marshall and Miller & Schroeder entered into subservicing agreements for both St. Regis I and II as allowed by the Participation Agreements. Dorsey was aware of the sale of Miller & Schroeder's assets and of obligations acquired by Marshall under the subservicing agreement. Marshall's rights against Dorsey did not arise from the assignment of Miller & Schroeder's servicing responsibilities under the Participation Agreement. *See* Exhibit BBB, Section 4(3). Marshall's right to seek disgorgement of Dorsey's fees is the result of Dorsey's continuation as Marshall's counsel after the assignment. Once Marshall became responsible for overseeing the litigation as part of its obligation as servicer of the loans, it could have replaced counsel or Dorsey could have refused to continue as counsel in the litigation. Instead, the parties maintained the status quo and Dorsey then continued with its representation of the bank participants in the President Litigation, and Marshall as the new real party in interest in the Bremer litigation.

Since Dorsey's obligation to disclose material facts did not cease at the point of the initial breach because its conflict was ongoing, its obligation of disclosure was also ongoing. *See, for example, Int'l Broth. of Painters and Allied Trades Union & Industry Pension Fund v. Duval*, 925 F.Supp. 815, 823 –824 (D.D.C.1996) (immediately upon becoming a fiduciary, the fiduciary is obligated to disclose the extant state of affairs ... including disclosure of material omissions or misrepresentations); *McDougall v. Donovan*, 552 F.Supp. 1206, 1210 (N.D.Ill.1982) (ongoing breach of fiduciary duty may exist for acts that occurred prior to fiduciary status, because of breach's continuing nature). As a result, Marshall is not attempting to disgorge fees Miller & Schroeder paid to Dorsey, but fees it paid directly to Dorsey as part of its obligations under the subservicing agreement, and which Dorsey accepted. The analysis of the fiduciary duty that Dorsey owed to Marshall is, therefore, no different than that owed to Miller & Schroeder. In the present case, the facts support Marshall asserting a claim for disgorgement on the same basis as Miller & Schroeder.

### G. Judicial Estoppel

▮ And finally, Dorsey argues that the trustee should be judicially estopped from alleging that Dorsey was obligated to disclose its malpractice because Miller & Schroeder adopted the position that NIGC approval was not required in

its litigation against the Tribe.[64] Judicial estoppel, however, is not applicable under these facts for multiple reasons.

> Judicial estoppel prevents a party that has taken one position in litigating a particular set of facts from later reversing its position when it is to its advantage to do so. It is intended to protect the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories. Although the doctrine is not reducible to a pat formula, we have recognized certain boundaries. First, the later position must clearly be inconsistent with the earlier position. Also, the facts at issue should be the same in both cases. Finally, the party to be estopped must have convinced the first court to adopt its position; a litigant is not forever bound to a losing argument.

*Bauer v. Blackduck Ambulance Ass'n. Inc.*, 614 N.W.2d 747, 750 (Minn.Ct.App. 2000). Neither Miller & Schroeder, Bremer, nor Marshall convinced another court to adopt the position that NIGC approval of the Pledge Agreement was not required. Since no court has ever adopted that position, judicial estoppel does not apply in this case. In addition, the position taken by the Miller & Schroeder, upon the advice of Dorsey, that NIGC approval was not required was most certainly a losing argument and one to which the trustee and Marshall should not be bound. Finally, judicial estoppel is an equitable remedy, and Dorsey is in no position to seek equity. *See, e.g., Pine Island Farmers Coop*, 649 N.W.2d at 446 (Minn.2002) (a party with unclean hands is barred from seeking recourse in equity); *Fred O. Watson Co. v. U.S. Life Ins. Co.*, 258 N.W.2d 776, 778 (Minn.1977) ("one who comes into equity must come with clean hands"); *Johnson v.*

*Freberg*, 178 Minn. 594, 228 N.W. 159 (1929) (same),

H. Prejudgment Interest

▮ The Trustee and Marshall are also entitled to prejudgment interest pursuant to Minnesota Statute § 549.09 since disgorgement is not considered a "punitive damages, fines, or other damages that are noncompensatory in nature." MINN. STAT. § 549.09 subd. 1(b)(3). In *Perl v. St. Paul Fire & Marine*, the Minnesota Supreme Court held that although disgorgement is a form of punishment, it is considered "money damages" and not punitive damages. Although a court may consider the factors contained within the punitive damage statute, *see* Minnesota Statute § 549.20, as when determining the amount of the disgorgement, the disgorgement judgment is for the recovery of money.

> While a forfeiture may punish, the aim is to make amends to the client-to "put right" the attorney-client relationship that has been tainted. Forfeiture of a fee may occur irrespective of the intent and motives of the attorney, punitive damages, however, require a willful indifference to the rights of others. The outer limits of a fee forfeiture cannot exceed the amount of the earned fee; the outer limits of a punitive damages award, on the other hand, have no fixed boundary.

*Perl v. St. Paul Fire and Marine Ins. Co.*, 345 N.W.2d 209, 214 (Minn.1984). Therefore, the Trustee and Marshall are entitled to receive prejudgment interest from October 3, 2003, the date of commencement of their case, on the amount of fees disgorged.

---

**64.** It did so, of course, on the advice of its conflicted attorney.

## ORDER FOR JUDGMENT

ACCORDINGLY, IT IS HEREBY ORDERED IN CASE NUMBER 03–4291 THAT:

1. Trustee have judgment against Dorsey on Count IV for $836,344.32 (calculated by adding the attorney's fees and expenses Miller & Schroeder paid Dorsey in the Bremer/Miller & Schroeder litigation ($550,499.60) and the attorney's fees and expenses Miller & Schroeder paid Dorsey in the President litigation ($285,844.72), and prejudgment interest on said sum at the rate as calculated pursuant to Minnesota Statute § 549.09, commencing on October 3, 2003, and concluding on the date of entry of judgment. The award is subject to the Trustee's obligation to reimburse the loan participants, including Bremer, for the amount each paid Miller & Schroeder for said attorney's fees).

2. Marshall have judgment against Dorsey on Count IV for $51,099.88 (calculated by adding the attorney's fees and expenses Marshall paid Dorsey in the Bremer/Miller & Schroeder litigation ($45,916.29) and the attorney's fees and expenses Marshall paid Dorsey in the President litigation ($5,183,59), and prejudgment interest on said sum as calculated by Minnesota Statute § 549.09 commencing on October 3, 2003, and concluding on the date of entry of judgment).

ACCORDINGLY, IT IS HEREBY RECOMMENDED IN CASE NUMBER 05–4051 THAT:

1. Bremer have judgment against Dorsey on Counts I and III of Case Number 05–4051 for $1,759,000.00 (calculated by adding the original $2,000,000 investment and the $409,000 in fees and expenses incurred in pursuing the Bremer/Miller & Schroeder action and subtracting the $650,000 received in the settlement with the Tribe), and prejudgment interest on said sum as calculated pursuant to Minnesota Statute § 549.09 commencing on February 23, 2005, and concluding on the date of entry of judgment.

2. Dorsey have judgment dismissing Count II of the Complaint in Case Number 05–4051.

3. Count IV of the Complaint in Case Number 05–4051 be dismissed as moot.

LET JUDGMENT BE ENTERED ACCORDINGLY as to Count IV of the Complaint in Case No. 03–4291, and with respect to Counts I through IV of the Complaint in Case No. 05–4051, let this Report and Recommendation be delivered to the District Court as a Report and Recommendation for Entry of Judgment.